ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
*Bid Protest*

| | |
|---|---|
| SHIRLINGTON LIMOUSINE & TRANSPORTATION, INC.<br>717 D Street, N.W., Suite 300<br>Washington, D.C. 20004<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES<br>SERVE:<br>Attorney in Charge of Litigation<br>U.S. Department of Justice<br>Civil Division<br>Commercial Litigation Branch<br>1100 L St., N.W., 8th Floor<br>Washington, D.C. 20530<br><br>Defendant. | FILED<br>APR 4 2007<br>U.S. COURT OF FEDERAL CLAIMS<br><br>07-220 C |

**COMPLAINT FOR PRELIMINARY INJUNCTION, PERMANENT INJUNCTION AND DECLARATORY JUDGMENT**

COMES NOW, Shirlington Limousine & Transportation, Inc. ("Shirlington"), through its undersigned attorneys, and files this Complaint for Preliminary Injunction, Permanent Injunction and Declaratory Judgment.

**JURISDICTION AND FACTUAL BACKGROUND**

1. Jurisdiction is based upon 28 U.S.C. §§ 1491(b)(1) and (b)(2).

2. On November 20, 2006, the U.S. Department of Homeland Security ("DHS") issued Solicitation Number HSHQDC-07-R-00009 (the "Solicitation") as a request for proposals set aside for competition among small businesses. Under the Solicitation, DHS intended to award multiple, fixed unit price, indefinite quantity/indefinite delivery contracts for providing shuttle

bus and sedan transportation services to DHS employees within the District of Columbia and surrounding areas. In addition, the Solicitation requires the contractor to provide, maintain, secure and store the vehicles used to perform the contract.[1]

3. On or about December 7, 2006, Shirlington filed a protest with the United States Government Accountability Office ("GAO") on the basis that the Solicitation violates the terms of the Historically Underutilized Business Zone ("HUBZone") Act, 15 U.S.C. § 657a and Federal Acquisition Regulation ("FAR") § 19.1305 by failing to restrict competition to HUBZone small business concerns. (Exhibit 1). The United States Small Business Administration ("SBA") asked to review and provide comments on the protest, and did so via facsimile on January 22, 2007. (Exhibit 2)[2]. By decision dated March 13, 2007, GAO denied Shirlington's protest. (Exhibit 3).

4. In response to this protest, DHS submitted its Agency Record, which stated that Shirlington had not submitted a proposal in response to the Solicitation. Shirlington, upon

---

[1] The contract to be awarded under the Solicitation is for many of the same services as an existing contract that Shirlington currently has with DHS (the "Existing Contract"). The Existing Contract was originally awarded on October 25, 2005 as a one year contract with four (4) one year options. DHS has since modified the contract and Shirlington began performing a 9-month option period, called Option 1A, on October 27, 2006. Option period 1A ends on July 26, 2007 and potentially will be followed by an additional 3-month option period, Option 1B.

[2] Although the Comments provided by SBA contain a protective legend across the bottom of each page, SBA was not admitted to the protective order governing the GAO protests and no portion of its contents were designated to be "confidential" as required under the Protective Order. Furthermore, by its terms the Protective Order mandates that any party claiming protection "must clearly identify the specific portion of the material for which it is claiming protection." It also provides: "Wherever such protection is claimed . . . the party filing the pleading shall submit a proposed redacted version for public release when the protected version is filed." Neither was done in this case. Counsel for the plaintiff is aware that counsel for DHS wanted to withhold certain figures and names of companies in its filings with GAO; however, none of those names or figures appear in the SBA filing. Despite repeated attempts to obtain a version of the SBA comments without the protective legend, counsel has been informed by SBA

further investigation, timely filed a second protest on January 19, 2007 alleging that DHS erred in failing to accept its proposal. (Exhibit 4)[3]. By decision dated March 30, 2007, GAO denied Shirlington's second protest. (Exhibit 5).

5. DHS has not made a contract award under the Solicitation. Justice Department counsel, Kenneth Woodrow, informed Shirlington's counsel by telephone on April 4, 2007 that now award will be made by DHS until the Court has an opportunity to rule on the merits of this case, assuming the Court acts expeditiously.

6. Shirlington is a certified HUBZone small business concern. The United States Court of Federal Claims has succinctly summarized the history of the program for Historically Underutilized Businesses, in which Shirlington participates:

> In 1997 Congress passed the Historically Underutilized Business Zone ("HUBZone") Act . . . The Act established the HUBZone program, the purpose of which "is to provide Federal contracting assistance for qualified small business concerns located in historically underutilized business zones, in an effort to increase employment opportunities, investment, and economic development in those areas." The Small Business Administration ("SBA") is responsible for certifying qualified firms as HUBZone small business concerns . . . Once a firm is HUBZone certified and its name appears on the SBA's List of Qualified HUBZone Small Business Concerns, the firm is eligible for HUBZone preferences.

*J & H Reinforcing & Structural Erectors, Inc. v. United States*, 50 Fed. Cl. 570, 571 (2001) (citations omitted). Under this program, Shirlington has had the opportunity to flourish as a business when doing so might otherwise not have been possible. Due to its significance in promoting prosperity of small businesses from historically underutilized areas, it is

---

that it considers the fact that DHS did not object within two days under the Protective Order means that its original version is now public in any event.

[3] A copy of Shirlington's protest has been appended to this Complaint as Exhibit 4. Please note that Protest Exhibit A, Shirlington's proposal in response to the Solicitation, has been removed to protect the Plaintiff's confidential information. A copy can be provided to the Court upon request.

Congressionally mandated that federal agencies implement the HUBZone program to the maximum extent practicable.

7. When contracting for goods and services DHS must comply with the provisions of the HUBZone Act ("Act") as implemented in FAR § 19.1305. The Act specifically states that a "contract opportunity *shall* be awarded . . . on the basis of competition restricted to qualified HUBZone small business concerns" where certain requirements are met. 15 U.S.C. § 657a(b)(2) (emphasis supplied). Any federal agency, including DHS, must set aside an acquisition for competition among HUBZone small business concerns where the contracting officer has a "reasonable expectation that (1) Offers will be received from two or more HUBZone small business concerns; and (2) Award will be made at a fair market price." FAR § 19.1305(a), (b); 15 U.S.C. § 657a(b)(2).

8. "A regulation must be interpreted to harmonize with and further and not conflict with the objective of the statute it implements." MCS Portable Restroom Serv., B-299291 at 5, quoting *Trustees of Indiana Univ. v. United States*, 618 F.2d 736, 739 (Ct. Cl. 1980). The plain meaning and intent of the HUBZone Act is that all solicitations meeting these requirements *must* be set-aside. The FAR regulation is consistent with the SBA statutory and regulatory language and articulates a similar mandatory requirement.

9. Federal courts such as the United States Court of Appeals for the Ninth Circuit have recognized that the use of the word "shall" confirms the mandatory nature of HUBZone set-asides. *See Contract Mgmt., Inc. v. Rumsfeld*, 291 F.Supp. 2d 1166, 1173, (9th Cir. 2003), *aff'd* 434 F.3d 1145, 1147 (9th Cir. 2006). It has stated, "The HUBZone Program . . . commands in unequivocal terms that a contract opportunity be designated as a HUBZone set-aside when" certain requirements are met. *Id.* at 1147.

10. This is consistent with FAR § 19.1305(a), (b) and interpretations offered by GAO, which has used equally "unequivocal" terms as to the mandatory nature of the program. *See* MCS Portable Restroom Serv., B-299291, March 28, 2007, 2007 CPD ¶ * at 4 ("We acknowledge that, unlike the HUBZone and small business set-aside programs, which generally *require* set-asides if two or more HUBZone concerns or small-business concerns are interested in submitting offers and award is expected to be made at a fair market price, *see* FAR sections 19.502-1, 19.1305, the decision to make a S[ervice] D[isabled] V[eteran]-O[wned] S[mall] B[usiness] C[oncern] set-aside is discretionary with the contracting officer") (emphasis supplied); SWR, Inc., B-294266, Oct. 6, 2004, 2004 CPD ¶ 219 ("Acquisitions *must* be set aside for HUBZone small business concerns if the agency determines that" the requirements of FAR § 19.1305 are fulfilled) (emphasis supplied); Professional Landscape Management Services, Inc., B-287728.2, Nov. 2, 2001, 2001 CPD ¶ 180 ("In light of the *requirement* at [FAR] 19.1305(a) and (b), that contracting agencies set aside for HUBZone small businesses all procurements exceeding $100,000. . .") (emphasis supplied); Intermark, Inc., B-290925, Oct. 23, 2002, 2002 CPD ¶ 180 (discussing the difference between set asides that an agency "shall" – i.e., must – implement, versus those agencies "may" implement); Saturn Landscape Plus, Inc., B-297450.3, April 18, 2006, 2006 CPD ¶ 70 (The FAR "*requires* agencies to set aside for HUBZone firms any acquisition exceeding the simplified acquisition threshold" where the requirements of FAR § 19.1305 are met) (emphasis supplied).

11. This is, however, an issue of first impression before the United States Court of Federal Claims. While there have been Court of Federal Claims cases addressing whether a company was, in fact, properly certified to be a HUBZone Small Business Concern, and addressing whether the 10% HUBZone Price Evaluation Preference ("PEP") should be applied,

this is the first case which squarely addresses the circumstances in which the "rule of 2" has been addressed. There are over 14,000 HUBZone small business concerns now certified by the SBA, so the decision in this case will have major, widespread implications.

**COUNT I**

**(DHS Determined Not to Set-Aside the Solicitation for HUBZone Small Business Concerns in Violation of Statute and Regulation)**

12. The allegations contained in paragraphs 1 through 11 above are re-alleged and incorporated herein by reference.

13. DHS' decision not to set aside the Solicitation for HUBZone small business concerns was arbitrary, capricious, and not in accordance with the law and regulation. Pursuant to the HUBZone Act and FAR § 19.1305(a), (b), an agency "must make reasonable efforts to ascertain whether it will receive offers from at least two HUBZone small business concerns with the capability to perform the work." DHS' efforts and analysis of whether it would receive two or more offers from HUBZone small business concerns were unreasonable, and therefore contrary to law and regulations.

14. In particular, DHS erred when it conducted limited and flawed market research prior to issuing the Solicitation. DHS also erred in its analysis of the results of this research, causing it to incorrectly conclude that it could not reasonably expect to receive offers from two or more HUBZone small business concerns.

**A. DHS Conducted Limited and Flawed Market Research Prior to Issuing the Solicitation**

15. DHS' market research was insufficient to support its decision not to set aside the Solicitation for HUBZone small businesses because it both failed to consult appropriate online

databases to locate potential HUBZone offerors, and because it prematurely eliminated potential offerors on the basis of criteria not articulated in the contract.

16. First, DHS erred when it failed to consult the pertinent online databases to identify all potential HUBZone offerors.

17. Pursuant to FAR § 13.102, a contracting officer should consult the Central Contractor Registration database as its "primary source[] of vendor information." The CCR is the database where any company seeking a government contract must be registered, and it is the tool used for researching all small businesses, including HUBZone businesses. Here, DHS did not consult the CCR to identify potential HUBZone offerors.

18. Had it done so, it would have discovered a total of 21 active and distinct SBA-Certified HUBZone companies listed under the applicable North America Industry Classification System ("NAICS") codes, 485999 and 485320. (Exhibit 6).

19. The abundance of eligible HUBZone offerors weighs heavily against DHS' determination that this Solicitation should not have been set aside in accordance with FAR § 19.1305. This error is even more glaring given that 3 of the eligible firms listed under these NAICS codes are located in the District of Columbia, where the contract is to be performed.

20. SBA also operates its own database, PRO-NET, which provides information regarding more than 195,000 small, disadvantaged, Section 8(a), HUBZone, veteran owned, service disabled veteran owned and women-owned businesses. SBA recently merged the CCR and PRO-NET into a new database, the Dynamic Small Business Search. DHS did not consult this database to investigate and locate any and all potential HUBZone offerors. Thus, DHS' limited research was woefully inadequate for the purposes of determining whether a HUBZone set-aside was required.

21. DHS also improperly used access to a Defense Industrial Security Clearance Office ("DISCO") facility as a prerequisite in assessing the capabilities of potential vendors, when that requirement does not even appear in the Solicitation.

22. On June 23, 2006, DHS posted on the FedBizOpps website a Request for Information ("RFI") to determine vendors' interest in the Solicitation. The RFI requested that any interested firm "submit a capability package" outlining its qualifications to perform the contract. The RFI did not notify potential offerors of any specific security requirements applicable to the vehicle-storage facilities required under the contract. Rather, the RFI described the facility requirement as follows: "The determination as to whether or not it is practicable or feasible to use contractor proposed storage space or a particular type of storage space at a particular location shall be made by the Department of Homeland Security after considering the nature of program demands and special requirements at that location." RFI06-23-03 (Exhibit 7).

23. On October 10, 2006, DHS issued an amendment to the RFI announcing a substantial change to the proposed Solicitation, adding a requirement that the contractor have a DISCO cleared vehicle-storage facility. The contractor's capability of meeting this requirement was to be assessed *at time of award* (emphasis supplied). According to DHS, the purpose of the RFI was "for informational purposes ONLY," meaning that no response was required, and, to the best of Shirlington's knowledge, DHS received no responses. RFI062306AMENDMENT01 (Exhibit 8).

24. On November 20, 2006, DHS posted the contested Solicitation. Shirlington has searched in vain for any references in the Solicitation itself mandating that the vehicle-storage facilities be DISCO-cleared. Thus, under the Solicitation, DISCO clearance is not required.

However, DHS looked to this qualification in making its determination that there were not two or more qualified HUBZone small businesses. This was a major error.

### B. DHS's Market Research was Insufficient to Support its Decision Not to Set the Procurement Aside for HUBZone Small Businesses

25. DHS also erred in its analysis of this limited and flawed research because the results of the June 2006 RFI did not provide sufficient facts to support DHS' decision not to set aside the procurement. These results did not necessarily represent all offerors, HUBZone or otherwise.

26. On its face, response to the June 2006 RFI was not mandatory. In other words, failure to submit a voluntary response to the June 2006 RFI did not preclude any business from submitting a proposal under the Solicitation. Therefore, interested firms, including HUBZone businesses, may have chosen not to submit a response to the June 2006 RFI, for any reason. The results of the RFI do not necessarily determine the entire universe of potential offerors as of June 2006. For this reason, DHS' reliance on the RFI responses in declining to use a HUBZone set-aside was unreasonable. Indeed, Shirlington, as the incumbent contractor, was told by a DHS contracting officer that Shirlington need not respond to the June 2006 RFI, as DHS was already aware of Shirlington. Had Shirlington complied with this suggestion, it would have reduced the number of HUBZone responders to the June 2006 RFI.

27. Moreover, the June 2006 RFI preceded issuance of the Solicitation by five entire months. During those five months, new HUBZone businesses may have become interested in submitting an offer under the Solicitation. Indeed, upon issuance of the Solicitation, even more HUBZone firms might have become interested had competition been properly set aside for such businesses. This failure renders DHS' market research inadequate and its failure to set-aside illegal.

28. DHS also improperly assessed the June 2006 RFI responders' capabilities to perform the contract. Pursuant to the FAR, analysis of a prospective contractor's ability to supply the equipment and facilities required by a contract is appropriate only with respect to the determination of contractor responsibility, an inquiry that is made after source selection but just before award. *See* FAR § 9.104-1(f). At the pre-solicitation stage, the determination of capability cannot be the same standard as the capability requirement in FAR § 9.104-1.

29. Additionally, a firm's ability to provide a DISCO-cleared facility was to be assessed at the time the contract *was awarded* (emphasis supplied). Security clearance was not to be a condition precedent to the submission of an offer. Rather, a business submitting a proposal under the solicitation could provide proof of its ability to satisfy the security clearance requirement any time prior to performance of work under the contract. Moreover, the security clearance requirement is more akin to a question of bidder responsibility. As such, a business could have submitted a proposal under a solicitation without having the requisite security clearance, because its lack thereof would be curable after the bids were opened.

30. Thus, DHS erred in relying on the results of the June 2006 RFI to determine that there would not be two or more qualified HUBZone offerors. Any capability determination done by DHS was premature and patently erroneous, since DISCO facility clearance could have been acquired up to and even after submission of proposals in December 2006.

31. DHS' assessment also failed to take into account that HUBZone firms could, in fact, come up with innovative proposals to meet the security requirements of the Solicitation. DHS' error is especially glaring in light of the fact that Shirlington is prepared to meet facility the requirements as outlined in the Solicitation. This fact alone is enough to conclude DHS' justifications for failing to use a HUBZone set-aside are founded upon insufficient information.

32. Finally, any reliance on prior procurement history to support a decision not to set aside the Solicitation for a HUBZone small business concern was also inappropriate. While it may be true that DHS has received very few HUBZone proposals under prior DHS solicitations, DHS cannot rely on this fact alone to support its failure to use a HUBZone set-aside here. Indeed, the Existing Contract between Shirlington and DHS was awarded as a HUBZone set-side contract.

33. Significant amounts of time separate the previous procurements and the one currently at issue. Because of its failure to consult resources such as the CCR for potential offerors, DHS has absolutely no knowledge regarding the state of HUBZone business in the relevant NAICS codes today. Absent such an analysis, DHS clearly did insufficient market research and, just as importantly, failed adequately to document the reasons for its decision.

34. In fact, over 20 HUBZone companies appear under the relevant NAICS code, and 3 actually responded to the Request for Information.[4] Should the Solicitation be reissued as a HUBZone set-aside, there are currently 28 HUBZone certified firms listed under the relevant NAICS codes according to the Dynamic Small Business Search program available through the CCR database.

35. DHS' failure to conduct adequate research and its improper assessment of the limited data it did acquire resulted in an unreasonable determination not to set-aside the Solicitation for a HUBZone small business concern, as required by statute and regulation. This was thus done in violation of FAR § 19.1305(a), (b) and 15 U.S.C. § 657a(b)(2).

[4] DHS received responses from four corporations claiming to be HUBZone small business concerns. Further research verified that one of the companies was not a certified HUBZone.

**COUNT II**

**(DHS erred in failing to accept Shirlington's Proposal)**

36. The allegations contained in paragraphs 1 through 35 above are re-alleged and incorporated herein by reference.

37. Even though Shirlington strongly believes that this procurement should have been set aside for HUBZone companies only, out of an abundance of caution it submitted a proposal under the small business set aside on December 19, 2006, so that it would have at least some chance of receiving an award in the event its Protest of the failure to set aside for HUBZone companies was not sustained.

38. It is clear that the instructions for delivering proposals under the Solicitation were inartfully drafted. Under "Contacts" in the Contract Administration Data on p. 14 of the Solicitation, the names of Frank Rumph, Contract Specialist, Iva Capps, Contract Specialist, and Victoria Short, Contracting Officer appear. Under each of these contact names appears the address:

Office of Procurement Operations
7th and D
245 Murray Lane, S.W.
Bldg. 410
Washington, D.C. 20528

The Solicitation Instructions to Offerors at page 38 stated that offers were to be received by 2:00 p.m. EST on December 12, 2006, and should be submitted to the following address:

Frank Rumph, Contract Specialist
OPO Headquarters Procurement Division
7th & D Street, S.W.
Washington, D.C. 20024

And to add to the confusion, Standard Form 1449 Box 15 on the front of the Solicitation listed the delivery address as:

> Department of Homeland Security
> Office of Procurement Ops. (DO)
> 245 Murray Lane
> Building 410
> Washington, D.C. 20528

Therefore, the Solicitation listed a whole variety of addresses: Murray Lane and 7th and D in one place, and two specific instructions to deliver, one to Murray Lane and one to 7th and D.

39. Shirlington has since learned that 7th and D is the "physical address," while Murray Lane is a "post office address." In the past, Shirlington delivered its proposal for the first contract it had with DHS at 7th and D Street, while its second proposal with regard to the Existing Contract was delivered electronically.

40. On December 8, 2006, DHS issued Amendment 0003 to the Solicitation to add transition language to the PWS and to provide the Government's response to questions submitted in response to the Solicitation. These questions indicate that the agency was aware of the confusion as to where proposals should be submitted. Among the questions addressed was:

> **1. Question:** Regarding solicitation. The SF 1449, 15 states "Deliver to Department of Homeland Security Office of Procurement ops (DO), 245 Murray Lane, Building 410, Washington, D.C. 20528. @ page 38 the delivery address is 7th and D Street, SW. Please clarify.
>
> **Government Response:** Change the delivery address @ 38 to read: Department of Homeland Security Office of Procurement Operations, 245 Murray Lane, Building 410, Washington DC 20528. ATTN Frank Rumph.

Amendment 0003 also extended the time and date for proposal submission until December 19, 2006, at 10:00 a.m. EST.

41. Shirlington submitted its proposal to the bid room located at 7th & D Street on December 19, 2006. Upon arriving there, Shirlington's representative asked the person behind the counter (who has since been identified as Aliza Brown) if this was the right place to submit

the proposal. Her response was "YES," whereupon she dutifully signed a Bid Receipt, which has the correct solicitation number entered thereon in her handwriting and which is date stamped RECEIVED, 2006 DEC 19 A 9:46:20 GSA-NCR BID ROOM. (Exhibit 9).

42. Shirlington has since learned that this was the incorrect location for the submission of proposals. Under normal conditions, a proposal, which is delivered late or at the wrong place, is justifiably unacceptable. *See* FAR § 15.208(a) and FAR § 15.208(b)(1). However, the circumstances surrounding this Solicitation warrant the relaxation of this requirement and dictate that DHS should be directed to accept Shirlington's proposal as properly filed.

**a. Case Law Exception**

43. In particular, Shirlington contends that DHS should be required to accept Shirlington's proposal as properly filed because (i) the agency engaged in wrongful action which resulted in the late submission of its proposal, and (ii) consideration of the late proposal will not compromise the integrity of the competitive procurement process.

**i. DHS Engaged in Wrongful Action, Resulting in an Improper Submission**

44. In this case, the government's failure to provide an adequate description of the multiple steps necessary to submit the proposals sought under the Solicitation was the paramount cause for the late receipt of Shirlington's proposal.

45. In addition, further investigation is necessary to determine if any other offerors were given more explicit directions or guidance regarding the submission of proposals. Investigation and discovery is also needed to determine the precise set of facts surrounding the submission of any and all proposals received in response to the Solicitation.

46. Shirlington contends that it did not significantly contribute to the late receipt of its proposal by not acting reasonably in fulfilling its responsibility to deliver the proposal to the proper place, at the proper time.

47. In fact, Shirlington took constructive action to verify the proper place for the submission of bids. Shirlington representatives called the existing contracting officer and were told to take it to the location at 7th and D Streets, N.W., and, upon arriving at the Bid Room they inquired of the young lady there, Aliza Brown, whether this was the place to deliver proposals and she said "yes" and signed a receipt for that delivery.

48. Further, Shirlington alleges that when there is an ambiguity followed by an inquiry, as occurred in this case, there is an increased obligation on the part of the government to be meticulously explicit in explaining where and how bids should be submitted.

49. Shirlington contends that the facts and testimony of this case reveal that the government's wrongful action was the paramount cause of its allegedly improper submission.

**ii. The Integrity of the Procurement Process Would be Preserved if Shirlington's Proposal was Deemed Timely.**

50. Consideration of Shirlington's proposal would not adversely impact the integrity of this competitive procurement. Where, as here, the offeror has relinquished control over the bid before the time for bid opening and has not had the opportunity to see, modify, or other handle its proposal, consideration of the proposal would not contradict the purposes of this policy.

**b. Statutory Exception**

51. FAR § 15.208(b)(1)(ii) sets out a statutory exception to the FAR filing requirements. Specifically, a "late" bid may be considered if (i) it is received before award is made; (ii) acceptance of the bid would not unduly delay the acquisition; and (iii) there is acceptable evidence to establish that the bid was received at the government installation designated for receipt and was under the government's control prior to the time for receipt. FAR § 15.208(b)(1)(ii).

**i. The Proposal was Received Before the Award and Accepting the Bid Would Not Delay the Acquisition**

52. It is uncontested that the proposal was received at the bid room before the award was made in this Solicitation.

53. Further, to date, no award has been made in this procurement. Thus, there is no prejudice to the government or other parties in accepting Shirlington's proposal. In addition to delcaratory relief, Shirlington is seeking a temporary restraining order and/or preliminary injunction to bar the government from awarding this contract on grounds in addition to the government's failure to accept its proposal. Should either request be granted, it would ensure that acceptance of Shirlington's proposal would not delay the acquisition because it would have been stayed pending the outcome of this case.

**ii. The Proposal is in the Agency's control**

54. The date and time stamped Bid Receipt provided to Shirlington's representative at the 7th and D Street Bid Office reflects the fact that the proposal was submitted to the government before the December 19, 2006 10 o'clock a.m. deadline stated in the third amendment to the RFP.

55. Shirlington acknowledges that the government will likely argue that this exception is not applicable to the facts of this case. However, a strict and literal application of the bid delivery requirements should not be used to reject a bid where to do so would contravene the intent and spirit of full competition.

56. In refusing to accept and consider Shirlington's proposal for award under the Solicitation, DHS is acting in contravention of the intent and spirit of competition requirements.

**COUNT III**

**(DHS Breached the Implied Duty of Good Faith and Fair Dealing)**

57. The allegations contained in paragraphs 1 through 56 above are re-alleged and incorporated herein by reference.

58. DHS breached the implied duty of good faith and fair dealing in deciding to abrogate the Existing Contract and in conducting its research and analysis of potential HUBZone offerors when drafting the current Solicitation.

59. It is widely acknowledged that Shirlington has performed admirably as the incumbent contractor on the DHS contract requiring substantially similar services to those sought under the new Solicitation.

60. In the spring of 2006 Shirlington became collaterally involved in a federal investigation into the criminal acts of former Congressman Randy "Duke" Cunningham. Because Congressman Cunningham had used Shirlington's sedans, Mr. Baker (owner of Shirlington Limousine & Transportation, Inc.) was dragged by the press "feeding frenzy" into the fray. He was never charged with any wrongdoing whatsoever.

61. Mr. Baker has always been forthright regarding the earlier indiscretions of his youth and has repaid his debt to society. Shirlington's superior performance on the Existing DHS Contract is evidence of the incredible transformation he has undergone as he has become an accomplished and successful member of the Washington, D.C. small business community.

62. Nevertheless, in light of these unfounded allegations, on May 8, 2006 two members of the House Committee on Homeland Security sent a letter to Homeland Security Inspector General Richard Skinner, requesting an investigation into DHS' dealings with Shirlington. (Exhibit 10).

63. In addition, on May 9, 2006 Congresswoman Louise Slaughter sought a Resolution of Inquiry, directing the Secretary of Homeland Security to provide information to the House of Representatives relating to any existing or previous agreement between the Department of Homeland Security and Shirlington. (Exhibit 11).

64. This resolution was adversely reported by the House Homeland Security Committee because the members did not want to duplicate the efforts of the House Select Committee on Homeland Security: Subcommittee on Management, Integration and Oversight Subcommittee which was investigating the matter in response to the May 8, 2006 letter submitted by its members.

65. On May 26, 2006 the Select Committee held one of its first ever oversight hearings directly related to the Department of Homeland Security. Its focus was on "Homeland Security Department's Shirlington Limousine Case." The text of the hearing transcript demonstrates the enormous pressure and scrutiny DHS faced regarding the award of the Existing Contract to Shirlington.

66. However, amidst the many false accusations levied during that hearing, Shirlington's performance excellence was also acknowledged. When questioned about Shirlington's receipt of a DHS small business achievement award for meritorious service in 2005 Mr. Kevin Boshears, director of the DHS Office of Small and Disadvantaged Business Utilization stated that Shirlington received the award because "[a]ccording to the nomination form, they provided outstanding customer service. . .on their contract with us. . ."

67. On August 30, 2006, the contracting officer provided preliminary written notification to Shirlington that DHS intended to exercise Option year 1 of the Existing Contract.

68. Shortly thereafter, however, DHS began to take steps toward pushing Shirlington out of both the Existing Contract and the new procurement. At a meeting on September 18, 2006 Shirlington was informed by DHS personnel that the agency would prefer to modify the option under the contract from the existing one-year option to a six-month option with two further three-month extensions.

69. After several rounds of negotiations colored by threats from DHS, Shirlington was awarded a nine-month option on the Existing Contract, with the possibility of another 3-month extension to follow.

70. This contract extension was met by public and political outcry and was the subject of many news articles.

71. The political pressure surrounding this decision to exercise Shirlington's option is most clearly demonstrated by the letter written by Congresswoman Louise Slaughter to Michael Chertoff, Secretary of the Department of Homeland Security immediately following DHS' exercise of the option to extend the contract with Shirlington. Following a series of inflammatory comments, Ms. Slaughter concludes, stating "I am angry [sic] by DHS' decision to continue Shirlington Limousine, Inc.'s contract, and urge that it be revoked until the investigation into the company's questionable actions are concluded." (Exhibit 12). At no time did Ms. Slaughter give even lip service to due process or well established government contracts statutes and regulations, which preclude "revoking" contracts based on groundless accusations.

72. The Solicitation central to this case was issued one month later, on November 20, 2006. Shirlington contends that DHS sought to relieve some of the political pressure it faced from Ms. Slaughter and other members of Congress by crafting a procurement strategy around Shirlington so as to preclude it from competition.

73. Thus, despite its successful past history of using HUBZone set-asides, including the Existing Contract, DHS instead issued the solicitation as a small-business set-aside. In addition, the Solicitation also contained new security requirements that would admittedly be difficult for a small business such as Shirlington to meet. Shirlington has, as evidenced in the rejected proposal submitted on December 19, 2006, nevertheless met these stringent requirements.

74. In caving to these political pressures, DHS breached the implied duty of good faith and fair dealing.

75. This was done at the expense of not only Shirlington, but also at the expense of the numerous other HUBZone contractors eligible to compete for this contract. This bad faith was further amplified when DHS refused to accept Shirlington's proposal despite the convoluted instructions for submission of Proposals included in the Solicitation and subsequent misleading statements made by DHS personnel.

**BASIS FOR DECLARATORY AND INJUNCTIVE RELIEF**

76. As a result of DHS' unlawful actions, Shirlington will suffer irreparable injury for which it has no adequate legal remedy. This injury consists of lost opportunity to fairly compete for and perform work under the Solicitation as well as a substantial profit it would have earned if allowed to perform under the Existing Contract for the three plus remaining option years, or under the new contract.

77. The relief requested by Shirlington will not injure DHS and will serve the public interest by insuring that the procurement is conducted pursuant to statute and regulation. DHS' violations of federal procurement statutes, regulations and policies, adversely affect and undermine the integrity of the entire federal procurement process. The relief requested by Shirlington will insure that DHS protects the public interest by preserving the integrity of the

public confidence in the federal procurement process, thereby promoting competition for federal government contracts.

78. Shirlington is fully qualified to perform under the contract award pursuant to the solicitation.

79. This Court should provide Shirlington effective relief by declaring that the Solicitation should be canceled and a new Solicitation, properly set aside for HUBZone small business concerns, should be issued. Shirlington requests that the court preliminarily and permanently enjoin DHS from making an award under the Solicitation as it now stands, as a Small Business set-aside.

**PRAYER FOR RELIEF**

WHEREFORE, Shirlington Limousine & Transportation, Inc., prays that this Court grant the following relief:

a. Declare that the Solicitation should have been set aside for competition among HUBZone small business concerns and that DHS may not award the contract under Solicitation Number HSHQDC-07-R-00009 in violation of FAR § 19.1305(a), (b) and 15 U.S.C. § 657a.

b. Declare that the Solicitation should be canceled and reissued as a HUBZone small business set-aside.

c. If the procurement is not set aside for HUBZone small businesses, declare that DHS should be required to accept Shirlington's proposal for the small business contract as timely and properly filed.

d. Preliminarily and permanently enjoin DHS from proceeding with an award of the Contract.

e. Granting such other and further relief, including the award of attorneys' fees, court costs, and bid preparation costs as the Court may deem just and proper.

Respectfully submitted,

David J. Taylor
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W., 9th Floor
Washington, D.C. 20005
Ph: (202) 898-5800
Fx: (202) 682-1639

Mr. Taylor's Direct Dial
(202) 898-5838

davidtaylor@spriggs.com

*Counsel of Record for Plaintiff*
*Shirlington Limousine & Transportation, Inc.*

April 4, 2007

OF COUNSEL:

William J. Spriggs
Katherine A. Schultz
SPRIGGS & HOLLINGSWORTH