# EXHIBIT 3

GAO
Accountability * Integrity * Reliability

Comptroller General
of the United States

United States Government Accountability Office
Washington, DC 20548

# Decision

**Matter of:** Shirlington Limousine & Transport, Inc.

**File:** B-299241

**Date:** March 13, 2007

David J. Taylor, Esq., Spriggs & Hollingsworth, for the protester.
Rose J. Anderson, Esq., Department of Homeland Security, and Lara H. Hudson, Esq., Small Business Administration, for the agencies.
Kenneth Kilgour, Esq., and Christine S. Melody, Esq., Office of the General Counsel, GAO, participated in the preparation of the decision.

## DIGEST

1. Protest that solicitation requirements that secured storage facility contain an electronic access control system, that the contractor supply sedans, and that all shuttle buses be equipped with wheel chair lifts are unduly restrictive of competition is denied where the record establishes that requirement was reasonably designed to ensure that the government's needs would be met.

2. Protest challenging agency decision not to set aside procurement for Historically Underutilized Business Zone (HUBZone) small businesses is denied where the decision was based on sufficient facts to establish reasonableness of agency's conclusion that there was not a reasonable expectation that offers would be received from two or more HUBZone business concerns.

## DECISION

Shirlington Limousine & Transport, Inc. protests the terms of request for proposals (RFP) No. HSHQDC-07-R-00009, issued by the Department of Homeland Security (DHS) for agency-wide transportation services. Shirlington asserts that the solicitation is unduly restrictive of competition because it requires the secured storage facility to be accessed by an electronic access control system, that the contractor supply sedans, and that all shuttle buses be equipped with wheelchair lifts. Shirlington also asserts that the solicitation, issued as a small business set-aside, instead should have been set aside for Historically Underutilized Business Zone (HUBZone) small business concerns.

We deny the protest.

BACKGROUND

In June 2006, DHS decided to revise the way in which it procured transportation services with the goal of improving the quality of service and promoting the more efficient use of resources. The existing DHS transportation contract has a total value of $21.8 million over 5 years, and the agency estimate for the new solicitation is $41 million over 5 years. Agency Report (AR), Tab 11, Affidavit of Director of the Office of Procurement Operations (OPO), at 2. Under the existing contract, Shirlington operates shuttle buses that transport agency employees between various agency offices and provides executive sedan service to transport authorized staff to and from any location in the Washington, DC metropolitan area. Shirlington provides the shuttle buses, and the government provides the sedans. From the record, it appears that the higher cost of the contract stems primarily from the shift of responsibility for the sedans and the storage facility from the government to the contractor.

On June 23, the agency issued a request for information (RFI) on the FedBizOpps website to determine the level of interest in a DHS-wide transportation services contract. The RFI stated that the "[c]ontractor is responsible for maintaining a cleared facility for parking the sedans and buses." AR, Tab 3, RFI, at 1-2. Interested firms were asked to submit a capability package that identified the following: core services; corporate experience, including relevant contracts; type of business; current security clearance level for overnight parking of vehicles; and drivers with suitability determinations.

The agency received responses from 11 small businesses, all of which were located in Maryland, Virginia, or Washington, DC, and four of which claimed to be HUBZone-certified. On October 10, the agency issued an amendment to the RFI informing interested parties that the agency would require the contractor to have a Defense Industrial Security Clearance Office (DISCO)-cleared facility at the time of contract award. AR, Tab 5, RFP amend. 1, at 1. That amendment advised offerors that it was for "informational purposes ONLY" and a "response to [the amendment was] NOT required or expected." Id.

According to the agency, it conducted an internal review of the available potential offerors for the requirement to determine whether it should be set aside for either HUBZone firms or small businesses. The OPO Director and the Director of the Office of Small and Disadvantaged Business Utilization (OSDBU) reviewed the history of the two previous transportation contracts at DHS, noting that the upcoming solicitation would place a significantly greater burden on the contractor than did the prior two contracts: previously, the agency did not require security clearances for storage facilities because the sedans were stored at agency facilities; the contractor-supplied dispatching service was housed at the agency; and the agency provided all sedans. The OSDBU Director characterized the competition under the first of the previous agency transportation contracts as "very limited," with

only one HUBZone firm, the incumbent contractor Shirlington, submitting an offer.[1] AR, Tab 10, Affidavit of OSDBU Director, at 1. Under the second contract, two HUBZone firms submitted proposals, one of which was rated marginal and could not be considered for award. The Directors concluded that the agency failed to receive proposals from two or more qualified HUBZone businesses in either of the two previous agency transportation solicitations, both of which contained considerably less stringent requirements than the proposed solicitation.

The agency states that these two Directors also evaluated the four responses to the RFI that were submitted by HUBZone firms, using information provided by each of the firms, previous experience with two of the firms, and additional research conducted on the Consolidated Contractor Registration (CCR) database. One firm was the incumbent and protester, Shirlington. Another was the HUBZone firm that had submitted a marginal proposal under a previous transportation solicitation. The third firm, the agency notes, indicated "that its experience was limited to shuttle/bus services as a subcontractor to commercial activities and it did not appear to have experience providing executive sedan services." Id. at 2. The fourth firm was determined not to be a HUBZone-certified firm. Of the three actual HUBZone firms, only one had performed a contract that was similar to the existing requirement, and none had performed a contract of the scope of the new agency-wide contract that was contemplated.

The OSDBU and OPO Directors concluded that the increased scope and breadth of the requirement rendered the contract too difficult and capital-intensive to be performed by a HUBZone firm. In the Directors' estimation, if the solicitation was set aside for HUBZone firms, there would be a high degree of risk to the government that the agency would not receive adequate proposals. AR, Tab 11, Affidavit of OPO Director, at 3. The two Directors then concluded, based on the prior procurements and the responses to the RFI, that small businesses were interested and could fulfill the requirements. As noted above, the RFP subsequently was issued as a small business set-aside on November 20.

ANALYSIS

The solicitation contained the following electronic access control requirement:

---

[1] While Shirlington is the incumbent on the current contract, it is not performing the expanded scope of work that would be required under the new solicitation.

> The vehicle storage facility gate access will have a minimum of [two][3] electronic access control keypads. . . . The electronic access control keypad will create a history for every vehicle's entry and departure that can be accessed any time in the future. Electronic access control can also be set up strategically to create security zones within the vehicle storage area. . . . The electronic access control system will have all doors integrated into one system. . . . Program of the access control system will be done through a computer based system.

AR, Tab 6, RFP attach. 4, at 1. The solicitation also required that closed circuit television (CCTV) cameras be mounted throughout the vehicle storage area "to provide a record of all activities, persons, and operators inside and outside the facility." Id. at 2.

The protester asserts that the solicitation requirement that the secured storage facility be accessed by an electronic access control system is unduly restrictive of competition, "cannot be deemed necessary" to security, and is "superfluous." Protest at 6.

The Competition in Contracting Act of 1984 requires that agencies specify their needs and solicit offers in a manner designed to achieve full and open competition, so that all responsible sources are permitted to compete; solicitations may include restrictive requirements only to the extent they are necessary to satisfy the agency's legitimate needs. 41 U.S.C. § 253a(a)(1)(A), (2)(B) (2000). The determination of a contracting agency's needs and the best method for accommodating them is a matter primarily within the agency's discretion. Tucson Mobilephone, Inc., B-250389, Jan. 29, 1993, 93-1 CPD ¶ 79 at 2, recon. denied, B-250389.2, June 21, 1993, 93-1 CPD ¶ 472. Where a requirement relates to human safety and security, an agency has the discretion to define solicitation requirements to achieve not just reasonable results, but the highest level of reliability and effectiveness. Caswell Int'l Corp., B-278103, Dec. 29, 1997, 98-1 CPD ¶ 6 at 2.

Where a protester challenges a specification as unduly restrictive, the procuring agency has the responsibility of establishing that the specification is reasonably necessary to meet its needs. The adequacy of the agency's justification is ascertained through examining whether the agency's explanation is reasonable, that is, whether the explanation can withstand logical scrutiny. Chadwick-Helmuth Co., Inc., B-279621.2, Aug. 17, 1998, 98-2 CPD ¶ 44 at 3.

The language of the solicitation, quoted above, identifies several advantages inherent in an electronic access control system. An electronic access control system creates

---

[3] The solicitation omits the minimum number of keypads required. The context in which the omission appears makes it clear that the minimum number required is two.

a history of every vehicle's entry and exit from the garage, has the potential to create security zones within the storage area, and has the ability to have all garage doors integrated into one system and to have access programmed through a computer-based system. According to the agency, DHS's Office of Security, which has the responsibility to review and approve all solicitations, provided the specifications for the securing of the vehicles. AR, Tab 11, Affidavit of OPO Director, at 2. The Chief of the agency's Physical Security Division stated that the solicitation requirements "are drawn from recommended minimum security standards and security best practices for Federal facilities." AR, Tab 11, attach. 1, Memorandum from Chief, Physical Security Division, to CO, Jan. 3, 2007. The Chief states that an "electronic access control with an intrusion detection capability is required to compensate for the inherent vulnerabilities in physical lock and key control systems." Id. Electronic access control systems, the Chief asserts, enable the system operator to "track and control access, immediately suspend access, and maintain an audit capability for inspection or investigative purposes." Id.

The protester disagrees that the solicitation requirement at issue is reasonable. Shirlington argues that the advantages of the electronic access control system cannot be achieved because there is no solicitation requirement that it be monitored full-time. However, Shirlington does not explain why an automated system requires 24-hour monitoring. The protester also argues that the required CCTV cameras alone are sufficient. While the CCTV cameras may be a partially redundant system, the record shows that they record valuable data the electronic access system does not, and likewise the electronic access system supplies information the CCTV cameras are unable to provide. In the interest of human safety and security, the agency has specified a system that produces not just reasonable results, but higher levels of safety and efficiency. Although Shirlington disagrees with the agency's judgment with respect to its needs, it has not shown the requirement to be unreasonable. Kastle Sys., Inc., B-231990, Oct. 31, 1988, 88-2 CPD ¶ 415 at 8. Consequently, we have no basis upon which to object to the agency's inclusion of the electronic access control system requirement in the RFP.

In its protest, Shirlington notes two additional "flaws" in the solicitation: that the contractor must supply the sedans, and that all shuttle buses to be supplied by the contractor must comply with the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. (1994). Protest at 3. With respect to the latter argument, we note first that the solicitation does not require compliance with the ADA, but rather requires that the shuttle buses accommodate wheelchairs and that "reasonable accommodation for official transportation in the Washington DC area is made for [passengers requiring assistance] on a case-by-case basis." AR, Tab 8, RFP amend. 2, at 6. The agency defends the requirement that all shuttle buses have wheelchair lifts by noting that there may be federal employees and other authorized riders with disabilities who do not have specified routes. Moreover, the shuttle bus services under the solicitation are made available without authorized users having to reserve the service in advance. We think it is reasonable for the agency to structure the

solicitation to make shuttle bus service available at all times to all authorized riders with disabilities.

With respect to the requirement that the contractor provide all the required vehicles (shuttle buses with wheelchair lifts and sedans), the protester asserts that since doing so will be very expensive for a contractor, the government should supply the vehicles instead. Without more, the allegation that a requirement is costly is not sufficient to show that the requirement is unduly restrictive of competition. Supreme Edgelight Devices, Inc., B-261667, Sept. 28, 1995, 95-2 CPD ¶ 153 at 3; see Madison Servs., Inc., B-278962, Apr. 17, 1998, 98-1 CPD ¶ 113 at 2-3 (solicitation may impose substantial risk on the contractor and minimal administrative burden on the agency).

The protester also argues that the government could save money by leasing the sedans and supplying them to the contractor, rather than having the contractor supply the sedans. The general rule that the determination of the government's needs and the best method of accommodating those needs is primarily the concern of the contracting agency is no less applicable when the government is deciding who should own the equipment required for contract performance. See Crown Laundry and Cleaners, Inc., B-213796, B-213810, May 9, 1984, 84-1 CPD ¶ 516 at 2-3. The agency argues that it has structured the solicitation to obtain operational efficiencies, one of which is to be free of the responsibility of procuring and owning the sedans. The protester has not shown the requirement that the contractor supply the sedans to be unreasonable.

The protester also asserts that the agency unreasonably determined not to set the procurement aside for HUBZone small business concerns. Acquisitions that exceed the simplified acquisition threshold must be set aside for HUBZone small businesses if the agency makes two determinations, only the first of which is at issue here: that there is a reasonable expectation that offers will be received from two or more HUBZone small business concerns, and that award will be made at a fair market price. Federal Acquisition Regulation (FAR) § 19.1305(a), (b). Generally, our Office regards a determination to set aside a procurement as a matter of business judgment, within the agency's discretion. See York Int'l Corp., B-244748, Sept. 30, 1991, 91-2 CPD ¶ 282 at 6. An agency must make reasonable efforts to ascertain whether it will receive offers from at least two HUBZone small business concerns with the capability to perform the work, and we will review a protest to determine whether the agency has done so. Global Solutions Network, Inc., B-292568, Oct. 3, 2003, 2003 CPD ¶ 174 at 3. While the use of any particular method of assessing the availability of HUBZone small businesses is not required, and measures such as prior procurement history, market surveys, and advice from the agency's small business specialist may all constitute adequate grounds for a contracting officer's decision not to set aside a procurement, American Imaging Servs., Inc., B-246124.2, Feb. 13, 1992, 92-1 CPD ¶ 188 at 3, the assessment must be based on sufficient facts so as to establish its reasonableness. Rochester Optical Mfg. Co., B-292247; B-292247.2, Aug. 6, 2003, 2003 CPD ¶ 138 at 5.

Here, the record indicates that the agency employed several methods to ascertain whether to set aside the procurement for HUBZone firms. The agency's key small business official, the OSDBU Director, was integral to the agency's decision-making process. That official, in cooperation with the OPO Director, considered the responses the agency received to two similar, although substantially smaller in scope, solicitations, noting that in neither case did the agency receive two acceptable proposals from HUBZone firms. The agency gauged the interest from possible HUBZone firms by publishing an RFI and considered the responses to that RFI, discussed in detail above. The agency then made a determination, based on a review of the information provided by all of these sources, that it was unlikely to receive adequate proposals from two or more HUBZone firms. Given the record, including the protester's own apparent concerns with the difficulty that it would have in performing this contract, we find that the agency's decision not to set aside the procurement for HUBZone firms was reasonable.[3]

We solicited the views of the SBA on whether the agency should have set aside the procurement for HUBZone firms. The SBA concluded that the agency should have done so, arguing that the agency offered no support for its assertion that the four HUBZone firms that responded to the RFI "lacked capacity."[4] SBA Comments at 11. On the contrary, the capability package requested by the RFI contained a wealth of information on each of the interested firms. After reviewing that data and information from other sources, the agency articulated clearly why the three actual HUBZone firms, in its business judgment, would not be able to successfully complete the contract.

---

[3] As part of this protest ground, the protester alleges that the OSDBU director failed to properly discharge his duties as required by the FAR. Because we conclude that the agency's decision not to set aside this procurement for HUBZone firms was reasonable and consistent with the FAR, we need not address this allegation.

[4] In a related argument, the SBA asserts that the assessments of potential HUBZone offerors performed by the agency amounted to determinations of responsibility that should have been referred to the SBA. SBA Comments at 7. Once again, a determination that a particular procurement is to be set aside is basically a business judgment within the broad discretion of the contracting officer. See York Int'l Corp., supra. In making this determination, the contracting officer need not make determinations tantamount to affirmative determinations of responsibility, but rather need only make an informed business judgment that there is a reasonable expectation of receiving acceptably priced offers from eligible business concerns that are capable of performing the contract. See Admiral Towing and Barge Co., B-291849, B-291849.2, Mar. 6, 2003, 2003 CPD ¶ 164 at 3. The record shows that is precisely the analysis DHS conducted.

The SBA also argues that if the agency had conducted a search on CCR, using the two applicable North American Industry Classification System codes, the agency would have identified 33 HUBZone firms that might have been potential offerors. As a preliminary matter, the actual number of respondents is 31, because 2 firms appear in the results of both searches. In any event, SBA's argument is not persuasive; the raw number of HubZone firms generated by a CCR search reveals little about the capability of those firms to perform as required under the RFP. A cursory review of the list shows that many lack experience in the services called for; for example, one listed firm is described as a construction contractor located in Florida. Also, although all of the respondents to the RFI were local firms and it appears from the record that the contract would be of primary interest to local firms, only 5 of the 31 firms identified in the SBA's search are local, and 3 of them had in fact responded to the RFI. Of the two local firms not already identified by the agency, one delivers products to government agencies and the other offers no narrative of its capabilities. SBA simply points to the number of firms identified in the CCR search as evidence of likely HubZone competition without in any way examining whether--for the reasons set out above, among others--the firms are viable competitors under the RFP here.

Finally, the protester asserts that the agency improperly assessed the capability of the firms who responded to the RFI to provide the required DISCO-cleared storage facility because the agency first informed potential offerors of that requirement in an amendment to the RFI but discouraged HUBZone firms from responding to the amendment. Comments at 7. The SBA shares this concern. The agency specifically requested in the capability package that interested firms describe their current security clearance level for overnight parking of vehicles, thus putting interested firms on notice that they should fully disclose the extent of their security clearances. In fact, one of the responders specifically indicated that it could provide a DISCO facility. Under these circumstances, we see no basis to question the agency's assessment of the firms' capabilities on this ground.

The protest is denied.

Gary L. Kepplinger
General Counsel