**AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
***Bid Protest***

| | | |
|---|---|---|
| SHIRLINGTON LIMOUSINE & TRANSPORTATION, INC., Plaintiff, | ) | No. 07-220C Judge Braden |
| v. | ) | **PUBLIC VERSION** |
| THE UNITED STATES, Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND FOR DECLARATORY AND INJUNCTIVE RELIEF**

David J. Taylor
SPRIGGS & HOLLINGSWORTH
1350 I Street, NW, Ninth Floor
Washington, D.C. 20005
Ph: (202) 898-5800
Fax: (202) 682-1639

*Counsel of Record for Plaintiff*
*Shirlington Limousine & Transportation, Inc.*

May 2, 2007

OF COUNSEL:
William J. Spriggs
Katherine A. Schultz

## TABLE OF CONTENTS

I. JURISDICTION AND INTERESTED PARTY STATUS ....1

II. STATEMENT OF THE ISSUES ....1

III. STATEMENT OF FACTS ....3

A. Nature of the Case ....3

B. History of the HUBZone Program ....4

C. The Existing Contract ....5

D. The Solicitation ....6

1. The Commodity Counsel ....6

2. The June 23, 2006 Request for Information ....7

3. Analysis of the June 23, 2006 Request for Information Responses & Database Searches ....7

E. Proposal Delivery ....9

1. The Events of December 19, 2006 ....10

2. Current Location of the Proposal ....12

IV. ARGUMENT ....12

A. Legal Standards ....12

B. DHS' Determination Not to Set-Aside the Solicitation for HUBZone Small Business Concerns was Done in Violation of Statute and Regulation. ....14

1. HUBZone Set-Asides are Statutorily Mandated When Certain Requirements are Met ....14

2. DHS' Acted Unreasonably When it Concluded that it Would Not Receive Offers from Two or More HUBZone Small Business Concerns ....17

a. DHS Conducted Limited and Flawed Market Research Prior to Issuing the Solicitation ....17

i. DHS Failed to Consult the Appropriate Databases ....18

ii. DISCO Certification ....20

b. The Results of DHS' Market Research Were Insufficient to Support its Decision not to Set-Aside the Procurement for HUBZone Small Businesses ....... 21

i. Responses to the June 2006 RFI Did Not Necessarily Represent All Potential Offerors, HUBZone or Otherwise ....... 21

ii. DHS Improperly Assessed the June 2006 RFI Responders' Capabilities to Perform the Contract ....... 22

iii. DHS' Analysis of Prior Procurement History was also Inadequate to Support its Decision ....... 24

C. DHS Erred in Failing to Accept Shirlington's Proposal ....... 26

1. The Circumstances Surrounding Shirlington's Proposal Submission Meet the Case Law Exception to the FAR Filing Requirements. ....... 26

a. The Agency's Actions, In Total, Were the Paramount Cause of Shirlington's Failed Submission. ....... 27

b. Acceptance of Shirlington's Proposal as Properly Filed is Consistent with the Competitive Procurement System. ....... 29

2. The Facts of Shirlington's Proposal Submission Meet the Statutory Exception to the FAR Filing Requirements. ....... 30

D. DHS Breached the Implied Duty of Good Faith and Fair Dealing ....... 33

V. INJUNCTIVE RELIEF ....... 35

A. Standard ....... 35

B. Likelihood Of Success On The Merits ....... 35

C. Irreparable Injury ....... 36

D. Public Interest ....... 38

E. Balance Of Harms ....... 38

VI. CONCLUSION ....... 39

## TABLE OF AUTHORITIES

**Cases**

AABLE Tank Servs., Inc., No. B-273010, 1996 WL 655549 (Comp. Gen. Nov. 12, 1996) .......... 28, 29, 30, 33

Adirondak Constr. Corp., Nos. B-280015, B-280015.2, 1998 WL 540030, (Comp. Gen. Aug. 25, 1998) .......... 30

*Am. Combustion, Inc. v. Minority Bus. Opportunity Comm'n.*, 441 A.2d 660, (D.C. 1982) .......... 24

*Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345 (Fed. Cir. 2004) .......... 13, 14

*Bannum, Inc. v. United States*, 404 F.3d 1346 (Fed. Cir. 2005) .......... 13, 36

*Cal. Marine Cleaning, Inc. v. United States*, 42 Fed. Cl. 281 (1998) .......... 31, 32

*Contract Mgmt., Inc. v. Rumsfeld*, 291 F.Supp. 2d 1166 (D. Haw. 2003), *aff'd* 434 F.3d 1145, 1147 (9th Cir. 2006) .......... 15

*CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559 (2004) .......... 38

*Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388 (1999) .......... 39

*FMC Corp. v. United States*, 3 F.3d 424 (Fed. Cir. 1993) .......... 35

*Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324 (Fed. Cir. 2004) .......... 36

Global Solutions Network, Inc., No. B-292568, 2003 WL 22309121 (Comp. Gen. Oct. 3, 2003) .......... 17

*Hosp. Klean of Texas, Inc. v. United States*, 65 Fed. Cl. 618 (2005) .......... 26, 28, 30

*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324 (Fed. Cir. 2001) .......... 13, 14

Info. Ventures, Inc., No. B-294267, 2004 WL 2283189 (Comp. Gen. Oct. 8, 2004) .......... 18, 19

Intermark, Inc., No. B-290925, 2002 WL 31399028 (Comp. Gen. Oct. 23, 2002) .......... 16

*J & H Reinforcing & Structural Erectors, Inc. v. United States*, 50 Fed. Cl. 570 (2001) .......... 4

Kelton Cont., Inc., No. B-262255, 1995 WL 731737 (Comp. Gen. Dec. 12, 1995) .......... 29

Kirkland, Ellis, Hodson, Chaffetz, Masters & Rowe, No. B-173489, 1971 WL 4273 (Comp. Gen. Sept. 15, 1971) ..... 23

*Lewis-Nicholson, Inc. v. United States*, 550 F.2d 26 (Ct. Cl. 1977) ..... 34

*Lion Raisins, Inc. v. United States*, 51 Fed. Cl. 238 (2001) ..... 13

*Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993) ..... 36

*Malone v. United* States, 849 F.2d 1441 (Fed. Cir. 1988) ..... 33

MCS Portable Restroom Serv., No. B-299291, 2007 WL 926295 (Comp. Gen. Mar. 28, 2007) ..... 15, 16

*Metro Mach. Corp. v. SBA*, 305 F.Supp. 2d 614 (E.D. Va. 2004) ..... 37

Mktg. & Mgmt. Info., Inc., Nos. B-283399.2, B-283399.3, 1999 WL 1223555 (Comp. Gen. Nov. 30 1999) ..... 20

*Ocean Elec. Corp. v. Laird*, 473 F.2d 154 (D.C. Cir. 1972) ..... 23, 24

*OTI Am., Inc. v. United States*, 73 Fed. Cl. 758 (2006) ..... 36

*Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728 (2000) ..... 37

Palomar Grading & Paving, Inc., No. B-274885, 1997 WL 8497 (Comp. Gen. Jan. 10, 1997) ..... 28

*PGBA, L.L.C. v. United States*, 389 F.3d 1219 (Fed. Cir. 2004) ..... 35

*PGBA, L.L.C. v. United States*, 57 Fed. Cl. 655, 664 (2003) ..... 37, 38, 39

Prof'l Landscape Mgmt. Servs., Inc. -- Costs, No. B-287728.2, 2001 WL 1356490, (Comp. Gen. Nov. 2, 2001) ..... 16, 17

*Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705 (2006) ..... 36

Rochester Optical Mfg. Co., Nos. B-292247, B-292247.2, 2003 WL 21884877 (Comp. Gen. Aug. 6, 2003) ..... 17

Saturn Landscape Plus, Inc., No. B-297450.3, 2006 WL 1028419 (Comp. Gen. April 18, 2006) ..... 16

Select, Inc., Nos. B-245820, B-245820.2, 1992 WL 5028 (Comp. Gen. Jan. 3, 1992) ..... 29

St. Charles Travel, No. B-226567, 1987 WL 102409 (Comp. Gen. June 5, 1987) ..... 26

*Statistica, Inc. v. Christopher*, 102 F.3d 1577 (Fed. Cir. 1996) ..... 36

SWR, Inc., No. B-294266, 2004 WL 2609194 (Comp. Gen. Oct. 6, 2004) .......... 16, 17

*Tr. of Ind. Univ. v. United States*, 618 F.2d 736 (Ct. Cl. 1980) .......... 15

*United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312 (1998) .......... 37

*Univ. Research Co., LLC v. United States*, 65 Fed. Cl. 500 (2005) .......... 39

Wyatt & Assocs., No. B-243349, 1991 WL 140260 (Comp. Gen. July 1, 1991) .......... 26

**Statutes & Regulations**

13 C.F.R. § 126.200-309 (2007) .......... 18

13 C.F.R. § 126.607(b) .......... 15

15 U.S.C. § 657a (2004) .......... 3

15 U.S.C. § 657a(b)(2) .......... 25

15 U.S.C. § 657a(b)(2)(B) .......... 14, 15

28 U.S.C. § 1491 (2001) .......... 13

28 U.S.C. § 1491(b)(1)-(2) .......... 13

28 U.S.C. § 1491(b)(4) .......... 35

28 U.S.C. §§ 1491 (b)(1) and (b)(2) .......... 1

48 C.F.R. § 10.002(b)(2) (2007) .......... 17

48 C.F.R. § 19.1305 (2006) .......... 3

5 U.S.C. § 561 *et seq.* (1996) .......... 13

5 U.S.C. § 657a (2004) .......... 3

5 U.S.C. § 706 .......... 35

5 U.S.C. § 706(2)(A) .......... 13, 26

5 U.S.C. §§ 701-706 (1994) .......... 13

FAR § 13.102 .......... 18

FAR § 15.208(b)(1)(ii) .......... 30

FAR § 19.1305 .......... 3, 16

FAR § 19.1305(a) .......... 9

FAR § 19.1305(a)-(b) .......... 15, 17, 21, 25

FAR § 52.214-6 .......... 27

FAR § 9.104-1(f) .......... 22

**Other Authorities**

RCFC 52.1 .......... 1, 12

RCFC 65 .......... 1

Restatement (Second) of Contracts § 241(e) (1981) .......... 34

**AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
*Bid Protest*

| | |
|---|---|
| SHIRLINGTON LIMOUSINE & TRANSPORTATION, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 07-220C<br>Judge Braden<br><br>**PUBLIC VERSION** |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND FOR DECLARATORY AND INJUNCTIVE RELIEF**

Shirlington Limousine & Transportation, Inc. ("Shirlington" or "Plaintiff"), files this memorandum in support of its Motion for Judgment on the Administrative Record ("AR") under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), and for declaratory and injunctive relief under 28 U.S.C. § 1491(b)(2) and RCFC 65.

## I. JURISDICTION AND INTERESTED PARTY STATUS

This court has jurisdiction under 28 U.S.C. §§ 1491 (b)(1) and (b)(2); earlier briefed by Plaintiff. Plaintiff is an interested party as the incumbent HUBZone contractor, a potential offeror whose direct economic interest will be affected if these illegal actions are allowed to stand, and an actual offeror on the portion of the procurement in dispute under Count II hereof.

## II. STATEMENT OF THE ISSUES

Count I raises an important matter of first impression in this Court. While the Court of Federal Claims has heard cases on whether companies are validly determined to be Historically Underutilized Business Zone Small Business Concerns ("HUBZone SBCs" or "HUBZone

companies") and whether the HUBZone price evaluation preference ("PEP") applies in certain cases, under the 1997 statute which created the program, the Court has not directly decided the parameters of the statute's and regulations' mandate that contract opportunities *shall* be set aside for HUBZone companies under certain conditions.

Plaintiff Shirlington respectfully requests declaratory and injunctive relief enjoining the U.S. Department of Homeland Security ("DHS") from proceeding with the award of a contract under Solicitation Number HSHQDC-07-R-00009 (the "Solicitation") for shuttle bus and sedan transportation services to DHS employees within the District of Columbia and surrounding areas. The Solicitation must be canceled because, *inter alia*, DHS erred when it failed to set-aside the Solicitation for competition among HUBZone small business concerns. It further erred when it based this decision on outdated and incomplete information gathered without consultation of the relevant databases, and improperly relied upon the June 23, 2006 Request for Information ("RFI"), which could not serve as a proper bell-weather indicator of potential offerors because it did not require contractor responses. Alternatively, should the Solicitation be deemed valid, DHS should be required to accept Shirlington's proposal thereunder as properly filed because the Agency's actions were the paramount cause of any mistake in its submission and the proposal was under government control prior to the time for receipt.

In particular, Plaintiff states that this case presents the following issues:

1. Whether DHS' decision not to set-aside the Solicitation for HUBZone small business concerns was arbitrary and capricious, and not in accordance with law and regulation.

2. Whether DHS erred in failing to accept Shirlington's proposal as properly filed.

3. Whether DHS breached the implied duty of good faith and fair dealing in deciding to abrogate the Existing Contract and in conducting its research and analysis of potential HUBZone offerors when drafting the current Solicitation.

## III. STATEMENT OF FACTS

### A. Nature of the Case

Shirlington is currently performing many of the services required for this "new" procurement under an existing contract (the "Existing Contract"), which was awarded in October 2005 as a HUBZone contract for five years, consisting of a base year and four one-year options.

On November 20, 2006, DHS issued the Solicitation as a request for proposals set aside for competition among small businesses. Under the Solicitation as drafted, DHS intended to award multiple, fixed unit price, indefinite quantity/indefinite delivery contracts for providing shuttle bus and sedan transportation services to DHS employees within the District of Columbia and surrounding areas. In addition, the Solicitation requires the contractor to provide, maintain, secure, and store the vehicles used to perform the contract.

On or about December 7, 2006, Shirlington filed a protest with the United States Government Accountability Office ("GAO") on the basis that the Solicitation violates the terms of the Historically Underutilized Business Zone ("HUBZone") Act, 15 U.S.C. § 657a (2004) and Federal Acquisition Regulation ("FAR") § 19.1305; 48 C.F.R. § 19.1305 (2006), by failing to restrict competition to HUBZone small business concerns. (AR Tab 2 at 11.) The United States Small Business Administration ("SBA") asked to review and provide comments on the protest, and did so via facsimile on January 22, 2007. (AR Tab 14 at 277.) By decision dated March 13, 2007, GAO denied Shirlington's protest. (AR Tab 16 at 433.)

In response to that protest, DHS submitted its Agency Record, which stated Shirlington had not submitted a proposal in response to the Solicitation. Shirlington had submitted a timely proposal on December 19, 2006 and, upon further investigation, timely filed a second protest on January 19, 2007, alleging that DHS erred in failing to accept its proposal. (AR Tab 26 at 539.) By decision dated March 30, 2007, GAO denied this second protest. (AR Tab 39 at 598.)

DHS has not awarded a contract under the Solicitation and has informed Plaintiff and this Court that it will withhold award until a decision has been made on the merits of this case.

### B. History of the HUBZone Program

Shirlington is a certified HUBZone small business concern. The United States Court of Federal Claims has succinctly summarized the history of the program for Historically Underutilized Businesses, in which Shirlington participates:

> In 1997 Congress passed the Historically Underutilized Business Zone ("HUBZone") Act . . . The Act established the HUBZone program, the purpose of which "is to provide Federal contracting assistance for qualified small business concerns located in historically underutilized business zones, in an effort to increase employment opportunities, investment, and economic development in those areas.". . . The Small Business Administration ("SBA") is responsible for certifying qualified firms as HUBZone small business concerns . . . Once a firm is HUBZone certified and its name appears on the SBA's List of Qualified HUBZone Small Business Concerns, the firm is eligible for HUBZone preferences.

*J & H Reinforcing & Structural Erectors, Inc. v. United States*, 50 Fed. Cl. 570, 571 (2001) (citations omitted). Under this program, Shirlington has had the opportunity to succeed as a business when doing so might otherwise not have been possible. Due to its significance in promoting small businesses from historically underutilized areas, it is Congressionally mandated that federal agencies implement the HUBZone program to the maximum extent practicable.

### C. The Existing Contract

Shirlington was awarded its first contract with DHS on April 27, 2004. On October 25, 2005, DHS awarded Shirlington Contract No. HSHQDC-05-C-00036, the Existing Contract, which was solicited as a HUBZone small business set-aside, for providing transportation services to DHS employees within the District of Columbia and surrounding areas. The contract to be awarded under the current Solicitation is for essentially the same services as this Existing Contract.

Under the Existing Contract, Shirlington provides DHS two distinct types of transportation services. First, Shirlington operates shuttle buses that transport DHS employees among the agency's various offices according to schedules delineated by the contract. As required by the Existing Contract, Shirlington supplies these shuttle buses. In addition, Shirlington provides executive motor pool sedan services, which are used to transport authorized managers and senior executives to and from any location within the D.C. metropolitan area. Unlike the shuttle buses, DHS leases the sedans, and Shirlington manages the personnel.

DHS has modified the Existing Contract since it was originally awarded and Shirlington began performing a 9-month option period, called Option 1A, on October 27, 2006. Option period 1A ends on July 26, 2007 and may be followed by an additional 3-month option period, Option 1B. There are three remaining one-year option periods under the contract.

Shirlington has performed admirably under both its first contract and the Existing Contract. (AR Tab 13 at 275.) For example, Shirlington was given only 48 hours notice to commence the first contract, rather than the 60 to 90 days of transition time typical in a transportation contract. *Id.* Shirlington was able to adhere to this shortened deadline despite many challenges inherent in coordinating and executing such a large undertaking in such a short amount of time. This ability to adapt and Shirlington's history of performance excellence are

reflected in the fact that many of the goals and initiatives first implemented by Shirlington are now being used as the benchmark for the current Solicitation.

**D. The Solicitation**

DHS issued the current Solicitation on November 20, 2006. (AR Tab 6 at 29.) The Solicitation is a request for proposals under which DHS will award multiple, fixed unit price, indefinite quantity/indefinite delivery contracts for the provision of transportation services to DHS employees within the Washington, D.C. metropolitan area. (AR Tab 6 at 31.) The Solicitation resembles Shirlington's Existing Contract in many respects, however, separate contracts will be awarded for the shuttle bus and sedan services under the Solicitation. *Id.*

The Solicitation was issued as a general small business set-aside, meaning that competition was restricted only to qualified small businesses. (AR Tab 6 at 29.) This is in contrast to the previous DHS contracts, including the Existing Contract, which were issued as HUBZone small business set-asides.

**1. The Commodity Counsel**

DHS decided to use the strategic sourcing process to acquire the agency's transportation services. (AR Tab 11 at 249.) This process requires the formation of a Commodity Council, consisting of a variety of program and acquisition representatives from DHS. *Id.* In developing Solicitations, the Council relies on historical data (*i.e.*, existing and prior contracts), market surveys, and the expertise of its members. *Id.* The Commodity Council was responsible for consolidating and refining the agency's requirements and acquisition strategy for the contract. *Id.*

It appears from the AR that the DHS Contracting Officer, the Director of the Office of Small and Disadvantaged Business Utilization (OSDBU) for DHS, and the Director of Office of

Procurement Operations ("OPO") were the primary players who worked in concert to decide not to make the solicitation a HUBZone set-aside. (AR Tab 1 at 1; Tab 10 at 246; Tab 11 at 250.)

### 2. The June 23, 2006 Request for Information

On June 23, 2006, several months prior to the issuance of the Solicitation, the DHS OPO issued a Request for Information ("RFI") on the federal business opportunities website, FedBizOpps, to determine industry support and the level of interest in a DHS-wide transportation services contract. (AR Tab 1 at 1; Tab 3 at 21.) The RFI asked interested companies to submit a capability package responding to six core criteria: (a) core services, including NAICS[1] codes; (b) key personnel; (c) corporate experience; (d) type of business; (e) current facility security clearance level for overnight parking of vehicles and buses; and (f) drivers with suitability determinations. (AR Tab 3 at 25.) Eleven small businesses responded to the RFI. Of the eleven responders, DHS concluded that three were certified HUBZone companies.[2] These responses are summarized at Tab 4 of the AR. The Commodity Council met in August 2006 to review these results. (AR Tab 11 at 250.) At this time, the Council determined that DHS would award two separate contracts for the shuttle services, without stating the reasons for replacing the Existing Contract. *Id.*

### 3. Analysis of the June 23, 2006 Request for Information Responses & Database Searches

The Director of OPO, Soraya Correa, also met with Kevin Boshears, the Director of OSDBU at DHS, to review these responses and to discuss the procurement history of two previous transportation contracts issued on behalf of DHS, including the Existing Contract. (AR

[1] All goods and services which can possibly be provided to the government have been assigned a NAICS code under the North American Industry Classification System.

[2] Four of the eleven responders described themselves as HUBZone small businesses, but DHS concluded that one of the four was not in fact such a business.

Tab 10 at 246; AR Tab 11 at 251.) It was noted that only one HUBZone offer, from Shirlington, was received and subsequently accepted for the first DHS transportation contract. *Id.* Two HUBZone offers were received for the second, Existing DHS Contract. (AR Tab 10 at 247; AR Tab 11 at 251.)

Ms. Correa and Mr. Boshears had their staff conduct additional research using the Central Contractor Registration ("CCR") and Small Business Administration ("SBA") databases regarding the four HUBZone firms that responded to the RFI. *Id.* It was determined that of the four firms, one was the incumbent contractor – Shirlington; the second had submitted a marginal proposal during prior DHS procurements; the third had limited experience relevant to this type of procurement; and the fourth was not actually a HUBZone. *Id.*

Based upon this information, the Director of the OPO and the Director of OSDBU concluded that conducting the procurement as a HUBZone set-aside would create a high risk that the government would not receive adequate proposals. (AR Tab 11 at 251.) They also determined that this acquisition "would be too difficult and too expensive for a HUBZone company to fulfill." (AR Tab 11 at 252.) Accordingly, Ms. Correa and Mr. Boshears then decided to issue the procurement as a small business set-aside. The Chief Procurement Officer then approved this acquisition strategy. (AR Tab 11 at 252.)

On October 10, 2006 the OPO issued an amendment to the June 23, 2006 RFI informing interested parties that the DHS acquisition would require all interested parties to have a Defense Industrial Security Clearance Office ("DISCO") cleared Contractor Owned facility at the time of award. (AR Tab 5 at 27.) This amendment was issued for informational purposes only and a response was not required or expected. *Id.* Although this new requirement was not made public until after responses to the June 2006 RFI were due, it was taken into consideration in evaluating

whether or not the agency could expect to receive two or more HUBZone offers. (AR Tab 10 at 247.)

Rather than appropriately setting aside the Solicitation for HUBZone small businesses, DHS issued the Solicitation as a general small business set-aside on November 20, 2006. (AR Tab 6 at 29.) Where a HUBZone set aside is appropriate, however, it takes precedence over a small business set aside. FAR § 19.1305(a). Because a HUBZone set aside was required here, the Solicitation's terms violate both the statute and the FAR and the Solicitation is thus invalid.

**E. Proposal Delivery**

With regard to Count II, under which Plaintiff alleges that it's proposal of December 19, 2006 (submitted under the less restrictive small business set-aside) was improperly refused by DHS, the following facts are relevant.

Shirlington has an existing five-year contract, but DHS has decided to take that contract away. Shirlington has an excellent argument that the "new" procurement should be a HUBZone set-aside. However, if it fails in its effort to get the procurement set aside for competition among HUBZone small business concerns, it must have a proposal in the small business set-aside competition. Shirlington therefore submitted its proposal on December 19, 2006 under the "new" procurement.

It is clear that the instructions for delivering proposals under the "new" Solicitation were inartfully drafted. In the "Contract Administration Data" portion of the Solicitation each "contact" was followed by this address:

> Office of Procurement Operations
> 7th and D, 245 Murray Lane, S.W., Bldg. 410
> Washington D.C. 20528

(AR Tab 6 at 42.) However, the "Instructions to Offerors" portion designates the following as the submission location:

> OPO Headquarters Procurement Division
> 7th and D Street, S.W.
> Washington, D.C. 20024

(AR Tab 6 at 66.) To add to the confusion, the Standard Form 1449 Box 15 on the front of the Solicitation listed the delivery address as:

> Department of Homeland Security, Office of Procurement Ops. (DO)
> 245 Murray Lane, Building 410
> Washington D.C. 20528

(AR Tab 6 at 29.) Therefore, the Solicitation listed a whole variety of addresses: Murray Lane and 7th and D in one place, and two specific instructions to deliver, one to Murray Lane and one to 7th and D.

Shirlington has since learned that 7th and D is the "physical address," while Murray Lane is a "post office address." It is now known that entrance into the Murray Lane facility requires any visitor to go through multiple steps, including a stop at a manned security entrance and the subsequent screening of any documents arriving at the location. (AR Tab 36 at 577; AR Tab 21 at 507.) Although DHS did issue an amendment with regard to the delivery address, providing that the delivery address stated on page 38 of the solicitation be changed from 7th and D Street, S.W., to 245 Murray Lane, Building 410, DHS failed to provide prospective bidders with any information regarding the extensive inspection process, nor directions to this location which is within a secured facility.

### 1. The Events of December 19, 2006

On the morning of December 19, 2006, Shirlington unsuccessfully attempted to contact Frank Rumph, the Contract Specialist, regarding the designated submission location. Mr. Rumph stated that at "approximately 8:30 am, [he] received two phone calls from prospective Offerors requesting directions to the proposal delivery address . . . [and he] responded by stating that the location was located on the Anacostia Naval Station." (AR Tab 31 at 559.)

Shirlington submitted its proposal to Bid Room 1065, identified by a sign at the entrance that stated 'HSPD-12 Contractor Processing Center,' and located within the GSA Building at 7th and D Streets, S.W., Washington D.C. (AR Tab 35b at 566.) The entire DHS Procurement Operations Headquarters is located within this building, as are some GSA offices. This is the *same location* where Shirlington previously filed its first proposal and numerous DHS procurement related documents. During all of these previous dealings, although the address used on the various mailings and documents was listed as 245 Murray Lane, they were always hand delivered to 7th and D Streets, S.W. (Pl.'s Compl. Ex. 4, Attach 1, Decl. Lucretia Pearce at 3-4.)[3]

Upon arriving at the Bid Room, Shirlington's representative, Ms. Lucretia Pearce, encountered a government worker, later identified to be Ms. Aliza Brown. Ms. Pearce "announced [she] was delivering bids for the Homeland Security Transportation Contract." (Pl.'s Compl. Ex. 4, Attach 1, Decl. Lucretia Pearce at 3.) Upon looking at the bid parcels, marked with the address of 245 Murray Lane, Building 410, Washington, DC 20528, ATTN: Frank Rumph, Ms. Brown registered them by identifying the Request for Proposal number and clocking it in. *Id.* Ms. Brown then handed Ms. Pearce the Bid Receipt, which included the DHS Request for Proposal Number and Ms. Brown's signature. *Id.* The bid receipt confirmed that Shirlington submitted its proposal on Dec. 19, 2006, prior to the 10:00 A.M. deadline. (AR Tab 34 at 563.) Shirlington was only made aware that its proposal was not accepted by DHS upon reading in the Agency Record in the filed GAO protest that DHS alleged Shirlington had not submitted a proposal.

---

[3] Concurrent with this filing, Plaintiff is filing a motion requesting that this declaration, originally submitted to the Court as Exhibit 4, Attachment 1 to Plaintiff's Complaint, be included as a supplement to the Administrative Record.

### 2. Current Location of the Proposal

Upon learning that DHS did not receive Shirlington's proposal, Shirlington's representatives returned to that same Bid Room and discovered that their proposal was still there. (Pl.'s Compl. Ex. 4, Attach 1, Decl. Lucretia Pearce at 8.) At that point, Mr. Carl Campbell[4] assured Shirlington that he would make sure the proposal was delivered to DHS and that this was a mistake on the part of the Bid Room, not Shirlington. *Id.* at 8, 10. However, Mr. Campbell later informed Shirlington that it had delivered the proposal to the wrong location and that he did not know the location of 245 Murray Lane, suggesting Shirlington "Mapquest" it. *Id.* at 11.

Although the Bid Room at 7th and D Streets was not the correct location, Ms. Brown stated "the GSA Bid Room routinely receives proposals for DHS." (AR Tab 30 at 557.) The security guards at the 7th and D Streets, S.W. location also "confirmed that responses to Solicitations and proposals that list 245 Murray Lane are routinely signed in and delivered to the HSPD-12 Bid Room at the 7th and D Streets, SW address." (Pl's Compl. Ex. 4, Attach 2, Decl. of Christopher Baker, Jan. 18, 2007 at 7.)[5] It is Shirlington's understanding that its proposal still remains in the bid room, unmoved and untouched. (AR Tab 35f at 570.)

## IV. ARGUMENT

### COUNT I

### A. Legal Standards

Plaintiff Shirlington seeks judgment upon the administrative record pursuant to RCFC 52.1. The standard applicable to such a motion for judgment on the administrative record differs

---

[4] Mr. Campbell is a Branch Chief of the General Services Administration, National Capital Region ("GSA")'s Acquisition Management Division. (AR Tab 29 at 554.)

[5] Concurrent with this filing, Plaintiff is filing a motion requesting that this declaration, originally submitted to the Court as Exhibit 4, Attachment 2 to Plaintiff's Complaint, be included as a supplement to the Administrative Record.

from that applied in the context of a motion for summary judgment. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355-56 (Fed. Cir. 2005); *Lion Raisins, Inc. v. United States*, 51 Fed. Cl. 238, 246-47 (2001). "[P]roceeding under RCFC [52.1] restricts the evidence to the agency record. . ." *Bannum*, 404 F.3d at 1356. Unlike a motion for summary judgment, a genuine dispute regarding a material fact will not preclude a judgment on the administrative record. *See id.* Further, the Court must make findings of fact from the record as if it were conducting a trial. *Id.* at 1357.

The Tucker Act, 28 U.S.C. § 1491 (2001), as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), 5 U.S.C. § 561 *et seq.* (1996), authorizes the United States Court of Federal Claims to render jurisdiction over complaints alleging violations of statutes or regulations in connection with a procurement or proposed procurement. *See* 28 U.S.C. § 1491(b)(1)-(2). Thus, "[t]he Court of Federal Claims has jurisdiction to review both pre-award and post-award bid protests pursuant to 28 U.S.C. § 1491(b) . . ." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Plaintiff's Complaint presents such a pre-award protest.

The U.S. Court of Federal Claims reviews challenges to agency actions in a bid protest according to the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (1994). The APA states in relevant part that "[t]he reviewing court shall . . . (2) hold unlawful and set aside agency action, findings and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (incorporated by reference in 28 U.S.C. § 1491(b)(4)). *See also Banknote*, 365 F.3d at 1350-51; *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1330 (Fed. Cir. 2001). Under the APA standards, an Agency's procurement action should be "set

aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni,* 238 F.3d at 1332 (citations omitted). *See also Banknote*, 365 F.3d at 1351.

The Administrative Record demonstrates that DHS' decisions not to set-aside the Solicitation for HUBZone small businesses and not to accept Shirlington's proposal both lacked a rational basis and were in violation of procurement regulations and procedure.

### B. DHS' Determination Not to Set-Aside the Solicitation for HUBZone Small Business Concerns was Done in Violation of Statute and Regulation.

DHS' decision not to set aside the Solicitation for HUBZone small business concerns was arbitrary, capricious, and not in accordance with the law and regulation for the following reasons.

#### 1. HUBZone Set-Asides are Statutorily Mandated When Certain Requirements are Met

As a government agency, DHS must comply with the provisions of the HUBZone Act and FAR when procuring contracts for the government. While the FAR generally encourages full and open competition, the regulations sometimes limit competition amongst potential offerors. In some circumstances, agencies must restrict the pool of offerors for a solicitation based on certain characteristics, such as size or ownership of the business, socioeconomic status, or where the business and its employees are located or reside. This is called "setting-aside" the contract.

An example of such a "set-aside" is the HUBZone set-aside program enacted by Congressional legislation whereby "a contract opportunity *shall be awarded*. . .on the basis of competition restricted to qualified HUBZone small business concern[s]" when certain requirements are met. 15 U.S.C. § 657a(b)(2)(B) (emphasis added).

Under the terms of the HUBZone Act and its implementing regulation, any federal agency, including DHS, *must* set aside an acquisition for competition among HUBZone small business concerns where the contracting officer has a "reasonable expectation that -- (1) Offers will be received from two or more HUBZone small business concerns; and (2) Award will be made at a fair market price." FAR § 19.1305(a)-(b); 15 U.S.C. § 657a(b)(2)(B). *See also* 13 C.F.R. § 126.607(b) ("[T]he contracting officer shall set aside the requirement for HUBZone, 8(a) or SDOV SBC contracting before setting aside the requirement as a small business set-aside").

"A regulation must be interpreted so as to harmonize with and further and not conflict with the objective of the statute it implements." MCS Portable Restroom Serv., No. B-299291, 2007 WL 926295, at *5 (Comp. Gen. Mar. 28, 2007), quoting *Tr. of Ind. Univ. v. United States*, 618 F.2d 736, 739 (Ct. Cl. 1980). The plain meaning and intent of the HUBZone Act is that all solicitations meeting these requirements *must* be set-aside. The FAR regulation is consistent with the SBA statutory and regulatory language and confers a similar mandatory requirement.

While this is an issue of first impression before the U.S. Court of Federal Claims, other federal courts, such as the United States Court of Appeals for the Ninth Circuit, have recognized that the use of the word "shall" confirms the mandatory nature of HUBZone set-asides. *See Contract Mgmt., Inc. v. Rumsfeld*, 291 F.Supp. 2d 1166, 1173-74, (D. Haw. 2003), *aff'd* 434 F.3d 1145, 1147 (9th Cir. 2006). The 9th Circuit stated, "[t]he HUBZone Program . . . commands in unequivocal terms that a contract opportunity be designated as a HUBZone set-aside when certain criteria are met." *Contract Mgmt., Inc.*, 434 F.3d at 1147.

FAR § 19.1305(a)-(b) and interpretations offered by GAO, have used equally "unequivocal" terms as to the mandatory nature of the program. *See* MCS Portable Restroom

Serv., 2007 WL 926295, at *4 ("We acknowledge that, unlike the HUBZone and small business set-aside programs, which generally *require* set-asides if two or more HUBZone concerns or small-business concerns are interested in submitting offers and award is expected to be made at a fair market price, *see* FAR sections 19.502-1, 19.1305, the decision to make [a] S[ervice] D[isabled] V[eteran]-O[wned] S[mall] B[usiness] C[oncern] set-aside is discretionary with the contracting officer.") (emphasis added); SWR, Inc., No. B-294266, 2004 WL 2609194, at *3 (Comp. Gen. Oct. 6, 2004) ("Acquisitions *must* be set aside for HUBZone small business concerns if the agency determines" that the requirements of FAR § 19.1305 are fulfilled) (emphasis added); Prof'l Landscape Mgmt. Servs., Inc. -- Costs, No. B-287728.2, 2001 WL 1356490, at *1 (Comp. Gen. Nov. 2, 2001) ("In light of the *requirement* at [FAR] 19.1305(a) and (b), that contracting agencies set aside for HUBZone small businesses all procurements exceeding $100,000. . .") (emphasis added); Intermark, Inc., No. B-290925, 2002 WL 31399028, at *3 (Comp. Gen. Oct. 23, 2002) (discussing the difference between set asides that an agency "shall" – *i.e.*, must – implement, versus those agencies "may" implement); Saturn Landscape Plus, Inc., No. B-297450.3, 2006 WL 1028419, at *5 n.2 (Comp. Gen. April 18, 2006) (The FAR "*requires* agencies to set aside for HUBZone firms any acquisition exceeding the simplified acquisition threshold" where the requirements of FAR § 19.1305 are met) (emphasis added).

As stated above, this is however, a case of first impression before the U.S. Court of Federal Claims. The SBA databases reflect that there are currently over 14,000 certified HUBZone small business concerns. Therefore, the decision in this case will have major, widespread implications for the future of the HUBZone program.

### 2. DHS' Acted Unreasonably When it Concluded that it Would Not Receive Offers from Two or More HUBZone Small Business Concerns

When issuing a solicitation, the HUBZone Act and FAR § 19.1305(a)-(b) require an agency to "make reasonable efforts to ascertain whether it will receive offers from at least two HUBZone small business concerns with the capability to perform the work." SWR, Inc., 2004 WL 2609194, at *3. An agency's assessment of whether a HUBZone set aside is required "must be based on sufficient facts so as to establish its reasonableness." *Id.* (citing Rochester Optical Mfg. Co., Nos. B-292247, B-292247.2, 2003 WL 21884877, at *5 (Comp. Gen. Aug. 6, 2003)). Although a contracting officer's prediction of whether the agency has a reasonable expectation that at least two HUBZone small business concerns will submit offers and that award can be made at fair market price is regarded "as a matter of business judgment within the agency's discretion, which [GAO] will not disturb absent a clear showing that is has been abused," Global Solutions Network, Inc., No. B-292568, 2003 WL 22309121, at *2 (Comp. Gen. Oct. 3, 2003),"[i]t is well settled that an assessment not to set a procurement aside must be based on sufficient facts to establish its reasonableness." Prof'l Landscape Mgmt. Servs., Inc.- Costs, 2001 WL 1356490, at *4.

#### a. DHS Conducted Limited and Flawed Market Research Prior to Issuing the Solicitation

DHS failed to consult appropriate online databases to locate potential HUBZone offerors and prematurely eliminated potential bidders on the basis of criteria not articulated in the Solicitation. The FAR requires a Contracting Officer to utilize any or all of a variety of market research techniques when determining whether to set-aside a procurement. 48 C.F.R. § 10.002(b)(2) (2007). In its Comments regarding Shirlington's first GAO protest, the SBA noted "that the level of effort necessary to determine whether two or more HUBZone S[mall]

B[usiness] C[oncerns] will submit offers and award can be made at a fair market price is not burdensome." (AR Tab 14 at 282.) SBA concluded that DHS did not follow the straightforward methodology to obtain relevant information and that DHS' decision not to set aside the procurement for HUBZone small business concerns was based on outdated and incomplete information. (AR Tab 14 at 282.)

**i. DHS Failed to Consult the Appropriate Databases**

DHS did not use the CCR database or any other SBA database to conduct a broad search for any and all potential HUBZone offerors. Status as a qualified HUBZone small business concern is determined by SBA in accordance with 13 C.F.R. § 126.200-309 (2007). Qualified HUBZone small business concerns can be located by running a search on CCR, the database for researching all small businesses, including HUBZone businesses, and the Dynamic Small Business Search, an online database maintained by the SBA. (AR Tab 14 at 280.)

The SBA routinely provides comments on whether an agency has conducted adequate market research. In doing so, the SBA has frequently found fault with an agency's failure to consult the CCR, which, pursuant to FAR § 13.102, a contracting officer should use as its "primary source[] of vendor information." *See, e.g.*, Info. Ventures, Inc., No. B-294267, 2004 WL 2283189, at *3 (Comp. Gen. Oct. 8, 2004). The CCR is the database for researching all small businesses, including HUBZone businesses. Here, DHS did not consult the CCR to identify all potential HUBZone offerors. Had it done so, it would have discovered a total of twenty-one active and distinct SBA-Certified HUBZone companies listed under the applicable NAICS codes, 485999 and 485320. (AR Tab 2 at 19-20.) The abundance of eligible HUBZone offerors weighs heavily against DHS' determination that it could not reasonably expect to receive offers from two or more HUBZone businesses. This error is even more glaring given

that three of the eligible firms listed under these NAICS codes are located in the District of Columbia, where the contract is to performed.

The SBA also frowns upon an agency's failure to consult the SBA's database, PRO-NET, "which is an online database of information on more than 195,000 small, disadvantaged, Section 8(a), [HUBZone], and women-owned businesses." Info. Ventures, Inc., 2004 WL 2283189, at *3. The SBA recently merged the CCR and PRO-NET into a new database, the Dynamic Small Business Search.

In fact, it appears from the AR that while the Contracting Officer consulted the CCR and some unknown SBA database, this was done only to gather information regarding those firms that responded to the June 2006 RFI. It therefore appears that DHS was only looking for a way to reject from the competition those HUBZone companies that did respond to the RFI, rather than affirmatively seeking other firms which might not have responded. It should be remembered that this was a voluntary, not a mandatory response. And even more importantly, it should also be noted that DHS encouraged Plaintiff not to respond. Had Plaintiff not responded, the number of HUBZone company responses would have been one less, a fact that DHS apparently counted on.

A diligent search of the relevant databases would have revealed a variety of HUBZone small business concerns eligible to compete for this procurement. This is in direct contrast to the narrow and limited research the agency actually conducted regarding the RFI responders. (AR Tab 11 at 251.) The Agency should use these tools to search for additional potential offerors when conducting its market research under FAR Part 10.002(b)(1)(vii). In this case, DHS' decision not to set aside the procurement for HUBZone small business concerns was based on outdated and incomplete information. Outdated and incomplete information cannot constitute

the requisite "sufficient facts" upon which DHS was required to base its decision. *See e.g.*, Mktg. & Mgmt. Info., Inc., Nos. B-283399.2, B-283399.3, 1999 WL 1223555, at *2 (Comp. Gen. Nov. 30 1999) (recognizing that GAO had "found unreasonable the determination to issue a solicitation on an unrestricted basis where that determination [was] based upon outdated or incomplete information.") (citations omitted). Thus, DHS' limited research was totally inadequate for the purposes of determining whether a HUBZone set-aside should have been implemented and could be overturned on that basis alone.

**ii. DISCO Certification**

In addition, DHS improperly used access to a DISCO facility as a prerequisite in assessing the capabilities of potential vendors, when that requirement does not even appear in the Solicitation.

On June 23, 2006, DHS posted on the FedBizOpps website a RFI to determine vendors' interest in the Solicitation. The RFI requested that any interested firm "submit a capability package" outlining its qualifications to perform the contract. The RFI did not notify potential offerors of any specific security requirements applicable to the vehicle-storage facilities required under the contract. Rather, the RFI described the facility requirement as follows: "The determination as to whether or not it is practicable or feasible to use contractor proposed storage space or a particular type of storage space at a particular location shall be made by the Department of Homeland Security after considering the nature of program demands and special requirements at that location." (AR Tab 3 at 23.)

On October 10, 2006, DHS issued an amendment to the RFI announcing a substantial change to the proposed Solicitation – a requirement that the contractor have a DISCO cleared vehicle-storage facility. The contractor's capability of meeting this requirement was to be assessed *at time of award* (emphasis added). According to DHS, the RFI amendment "was

issued for informational purposes only," meaning that no response was required, and, to the best of Shirlington's knowledge, DHS received no responses. (AR Tab 5 at 27.)

On November 20, 2006, DHS posted the contested Solicitation. Shirlington has searched in vain for any references in the Solicitation itself mandating that the vehicle-storage facilities be DISCO-cleared. Thus, under the Solicitation, DISCO clearance is not required. However, DHS looked to this qualification in making its determination that there were not two or more qualified HUBZone small businesses. (AR Tab 10 at 247.) This was an error and resulted in the elimination of potential HUBZone offerors from consideration.

**b. The Results of DHS' Market Research Were Insufficient to Support its Decision not to Set-Aside the Procurement for HUBZone Small Businesses**

In explaining its decision not to set-aside the procurement for competition among HUBZone small businesses, DHS relied almost entirely on the responses to the June 2006 RFI. According to DHS, "[a] subsequent review of the interested parties that responded [to the June 2006 RFI] led to the conclusion that this procurement effort was not suitable for HUBZone set-aside," because, based on the June 2006 RFI responses, there was a "consensus among the procurement staff and the DHS small business personnel that there was no reasonable expectation" that the requirements of FAR § 19.1305(a)-(b) would be satisfied. (AR Tab 12 at 259.) However, this consensus was based upon inadequate market research, and therefore, insufficient facts. Consequently, DHS' decision not to issue the Solicitation as a HUBZone set-aside was unreasonable.

**i. Responses to the June 2006 RFI Did Not Necessarily Represent All Potential Offerors, HUBZone or Otherwise**

DHS' reliance on the RFI responses in declining to use a HUBZone set-aside was unreasonable. Failure to submit a voluntary response to the June 2006 RFI did not preclude any

business from submitting a proposal under the Solicitation. In fact, response to the June 2006 RFI was not mandatory. Therefore, interested firms, including HUBZone businesses, may have chosen not to submit a response to the June 2006 RFI, for any reason. Accordingly, the results of the RFI do not necessarily determine the entire universe of potential offerors as of June 2006.

Indeed, Shirlington, as the incumbent contractor, was told by a DHS contracting officer that Shirlington need not respond to the June 2006 RFI, as DHS was already aware of Shirlington. (AR Tab 13 at 276.) Had Shirlington complied with this suggestion, it would have further reduced the number of HUBZone responders to the June 2006 RFI.

Moreover, the June 2006 RFI preceded issuance of the Solicitation by five months. During those five months, new HUBZone businesses may have become interested in submitting an offer under the Solicitation. In fact, upon issuance of the Solicitation, even more HUBZone firms might have become interested had competition been properly set aside for such businesses. This failure renders DHS' market research inadequate and its failure to set-aside illegal.

**ii. DHS Improperly Assessed the June 2006 RFI Responders' Capabilities to Perform the Contract**

Pursuant to the FAR, analysis of a prospective contractor's ability to supply the equipment and facilities required by a contract is appropriate only with respect to the determination of contractor responsibility, an inquiry that is made before award. *See* FAR § 9.104-1(f). At the pre-solicitation stage, when the contracting officer is trying to establish whether she can reasonably expect offers from two or more HUBZone concerns, the determination of capability cannot be the same standard as the capability requirement in FAR § 9.104-1. Therefore, it was premature of the contracting officer to evaluate the June RFI responders' responsibility and to eliminate them as potential offerors before they had the opportunity to submit their proposals.

After receiving these responses, DHS issued an amendment to the RFI changing the requirements to include a DISCO certification, but indicated that interested firms need not reply. DHS did not explain why it discouraged responses nor why it used this certification as a requirement to determine "capability." Also, the Administrative Record does not contain any information pertaining to the capability packages submitted by the eleven responders to the original RFI. It appears that the Agency relied on these packages to determine whether or not it could reasonably expect to receive offers from two or more HUBZones, but this is not clear from the AR.

It was inappropriate, however, for DHS to make a (capability) responsibility determination regarding the three HUBZone businesses that responded to the June RFI. A capability assessment is to be conducted by the SBA and based upon information contained in offers/proposals, not a response to an RFI or based on information contained in unknown databases.

Additionally, it was premature for DHS to make this determination before the time of award. A firm's ability to provide a DISCO-cleared facility was to be assessed at the time the contract was *awarded* (emphasis added). Indeed, where a contract calls for special security clearance, "[s]uch a requirement [is] not a condition precedent to submission of a bid" under the solicitation for that contract. *Ocean Elec. Corp. v. Laird*, 473 F.2d 154, 156 (D.C. Cir. 1972) (quoting Kirkland, Ellis, Hodson, Chaffetz, Masters & Rowe, No. B-173489, 1971 WL 4273, at *4 (Comp. Gen. Sept. 15, 1971)). Rather, a business submitting a proposal under the solicitation can provide proof of its ability to satisfy the security clearance requirement "any time prior to performance of work under the contract." *Ocean Elec. Corp.*, 473 F.2d at 156.

Moreover, "a security clearance requirement constitutes a matter of [bidder] responsibility." *Id.* at 155. As such, a business may submit a proposal under a solicitation without having the requisite security clearance, because its lack thereof is "curable after the bids are opened." *Am. Combustion, Inc. v. Minority Bus. Opportunity Comm'n.*, 441 A.2d 660, 671 (D.C. 1982) (citations omitted). Thus, DHS erred in relying on the results of the June 2006 RFI to determine that there would not be two or more qualified HUBZone offerors. Any capability determination done by DHS was premature and patently erroneous, since DISCO facility clearance could and should have been acquired after award.

DHS' assessment also failed to take into account that HUBZone firms could, in fact, come up with innovative proposals to meet the security requirements of the Solicitation. DHS even acknowledges that an innovative proposal could meet these requirements. (AR Tab 12 at 259.) DHS' error is especially glaring in light of the fact that Shirlington is prepared to meet the facility requirements as outlined in the Solicitation. (AR Tab 13 at 275.) This fact alone is enough to conclude DHS' justifications for failing to use a HUBZone set-aside were based on insufficient information.

The Contracting Officer was obligated the make a determination as to whether or not it would receive offers from two or more HUBZone SBCs. However, this determination is to be based upon whether or not the offers would be received, not whether or not HUBZones would be capable of performing the contract. Capability can only be ascertained through a careful analysis of bids or offers, not the kind of information used here.

### iii. DHS' Analysis of Prior Procurement History was also Inadequate to Support its Decision

DHS' only other market research efforts were cursory discussions of the prior procurement history outlined in the affidavits of Kevin Boshears and Soraya Correa. (AR Tab

10 at 246; AR Tab 11 at 251.) The procurements referenced in those statements are Shirlington's Existing Contract and one other DHS contract, both of which resulted from HUBZone set-asides.

Any reliance on prior procurement history to support a decision not to set aside the Solicitation for a HUBZone small business concern was inappropriate. While it may be true that DHS has received very few HUBZone proposals under prior DHS solicitations, DHS cannot rely on this fact alone to support its failure to use a HUBZone set-aside here.

Significant amounts of time separate the previous procurements and the one currently at issue. Because of its failure to consult resources such as the CCR for potential offerors, DHS has absolutely no knowledge regarding the state of HUBZone business in the relevant NAICS codes today. Absent such an analysis, DHS clearly conducted insufficient market research and, just as importantly, failed to adequately document the reasons for its decision.

In fact, over twenty HUBZone companies appear under the relevant NAICS code, and three actually responded to the Request for Information. Should the Solicitation be reissued as a HUBZone set-aside, there are currently twenty-eight HUBZone certified firms listed under the relevant NAICS codes according to the Dynamic Small Business Search program available through the CCR database, an increase of seven since offers were received.

Thus, DHS' failure to conduct adequate research and its improper assessment of the limited data it did acquire resulted in an unreasonable determination not to set-aside the Solicitation for a HUBZone small business concern. This was done in violation of FAR § 19.1305(a)-(b) and 15 U.S.C. § 657a(b)(2). Accordingly, the Solicitation should be cancelled.