ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SHIRLINGTON LIMOUSINE and TRANSPORTATION, INC., | x | |
| Plaintiff, | : | |
| vs. | : | Case No. 07-220C |
| THE UNITED STATES OF AMERICA, | : | |
| Defendant. | x | |

Washington, D.C.

Tuesday, May 1, 2007

DEPOSITION OF:

FRANK L. RUMPH,

a witness, was called for examination by counsel for the plaintiff in the above-entitled matter, pursuant to Notice and agreement of the parties as to time and date, taken at the Department of Homeland Security, 7th and D Streets, S.W., Room 3515, Washington, D.C., convened at approximately 2:25 o'clock, p.m., before Catherine B. Crump, a court reporter and Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

APPEARANCE OF COUNSEL:

On behalf of the Plaintiff:

SPRIGGS & HOLLINGSWORTH, ESQUIRES
BY: DAVID J. TAYLOR, ESQUIRE
KATHERINE SCHULTZ, ESQUIRE
1350 Eye Street, N.W., 9th Floor
Washington, D.C. 20005
(202) 898-5800

On behalf of the Defendant:

UNITED STATES DEPARTMENT OF JUSTICE
BY: KENNETH D. WOODROW, ESQUIRE
1100 L Street, Northwest, Room
Washington, D.C. 20530
(202) 353-0513

and

UNITED STATES DEPARTMENT OF HOMELAND SECURITY
BY: ROSE J. ANDERSON, ESQUIRE,
7th and D Streets, S.W., Room 3051
Washington, D.C. 20528
(202) 447-3529

- 0 -

# I-N-D-E-X

Witness: Page:

Frank L. Rumph

Examination by Mr. Taylor 4

- 0 -

Exhibits: (Included in transcript) Page:

Exhibit Number 1 marked for identification to the Rumph deposition (April 30, 2007 Court Order) 25

- 0 -

Whereupon,

FRANK L. RUMPH,

a witness was called to testify by counsel for the defendant, and after having first been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. TAYLOR:

Q. Would you please state your full name for the record?

A. Frank L. Rumph.

Q. Will you spell it for the court reporter?

A. My middle name?

Q. No. The last name.

A. Oh. R-U-M-P-H.

Q. Have you ever had your deposition taken before?

A. No.

Q. You are aware that even though we're sitting in a conference room in a fairly informal environment, that your testimony is under oath and

it may be used in a court of law in the lawsuit that's currently pending?

A. Yes.

Q. Have you consulted with your agency counsel about the nature of a deposition? Do you understand what we're doing here?

A. Yes.

Q. All right. Are you under any medications of any kind --

A. No.

Q. -- that would impair your ability to answer or remember? I'm not saying you should be. I'm just saying are you. I need it on the record that you're not taking any medications at this time.

A. No.

Q. With whom are you currently employed or by whom?

A. United States Federal Government.

Q. What agency of the government?

A. Department of Homeland Security.

Q. How long have you been in that position?

A. Here?

Q. Homeland Security.
A. Two years.
Q. Were you with another agency that's one of the constituents of DHS before?
A. No.
Q. What is your current position?
A. I'm a contract specialist.
Q. And what are your duties as a contract specialist?
A. To evaluate and recommend awards to the C.O.
Q. C.O. meaning contracting officer?
A. Yes.
Q. Are you familiar with Solicitation HSHQ DC-07-R-00009?
A. Yes.
Q. And what is the nature of that solicitation? What is the subject matter of the solicitation?
A. It's the DHS-wide transportation services solicitation.
Q. Where is your office located?

A. Here in the building.
Q. And that being where? So the record can --
A. 7th and D Street.
Q. Southwest?
A. Yes.
Q. Where is the Office of Procurement Operations Headquarters located?
A. Same address, 7th and D Street, Southwest.
Q. This building has a GSA sign on the front of it. Are you co-located here with GSA?
A. Yes.
Q. How much space does your office -- I mean the whole Procurement Office, not your personal office -- take up in this building?
A. I would say one floor, this floor, maybe more, but I'm not sure.
Q. So it has a floor of the building?
A. Yes.
Q. Is the entire procurement shop located here? When I say shop, I mean do the people who are

in the procurement activity, are they mostly housed here?

A. Yes, mostly.

Q. Well, where are those who aren't housed here located?

A. At other locations, such as the NAC.

Q. The NAC being what?

A. Another DHS --

Q. What does NAC stand for?

A. I don't know what NAC stands for.

Q. Okay. I wanted the record to be clear if we knew. That's an acronym for another location?

A. Yes.

Q. Is that the Nebraska Avenue location?

A. Yes. I believe so. I've never been there, but we just refer to it as the NAC.

Q. There's a bid room located in this building, is there not?

A. Yes.

Q. In fact, I saw the sign when I came through security. Now, is that bid room used by DHS as well as GSA?

A. No.
Q. Never has been used by DHS?
A. To my knowledge, no.
Q. What percentage of your work is done at 7th and D Street?
A. One hundred percent.
Q. What percentage of your work is done at 245 Murray Lane?
A. I would say about five percent of where we send offers.
Q. Well, if you do a hundred percent here, how can you do five percent there? I'm confused. You better elaborate. What do you do here?
A. Oh, I develop RFQs, evaluate and administer contracts.
Q. This is where your principal office is located?
A. Yes.
Q. What do you do at Murray Lane?
A. At Murray Lane, I do nothing.
Q. Well, that was my earlier question, is in terms of your time not at the Procurement Office.

A. Oh, my physical time?

Q. What percentage of your time is conducted at Murray Lane?

A. None.

Q. But five percent of the procurement -- I mean roughly --

A. That I work on?

Q. -- that you work on is conducted at or through Murray Lane?

A. Yes, through Murray Lane.

Q. Where is Murray Lane located?

A. Anacostia Naval Base.

Q. And how far is that from here?

A. I don't know.

Q. Have you ever been to Murray Lane?

A. No, sir.

Q. What kind of work -- and I understand you said what you do personally, but what other kinds of work does the procurement shop do here at 7th and D Street?

A. We award contracts, administer contracts.

Q. Award and administer. You do that for all of DHS?

A. The components, yes.

Q. What are there, 22, 23 agencies that were merged together into DHS?

A. Yes.

Q. Do you know which?

A. I believe it's 21.

Q. Okay. So roughly 21 agencies, and the procurement operation really handles all of those constituent agencies?

A. Yes.

Q. But you say there are some procurement activities located elsewhere. Would that be like the Coast Guard might have some procurement activity somewhere else?

MR. WOODROW: Objection. At this point, I think we're getting beyond the scope.

MR. TAYLOR: Okay. I'll withdraw the question and move on. I don't want to take time with that. I just wanted to try to get a feel for what happens here.

BY MR. TAYLOR:
Q. But most of the procurement activities occur in this building. Right?
A. Yes.
Q. In the solicitation that I referred to, and you understand now that I'm talking -- the only solicitation that I'm interested in and that we'll be talking about today is that solicitation unless I identify another one. In that solicitation, originally at least, there was an address for delivery of proposals which said 245 Murray Lane, 7th and D Streets, Southwest; is that correct?
A. Yes.
Q. And why, if they're two physically different places, would both of those addresses be listed?
MR. WOODROW: Objection. Assumes facts not in evidence. We haven't established what we're talking about, the timeframes we're talking about.
BY MR. TAYLOR:
Q. I'm talking about any timeframe. Why would you say 245 Murray Lane, 7th and D Street,

Southwest in an indication of where a solicitation is to be sent or delivered?

A. I cannot answer that question because I do not know.

Q. Do you routinely receive mail here that's addressed to 245 Murray Lane?

A. Yes.

Q. Do you know whether if a package was delivered by messenger that was addressed to 245 Murray Lane, 7th and D Street, Southwest, do you know if that would be received here?

A. Yes.

Q. Do you receive things that are either Fed Ex or DHL or sent by some courier service with those addresses that arrive there?

A. To the 245 Murray Lane address?

Q. Yes. That have both addresses on it.

A. I can't speak to both addresses.

Q. Do you remember receiving any package or letter at any time that says 245 Murray Lane, 7th and D Street?

A. No, I cannot.

Q. And you are familiar with the bid room on the ground floor of this building. Correct?
A. Somewhat.
Q. And your testimony is that it has never, to your knowledge, been used for the receipt of proposals for DHS?
A. Yes.
Q. Are you familiar with the security measures that are in place at Murray Lane?
A. Vaguely.
Q. What are they?
A. I don't know. I just know there's a guard service there at the gate.
Q. Do you know why DHS uses both of those addresses?
MR. WOODROW: Objection. Assumes facts not in evidence with respect to both of the addresses. It's also vague.
BY MR. TAYLOR:
Q. Does DHS use the Murray Lane address for the delivery of documents related to contractual either proposals or contract administration, either

one?

A. Yes.

Q. And does it use the 7th and D Street address?

A. No.

Q. It does not use the 7th and D Street address?

A. No.

Q. Is it your testimony that no document is ever delivered to 7th and D Street?

A. I cannot --

Q. Is that what you mean by no, you don't use that address?

A. I cannot say that.

Q. Do you know what the official title of the 245 Murray Lane location is?

A. No.

Q. Do you know what Building 410 at 245 Murray Lane is for?

A. That's where proposals come into, that address.

Q. Always?

A. Yes.

Q. Your testimony is that one hundred percent of proposals are delivered to Murray Lane?

A. To my knowledge, yes.

Q. How are they delivered there?

A. By courier, in person. I don't know. I'm not there.

Q. Well, what instructions do you give people with respect to how to get them there?

A. It's addressed in the solicitation.

Q. The instructions of how to get to Murray Lane are addressed there?

A. The address.

Q. And what if a person cannot find that address; what instructions do you give them if they ask you where is this address?

A. Then we instruct them that it's at Anacostia Naval Base, which is a familiar site.

Q. Do you instruct with respect to what entrance to use at Anacostia Naval Base?

A. No.

Q. Do you instruct them how to find

Building 410 once they're at Anacostia Naval Base?
A. Ask to speak to the guard or the guards.
Q. You've never given anyone information with respect to how to get to 245 Murray Lane?
A. Correct.
Q. And you've never given anyone instructions on how to get to Building 410?
A. Correct.
Q. Does the procurement operations shop have an actual office at 245 Murray Lane?
A. Not that I'm aware.
Q. What happens to letters and/or packages that are delivered to 245 Murray Lane?
A. From my understanding, they go through an x-ray process.
Q. Then what happens to them?
A. Then they're delivered here to this address.
Q. How does that happen?
A. Through a mail courier.
Q. Through a mail courier? So they're brought over here in bulk in some way? I'm not

talking about these proposals. I'm talking about any daily mail delivery. If it goes to Murray Lane, it's brought here. Is there a mail room in this facility that then sorts it and sends it? I assume that there must be.

A. Yes.

Q. And so how do you receive it? If it's supposed to come to you, how do you receive it?

A. I'm not exactly sure of the process. I know that our administrative person receives the mail. How she receives it, I don't know, and then it's distributed to the C.O.s and the contract specialists.

Q. And it's your testimony that you're never aware of any document ever having been delivered to 7th and D Street?

A. Correct.

Q. What would happen if someone delivered a document to 7th and D Street addressed to the contract shop?

A. From my understanding, the security guards would not accept it.

Q. Are you familiar with the security measures in place at this location at 7th and D?
A. Somewhat.
Q. What are they?
A. In relationship to?
Q. In relationship to security.
A. You have to go through the metal detectors and you have to be -- your packages have to go through the metal detector. You have to have some kind of I.D. to show who you are.
Q. Would it be a fair characterization, then, to say that 245 Murray Lane is a mailing address and this is a physical address?
A. Yes.
Q. And it's your testimony -- I just want to be absolutely sure I understand you. Your testimony is that if an article was going to be sent to DHS at 7th and D Street, it actually would not be received here; nothing ever comes here if it's addressed to 7th and D?
A. To the best of my knowledge, yes.
Q. But to the contrary, if it's addressed

to 245 Murray Lane, but it says DHS, it would come here eventually?

A. Yes.

Q. Or wind up here. Have you ever tried to find Murray Lane yourself?

A. No.

Q. Have you ever entered a MapQuest search for it?

A. No.

Q. I want to be sure I understand what you're saying. You say nothing is ever delivered here. Right? I'm not just talking about proposals now. Any document that is -- has to do with a contract such as a monthly report or anything else required in contract administration.

A. Sorry. State your question again, please.

Q. Perhaps it was confusing. I'll rephrase it. It is your testimony that no document that is hand delivered is ever delivered to this address?

MR. WOODROW: Objection. Asked and answered.

You can go ahead and answer the question.

THE WITNESS: To the best of my knowledge, that is correct.

BY MR. TAYLOR:

Q. Okay. And again, why on page 14 does the solicitation list both addresses?

A. I do not know.

Q. Is that address commonly used when giving the address to which to send documents to DHS procurement?

MR. WOODROW: Objection. Vague as to "that address".

MR. TAYLOR: 245 Murray Lane, 7th and D, Southwest.

THE WITNESS: That address is given, yes.

BY MR. TAYLOR:

Q. And why is that address given if it's two different places?

MR. WOODROW: Objection. Vague as to "two different places".

You can go ahead and answer if you can.

THE WITNESS: I don't know understand the other address.

BY MR. TAYLOR:

Q. Well, you say there are two different places. You know, normally, is it not true that when you're trying to get something to a location, you put an address in. Right?

A. Yes.

Q. And it's your testimony that 7th and D Southwest, Washington, D.C. and 245 Murray Lane are two different physical locations?

A. Yes.

Q. Why would you put them both on as an address?

MR. WOODROW: Objection. Vague as to both as an address.

If you can understand the question, you can answer it.

THE WITNESS: I don't.

BY MR. TAYLOR:

Q. You don't?

A. No.

Q. Did you come up with the addressing system that says 7th and D, 245 Murray Lane, Building 410?

A. No.

Q. Do you know who did?

A. No.

Q. Are you aware that proposals were delivered electronically for a previous contract for transportation services?

A. No.

Q. You were not?

A. No.

Q. Do you know why the proposals under this solicitation were decided -- why it was decided they would not be delivered electronically?

A. No.

Q. Are you aware of any other proposals that have been delivered electronically?

A. No.

Q. For transportation for or any other purposes?

A. No.

Q. Are you aware that the address for the delivery of proposals under this solicitation was restated two different times subsequent to the initial solicitation?

A. Elaborate.

Q. Are you aware that the address and delivery instructions were changed for this solicitation two times subsequent to the issuance of the initial solicitation?

A. Yes.

Q. And can you tell me why those changes were made?

A. I do not know.

Q. Do you know who made them?

A. I'm not sure.

Q. Who would have been responsible for doing that?

A. The contracting officer.

Q. Who is that?

A. Victoria Short, Ms. Victoria Short.

Q. Are you aware that Shirlington Limousine

is currently providing transportation services under a contract with DHS?

A. Yes.

Q. And are you aware that they occasionally have documents which they need to deliver with respect to their performance under that contract?

MR. WOODROW: Objection. The question goes beyond the scope of the deposition.

MR. TAYLOR: Are you going to let him answer?

MR. WOODROW: No. I'm going to instruct him not to answer. Actually, at this point, if you'll indulge me, I'd like to go ahead and mark an exhibit.

[Rumph Exhibit No. 1 was marked for identification.]

MR. WOODROW: For the record, we've marked as Exhibit No. 1 to Mr. Rumph's deposition a copy of the Court's order dated April 30, 2007 setting forth the subject matter for today's deposition. Thank you.

MR. TAYLOR: Which I have read and

understand.

BY MR. TAYLOR:

Q. Prior to the day of bid delivery -- let me scratch that. When were proposals due under this solicitation?

A. I don't remember.

Q. Well, If I said December 19, 2006, would that refresh your memory?

A. Yes.

Q. Prior to that -- I'm not talking about the day of the bid. Prior to that, did any potential offerors contact you regarding the designated delivery location?

A. Yes.

Q. When I say contact you, I mean by E-mail, phone, letter, fax, or in any other way. So how many potential offerors contacted you?

A. I do not know.

Q. You do not know how many?

A. Correct. I received phone calls. I couldn't give you an exact number.

Q. All right. Well, let's go through it.

You got some inquiries by telephone?
A. Yes.
Q. Did you get any by E-mail?
A. Yes.
Q. Did you get any by fax?
A. No.
Q. Did you get any by letter?
A. No.
Q. Did you get any by personal meeting and request?
A. No.
Q. Now, again, I'm talking prior to December 19th. When did they contact you?
A. Various times.
Q. And why did they contact you?
A. For various reasons.
Q. And I'm talking about regarding the delivery location.
A. Okay.
Q. So is your answer still the same, more than one? You said they. More than one person contacted you with respect to this delivery location

prior to December the 19th?

A. I would say yes.

Q. Again, why did they contact you?

A. For the address of where it is to be delivered.

Q. What questions specifically did they ask you; do you recall?

A. Did I know where the 245 Murray Lane address is.

Q. And what did you tell them?

A. I told them it was at Anacostia Naval Base.

Q. What else did you tell them?

A. That was it.

Q. That was it?

A. They knew --

Q. At no time, did anybody say anything else, ask you anything else?

A. They knew where it was at.

Q. Did you advise anybody to deliver by messenger service?

A. No.

Q. Did you tell any of them that there was particularly high security at that location?

A. No.

Q. Did you ask or did you tell any of them how long it would take them to get something delivered at that location?

A. No.

Q. Did you provide any other specific instructions with respect to how to get a package delivered to 245 Murray Lane?

A. No.

Q. So it's your testimony that someone would call you and say -- well, first of all, did any of them express confusion about the fact that the solicitation listed both 7th and D Street and 245 Murray Lane?

A. No.

Q. Nobody said to you there are two addresses here, which one do I deliver to?

A. No.

Q. So the totality of your phone call, from your testimony, is someone would call and say where

is Murray Lane and you would say Anacostia Naval Station and they would say thanks very much, have a nice day?

A. Yes.

Q. There was no more content of the conversation than that?

A. That was it.

Q. Prior to the day of the bid delivery, did you do anything to inform any potential offerors of the extensive security procedures in place at 245 Murray Lane?

A. No.

Q. Other than saying Anacostia Naval Station, did you provide any directions to 245 Murray Lane?

A. No.

Q. Did you provide any directions to Anacostia Naval Air Station?

A. No.

Q. Did anyone in your office advise you as to how to respond to inquiries from potential offerors?

A. Yes.

Q. And who was that?

A. That's Victoria Short, the contracting officer.

Q. What did she tell you to say?

A. Any questions that we received, we were instructed -- I was instructed to have them submitted by E-mail.

Q. Submit the questions?

A. Questions by E-mail.

Q. So these phone calls that you got requesting directions or instructions, you had them send you an E-mail confirming that phone call?

A. Yes.

Q. Do you have those E-mails?

A. I believe so.

MR. TAYLOR: Will you agree, Counsel, to produce any and all E-mails requesting delivery instructions on these proposals?

MR. WOODROW: I can't at this point agree to do that. I would need a formal document request.

MR. TAYLOR: You'll get it.
MR. WOODROW: If such E-mails, in fact, exist.
MR. TAYLOR: He's just testified they do. I'm reasonably sure they probably will.
BY MR. TAYLOR:
Q. Were you instructed by Victoria Short or anyone else of anything else to say to people if they inquired about delivery of proposals?
A. No.
Q. Do you know who Alicia Yvonne Brown is?
A. No.
Q. Okay. Now I'm talking about the day of December the 19th, the day the proposals were due. Where were you located that morning?
A. In the building.
Q. In this building? How were you accessible that morning? In other words, were you at your computer? Could you receive E-mails?
A. Yes.
Q. Could you receive phone calls?
A. Yes.

Q. Was that only on an office phone or do you also have a cell phone?

A. Only on the office phone.

Q. Okay. Now, did any potential or actual offerors contact you that morning?

A. Yes.

Q. How many?

A. Two.

Q. And what did they ask you?

A. Where the 245 Murray Lane address is.

Q. What did you tell them?

A. Anacostia Naval Base.

Q. Any other instructions to them?

A. No.

Q. What time did they call?

A. I'm not sure.

Q. Give me a reasonable, as close an estimate as you can make.

A. I would say it was before the closing of the proposals were due.

Q. Which was what? Ten o'clock?

A. I'm not sure of the time.

Q. How much prior to the time?
A. I'm not sure.
Q. You have no recollection of what time you received a phone call?
A. No, I do not.
Q. What time do you get to work in the morning?
A. I'm here at 6:30.
Q. Were you here at 6:30 that day?
A. Yes.
Q. Without naming their names, can you tell me if both of those people who contacted you actually provided proposals?
A. I cannot.
Q. Did you make a note of who called you and when?
A. No, I did not.
Q. Do you keep a telephone log?
A. No.
Q. But you remember there were two?
A. Yes.
Q. Not one? Not three. Right? Two?

A. Yes.

Q. But you don't know when they called or whether they were offerors?

A. Correct.

Q. And they only asked you one question and you gave one answer?

A. Correct.

Q. Both cases?

A. Correct.

Q. Did you advise either of those people that they needed to arrive earlier because of the security over there?

A. No.

Q. Did you receive any other calls that morning with respect to the 245 Murray Lane location?

A. No.

Q. Did you receive any calls related to the 7th and D location?

A. No.

Q. Did either of those callers ask you whether they should deliver it at 245 Murray Lane or

to 7th and D?
A. No.
Q. Did you receive any other calls that morning that related to the solicitation in any way?
A. No.
Q. The instructions on the solicitation said they were to be to delivered to you; is that right?
A. Yes.
Q. And, yet, you were here at 7th and D. Right?
A. Yes.
Q. So how were people supposed to deliver to you if you were here and this isn't 245 Murray Lane?
A. At the address indicated in the solicitation, at 245 Murray Lane.
Q. How did you, in fact, receive the proposals that were submitted?
A. From the 245 Murray Lane address.
Q. How literally, physically, how did you get them? Did they appear on your desk one day?

How do you get those things?

A. They were brought up by the mail room.

Q. Were they together?

A. Yes.

Q. Had you given Murray Lane special instructions as to how to handle those proposals?

A. No.

Q. Did they know that a solicitation closing was happening that day and they should be expecting proposals?

A. I'm not aware of that.

Q. Either before -- how many proposals were accepted or how many were submitted?

MR. WOODROW: I think that information actually is subject to the protective order. I'm going to allow him to answer it, but we may need to seal that aspect of the deposition transcript

MR. TAYLOR: Well, why don't we not answer it.

BY MR. TAYLOR:

Q. Without naming the number of proposals that were received in both before and on the day of,

how many people called you asking for delivery instructions? You said there were two the morning of the closing. So how many total or how many before that? You said there were other people a while ago, there was at least more than one. Do you know how many, approximately?

A. No. I'm not sure.

Q. Do you know if any other people in the contract shop, Victoria Short or anyone else, received inquiries with respect to delivery?

A. I don't know.

Q. No one ever said to you, I got a call about delivery or, you know, what are these addresses?

A. Not that I can recall.

Q. To the best of your knowledge, how many of those people who called you actually submitted a proposal?

MR. WOODROW: Objection. Asked and answered.

You can go ahead.

MR. TAYLOR: How can it be asked and

answered? He didn't know how many a minute ago.

MR. WOODROW: He can go ahead and answer.

THE WITNESS: What was the question?

BY MR. TAYLOR:

Q. I asked you how many of those who contacted you successfully submitted a proposal.

A. I do not know.

Q. To the best of your knowledge, did any other offeror besides Shirlington submit their proposal to 7th and D Street?

A. Not to my knowledge.

Q. How long did you spend with one or more of your counsel preparing for this deposition?

MR. WOODROW: Objection to the extent that it requires him to divulge attorney-client privileged information.

MR. TAYLOR: The amount of time spent is clearly relevant and has nothing to do with privilege.

BY MR. TAYLOR:

Q. How long did you spend with either or

both of these attorneys?

MR. WOODROW: You can go ahead and answer.

THE WITNESS: About a half an hour.

BY MR. TAYLOR:

Q. Your answers have been extraordinarily vague, Mr. Rumph.

MR. WOODROW: Objection. Argumentative.

BY MR. TAYLOR:

Q. Did either one of them instruct you to be intentionally vague?

MR. WOODROW: Objection. Argumentative.

I'm going to instruct you not to answer the question because it potentially calls for attorney-client privileged information.

MR. TAYLOR: All right. We'll take it up with the judge. I have no further questions.

MR. WOODROW: Can we take just a short off the record break? We may have some questions from our side.

[Recess.]

MR. WOODROW: We have no questions for

the witness.

MR. TAYLOR: Thank you. That concludes your deposition. Thank you for your cooperation today.

(Whereupon, at approximately 3:02 o'clock, p.m., the above deposition was concluded and signature was Not waived.)

* * * * *

ORIGINAL

E-R-R-A-T-A S-H-E-E-T

IN RE: SHIRLINGTON LIMOUSINE and TRANSPORTATION, INC. vs. THE UNITED STATES OF AMERICA

DEPOSITION OF: FRANK L. RUMPH

DATE OF DEPOSITION: TUESDAY, MAY 1, 2007

At the time the above-named deponent read and signed this deposition, the deponent desired to make the following changes:

PAGE: LINE: AS TRANSCRIBED: CHANGE TO: REASON:

NONE F.L.R. 5/3/07

DATED: 5/3/07

[signature]

SIGNATURE OF DEPONENT

NCRA

CAROL J. THOMAS STENOTYPE REPORTING SERVICES, INC.
3162 MUSKET COURT
FAIRFAX, VIRGINIA 22030
(703) 273-9221

ORIGINAL

CERTIFICATE OF THE DEPONENT

I have read the foregoing pages 4 through 41 inclusive, and find the answers to the questions therein contained to be true and correct, with the exception of changes, if any, as per the errata sheet following herewith.

FRANK L. RUMPH

DATED: 5-3-07

- - - - - - - - - - - - - - - - - - - - - - - - -

CERTIFICATE OF THE NOTARY PUBLIC

SUBSCRIBED AND SWORN TO BEFORE ME THIS ____ DAY OF ________________, 2007

(PRINT NAME OF NOTARY)

NOTARY PUBLIC IN AND FOR THE STATE OF

MY COMMISSION EXPIRES:

NCRA

CAROL J. THOMAS STENOTYPE REPORTING SERVICES, INC.
3162 MUSKET COURT
FAIRFAX, VIRGINIA 22030
(703) 273-9221

# CERTIFICATE OF NOTARY PUBLIC

I, CATHERINE B. CRUMP, the officer before whom the foregoing deposition was taken, do hereby testify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me stenographically and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto nor financially or otherwise interested in the outcome of this action.

CATHERINE B. CRUMP

Notary Public in and for the
District of Columbia

My commission expires: October 31, 2007

# In the United States Court of Federal Claims

No. 07-220C

Filed April 30, 2007

SHIRLINGTON LIMOUSINE & TRANSPORTATION, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

## ORDER

Upon consideration of Plaintiff's April 18, 2007 Motion for Leave to Supplement the Administrative Record with Expanded Discovery and the Government's April 27, 2007 Opposition, the court hereby grants Plaintiff's April 18, 2007 Motion. Pursuant to RCFC 26 and 30, Plaintiff may depose Mr. Frank Rumph, Contract Specialist, Office of Procurement Operations, United States Department of Homeland Security, regarding the circumstances surrounding the delivery of proposals under the Solicitation and the decision to refuse to accept Plaintiff's proposal.

Plaintiff is hereby granted leave to file a supplemental brief to Plaintiff's April 30, 2007 Motion for Judgment on the Administrative Record on or before May 4, 2007 with information gleaned from the Rumph deposition as it relates to Count II of the Complaint. The Government's Response and Cross-Motion for Judgment on the Administrative Record will be filed on or before May 15, 2007, as set forth in the April 12, 2007 Scheduling Order.

**IT IS SO ORDERED.**

**s/Susan G. Braden**
**SUSAN G. BRADEN**
**Judge**

RUMPH
EXHIBIT NO. 1
C. CRUMP 5/1/07