No. 07-220C
(Judge Braden)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SHIRLINGTON LIMOUSINE & TRANSPORTATION, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

BRIAN M. SIMKIN
Assistant Director

KENNETH D. WOODROW
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street
Washington, D.C. 20530
tel: (202) 353-0513
fax: (202) 514-7976
Attorneys for Defendant

OF COUNSEL:

ROSE J. ANDERSON
Attorney Advisor
General Law Division
United States Department of Homeland Security
Washington, DC 20528

May 15, 2007

# TABLE OF CONTENTS

PAGE


STATEMENT OF THE CASE ........ 1

I. Nature Of The Case ........ 1

II. Counter Statement Of Facts ........ 2

ISSUES PRESENTED ........ 13

SUMMARY OF THE ARGUMENT ........ 13

ARGUMENT ........ 14

I. Standard Of Review ........ 14

A. Standard Of Review For Motion To Dismiss ........ 14

B. Standard Of Review For Motion For Judgment Upon The Administrative Record ........ 14

C. The Standard For Granting Injunctive Relief ........ 16

II. Shirlington Does Not Possess Standing To Challenge The Terms Of The Solicitation ........ 17

A. Shirlington Is Not An Actual Offeror Under The Solicitation ........ 19

1. The Burden Rests Upon The Contractor To Timely Deliver Its Proposal To The Proper Location ........ 19

2. Shirlington's Cannot Justify Its Failure To Timely Deliver Its Proposal ........ 20

a. The Delivery Location Was Clearly Set Forth In The Solicitation ........ 22

b. Shirlington Cannot Meet Any Of The Timeliness Exceptions Set Forth In FAR 15.208 ........ 22

B. Shirlington Is Not A Prospective Offeror Under The Solicitation ........ 26

**TABLE OF CONTENTS**
-continued-

PAGE

III. The Agency's Decision To Set Aside The Solicitation For Small Business Was Lawful and Reasonable ..... 27

A. The Agency Met The Statutory Requirements For Determining Whether The Solicitation Qualified As A HUBZone Set-Aside ..... 28

1. The Scope And Complexity Of The Agency-Wide Transportation Procurement Precludes Adequate Competition From HUBZone Companies ..... 29

2. The Agency Thoroughly Researched Prospective HUBZone Offerors And Concluded That It Would Not Receive Proposals From At Least Two Responsible Qualified HUBZone Companies ..... 30

3. DHS's Decision To Require Contractors To Maintain Secure Vehicle Storage Facilities Was Clearly Set Forth In The Solicitation ..... 32

B. DHS Properly Exercised Its Discretion In Determining That It Would Not Receive Awards From At Least Two Responsible HUBZone Contractors ..... 33

IV. Shirlington Cannot Demonstrate That The Agency Acted In Bad Faith ..... 34

V. Shirlington Is Not Entitled To Injunctive Relief ..... 36

A. Shirlington Has Not Demonstrated That It Has Succeeded Upon The Merits Of Its Claims ..... 36

B. Shirlington Has Not Demonstrated That It Was Irreparably Injured By The Government's Actions ..... 36

C. Permanently Enjoining The Procurement Would Not Serve The Public Interest ..... 37

D. The Balance Of Harms Favors The Government ..... 38

CONCLUSION ..... 38

## TABLE OF AUTHORITIES

**CASES** **PAGE(s)**

A-Transport Northwest Co. v. United States,
27 Fed. Cl. 206 (1992) .......... 35

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002) .......... 34

American Federation of Government Employees, AFL-CIO v. United States,
258 F.3d 1294 (Fed. Cir. 2001) .......... 17

Argencord Mach. & Equip., Inc. v. United States,
68 Fed. Cl. 167 (2005) .......... 16

Asco-Falcon II Shipping Co., v. United States,
32 Fed. Cl. 595 (1994) .......... 35

Awad v. United States,
61 Fed. Cl. 281 (2004) .......... 13, 14

Banknote Corp. of Am., Inc. v. United States,
365 F.3d 1345 (Fed. Cir. 2004) .......... 22

Bean Stuyvesant, L.L.C. v. United States,
48 Fed. Cl. 303 (2000) .......... 16

Beta Analytics Int'l., Inc. v. United States,
44 Fed. Cl. 131 (1999) .......... 15

CACI, Inc. v. United States,
719 F.2d 1567 (Fed. Cir. 1983) .......... 14, 16

CCL Serv. Corp. v. United States,
48 Fed. Cl. 113 (2000) .......... 16

Cal. Marine Cleaning, Inc. v. United States,
42 Fed. Cl. 281 (1998) .......... 24, 25

Camp v. Pitts,
411 U.S. 138 (1973) .......... 15

Cent. Ark. Maint., Inc. v. United States,
68 F.3d 1338 (Fed. Cir. 1995) .......... 14

## TABLE OF AUTHORITIES
**-continued-**

**CASES** **PAGE(s)**


Cincom Sys., Inc. v. United States,
37 Fed. Cl. 663 (1997) ........ 15, 16

City of Tacoma Dept. of Pub. Utils. v. United States,
31 F.3d 1130 (Fed. Cir.1994) ........ 22

Community Heating & Plumbing Co., Inc. v. Kelso,
987 F.2d 1575 (Fed. Cir. 1993) ........ 24

Conscoop-Consorzia Fra Cooperative Di Prod. E Lavoro v. United States,
62 Fed. Cl. 219 (2004) ........ 18, 19

Contract Management, Inc. v. Rumsfeld,
291 F.Supp.2d 1166 (D. Hawaii 2003), aff'd, 434 F.3d 1145 (9th. Cir. 2006) ........ 28

Cubic Def. Sys. v. United States,
45 Fed. Cl. 450 (2003) ........ 15

FMC Corp. v. United States,
3 F.3d 424 (Fed. Cir. 1993) ........ 16

Fed. Data Corp. v. United States,
911 F.2d 699 (Fed. Cir. 1990) ........ 26

Graphicdata, LLC v. United States,
37 Fed. Cl. 771 (1997) ........ 17

Hayes International Corp. v McLucas,
509 F.2d 247 (5th Cir. 1975) ........ 37

Hospital Klean of Texas, Inc. v. United States,
65 Fed. Cl. 618 (2005) ........ 19, 37

Indium Corp. of Am. v. Semi-Alloys, Inc.,
781 F.2d 879 (Fed. Cir. 1985) ........ 14

Information Technology & Applications Corp. v. United States,
316 F.3d 1312 (Fed. Cir. 2003) ........ 34, 35

J&H Reinforcing and Structural Erectors, Inc. v. United States,
50 Fed. Cl. 570 (2001) ........ 19

## TABLE OF AUTHORITIES
**-continued-**

**CASES** **PAGE(s)**

Keco Indus., Inc. v. United States,
203 Ct. C 492 F.2d 1200 (1974) ..... 16

Kinnett Dairies, Inc. v Farrow,
580 F.2d 1260 (5th Cir. 1978) ..... 37

L.P. Consulting Group, Inc. v. United States,
66 Fed. Cl. 238 (2005) ..... 34

MCI Telecomm. Corp. v. United States,
878 F.2d 362 (Fed. Cir. 1989) ..... 25, 26

McMahon v. United States,
342 U.S. 25 (1951) ..... 18

McRae Industries, Inc. v. United States,
53 Fed. Cl. 177 (2002) ..... 26

Myers Investigative and Security Svcs., Inc. v. United States,
275 F.3d 1366 (Fed. Cir. 2002) ..... 17

Overstreet Elec. Co., Inc. v. United States,
47 Fed. Cl. 728 (2000) ..... 15

Petchem, Inc. v. United States,
99 F. Supp. 2d 50 (D.D.C. 2000) ..... 33

Spezzaferro v. Fed. Aviation Admin.,
807 F.2d 169 (Fed. Cir. 1986) ..... 34

Steel Co. v. Citizens for a Better Env't,
523 U.S. 83 (1998) ..... 17

Tech Systems, Inc. v. United States,
50 Fed. Cl. 216 (2001) ..... 14, 15

Wackenhut Int'l, Inc. v. United States,
40 Fed. Cl. 93 (1998) ..... 14

Winstar Communications, Inc. v. United States,
41 Fed. Cl. 748 (1998) ..... 15

**TABLE OF AUTHORITIES**
**-continued-**


**STATUTES AND REGULATIONS** **PAGE(s)**

5 U.S.C. § 706 .......... 14

15 U.S.C. § 657a .......... 26, 27

28 U.S.C. § 1491(b)(4) .......... 14, 26

28 U.S.C. § 1491 (b)(1) .......... 17

28 U.S.C. § 1491 .......... passim

31 U.S.C. § 3551(2) .......... 17

13 C.F.R. § 126.607 .......... 28, 31

48 C.F.R. § 15.208 .......... passim

48 C.F.R. § 19.1301(b) .......... 27, 31, 33, 36

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| SHIRLINGTON LIMOUSINE & TRANSPORTATION, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 07-220C |
| THE UNITED STATES, | ) | (Judge Braden) |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Pursuant to Rules 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court dismiss plaintiff's bid protest complaint for lack of jurisdiction. In the alternative, pursuant to RCFC 52.1, the United States respectfully requests the Court to grant judgment upon the administrative record in the United States' favor. In addition, pursuant to RCFC 65(a), defendant respectfully requests the Court to deny the motion for declaratory and injunctive relief of plaintiff, Shirlington Limousine & Transportation, Inc. ("Shirlington").

In support of our motion and opposition we rely upon the administrative record, this brief, and the accompanying statement of facts.

## STATEMENT OF THE CASE

### I. NATURE OF THE CASE

In this pre-award protest, Shirlington seeks to permanently enjoin the Department of Homeland Security ("DHS" or "Agency") from proceeding with the award of a contract under

Solicitation Number HSHQDC-07-R-00009 (the "solicitation") to provide Agency-wide shuttle bus and sedan transportation services for DHS employees.

Shirlington's complaint includes three counts. In Count 1 of its complaint, Shirlington alleges that the agency erred by failing to set aside the procurement for competition among companies that are qualified as Historically Underutilized Business Zone Small Business Concerns ("HUBZone SBCs" or "HUBZone firms"). Compl. at ¶¶ 12-35. Count 2 of the complaint alleges that DHS erred by failing to accept Shirlington's proposal that Shirlington delivered to the wrong location. Compl. at ¶¶36-56. Count 3 alleges that DHS breached an "implied duty of good faith and fair dealing" by pushing Shirlington out of the existing contract and the new procurement, allegedly in response to political pressure from Members of Congress. Compl. at ¶¶57-75.

## II. COUNTER-STATEMENT OF FACTS

1. The Department of Homeland Security ("DHS" or "Agency") currently is comprised of a Headquarters office and more than 16 separate components, ranging from the Federal Emergency Management Association to the United States Coast Guard. These components are housed in multiple separate buildings located throughout the District of Columbia metropolitan area. AR249 (Tab 10); AR127-131 (Tab 6) (setting forth current DHS shuttle bus routes).[1]

2. Agency employees currently use shuttle buses and executive sedans to travel between the Agency's dozens of offices located in the District of Columbia metropolitan area. Each of DHS's various components acquire commercial executive sedan and shuttle services

---

[1] "AR___" refers to the administrative record of this case.

from different providers at varying degrees of quality and cost. AR249 (Tab 11).

3. On October 25, 2005, DHS awarded Shirlington a contract to provide transportation services to the DHS Headquarters. The contract was for a period of one year with four one-year options. Subsequently, Shirlington and DHS mutually agreed to modify the option periods under the contract. Shirlington currently is performing a nine-month option period, called Option 1A, which ends on July 26, 2007.

4. Shirlington is currently one of seven contractors providing transportation services to DHS and its components in the District of Columbia metropolitan area. These services include sedans and shuttles for DHS's Headquarters, sedans, vans, and shuttle buses for Immigration and Customs Enforcement, sedans and shuttles for Customs and Border Protection, and sedans for the Transportation Security Administration and the United States Customs and Immigration Service. AR194 (Tab 8).

5. In May 2006, DHS initiated a comprehensive analysis of its transportation requirements. AR249 (Tab 11).

6. Recognizing the inefficiencies of the current provider structure, the Agency's Chief Administrative Officer, Don Bathurst, and the Director of the Office of Procurement Operations, Soraya Correa, concluded that the agency could achieve cost savings and greater efficiency by consolidating the agency's transportation services using a strategic sourcing process. AR249. The Office of Management and Budget currently requires all Federal agencies to implement strategic sourcing initiatives to improve Federal procurement practices. AR1 (Tab 1). DHS currently employs strategic sourcing processes to acquire several commercial commodities and services, ranging from handguns to express mail services. Id.

7. As a part of the strategic sourcing process, DHS formed a Commodity Council consisting of representatives from each organizational component within the Agency. The Council is responsible for consolidating and refining the Agency's requirements and developing an acquisition strategy to meet those requirements. AR249. The Council relies upon historical data (i.e., existing contracts and results of previous competitive actions), market surveys, and responses to requests for information.

8. The agency designated Victoria Short as the contracting officer and Frank Rumph as the contract specialist to handle the consolidated transportation procurement. AR250.

9. On June 23, 2006, the contracting officer issued a Request for Information ("RFI") identifying the Agency's preliminary requirements for transportation services. AR21 (Tab 3).

10. The purpose of the RFI was to gauge the level of interest in a DHS-wide transportation services contract. AR21; AR250.

11. The RFI specified that the contractors would be responsible for providing all sedans and shuttle buses and that the shuttle buses must be "handicapped/wheelchair accessible." AR250; AR21 (Tab 3). It further specified, at a minimum, that all "contractor principals and operations personnel are required to obtain a Suitability Determination." AR21.

12. On October 10, 2006, the Agency amended the RFI to inform potential offerors that "all interested parties have a Defense Industrial Security Clearance Office ("DISCO") cleared Contractor Owned facility at time of award" and that "all Contractor principals and operations personnel are required to obtain a Secret Clearance." AR27 (Tab 5).

13. Of the 11 companies that responded to the Request For Information ("RFI"), only

four claimed to be HUBZone companies. AR251.

14. Based upon the information provided by each of the RFI respondents, and upon research conducted through the Consolidated Contractor Registration ("CCR") and Small Business Administration ("SBA") databases, the Agency concluded that only one of the HUBZone firms, Shirlington, had performed a contract that was similar to the proposed solicitation. AR251.

15. The Agency further determined that another of the HUBZone respondents had previously submitted a marginal proposal that could not be considered for award for a previous DHS transportation contract. Id. The third HUBZone firm indicated that its experience was limited to providing shuttle bus service as a subcontractor to commercial organization, while the fourth respondent was not a HUBZone certified firm based upon the CCR and SBA databases.

16. Only one of the RFI respondents, a small business firm, could meet the DISCO-cleared facility requirement. AR247 (Tab 10).

17. In August and September of 2006, the Commodity Council held multiple meetings to review the results of the RFI and decide upon a strategy for the acquisition. The Council and the contracting officer concluded that: (1) the DHS executive sedan service would be consolidated with a single dispatcher to provide on-call transportation and courier services for authorized DHS executives; (2) the contractor would provide and house the dispatching service; (4) DHS would award two separate contracts for shuttle bus services; (4) the contractors would provide all of the vehicles, including shuttle buses and executive sedans; (5) contractors would be responsible for providing secure storage of the vehicles. AR250 (Tab 11).

18. One of the principal rationales for consolidating the executive sedan services is to

ensure the safety and security of DHS employees traveling between facilities in the Washington metropolitan area. Based upon the security requirements established by the Office of the Chief Security Officer, the Agency determined that contractors must – at a minimum – provide a secure facility for storing vehicles and dispatching calls and ensure that contractor employees obtain appropriate security clearances. AR250 (Tab 11).

19. The proposed procurement is larger in both scope and complexity than any of the Agency's existing transportation contracts. For example, Shirlington currently provides a portion of the Agency's sedan services to the DHS headquarter's component, but the Agency owns the sedans and houses the dispatching service on Agency property. The contract does not require contractor employees to have security clearances because the sedans are stored at Agency facilities. AR251 (Tab 11).

20. In September 2006, the Agency conducted a thorough review of the procurement process and evaluated how the proposed changes to the scope and complexity of the Agency-wide procurement would affect small businesses, including HUBZone companies. AR246, 251.

21. The Agency's evaluation included detailed discussions between the Director of the Office of Procurement Operations and the Director of the Small and Disadvantaged Business Utilization. The discussions specifically related to the small business considerations for the proposed Agency-wide transportation contract. AR251.

22. The Director of the Small and Disadvantaged Business Utilization Office specifically tasked his personnel to perform additional research into the matter. Based upon this analysis, the Agency concluded that it would not receive adequate proposals if the procurement was conducted the procurement under a HUBZone sole-source or competitive set-aside. AR247.

The Agency further concluded that the significant increase in the size and scope of the proposed Agency-wide contract would be too difficult and too expensive for HUBZone businesses. AR247, 252. The Agency concluded, however, that small businesses were interested in the procurement and could fulfill the requirements. Id.

23. On October 6, 2006 the Director of the Office of Procurement Operations convened a meeting of the senior executives involved with the procurement and they each concurred with the acquisition strategy to set-aside the procurement for small businesses and concurred in the decision-making process. AR247, 252.

24. On November 20, 2006, the Agency posted a Request for Proposals ("RFP" or "solicitation") on the FedBizOps website for the DHS-wide Transportation services requirement.

25. The November 20, 2006 solicitation, in the section entitled "Instructions To Offerors," instructed offerors that proposals were to be received by 2:00 p.m. Eastern Standard Time ("EST"), December 12, 2006, and should be submitted to the following address:

Frank Rumph, Contract Specialist
OPO Headquarters Procurement Division
7th and D Streets, SW
Washington, DC 20024

AR66 (Tab 6).

26. The November 20, 2006 solicitation also contained Standard Form 1449, which designated a delivery address in Box 15 of the form as follows:

Department of Homeland Security
Office of Procurement Ops. (DO)
245 Murray Lane
Building 410
Washington, DC 20528

AR29 (Tab 6).

27. The RFP gave prospective offerors an opportunity to submit questions regarding the RFP via e-mail by November 28, 2006. The RFP also stated that the prospective offerors could submit additional questions, if any, after the pre-proposal conference. The additional questions were due December 5, 2006. AR66 (Tab 6).

28. On November 28, 2006, DHS issued Amendment 0001 providing information for the pre-proposal conference and incorporating the applicable Department of Labor wage determination for the solicitation. AR169 (Tab 7).

29. On December 1, 2006, DHS held a pre-proposal conference. The purpose of the conference was to provide potential offerors with the background of the requirement and the strategic source initiative, address information that potential offerors would need to know regarding the preparation of their proposals, and provide an overview of the necessary security requirements. Twelve vendors attended, including two representatives from Shirlington.

30. On December 4, 2006, DHS issued Amendment 0002 to the solicitation in order to provide the slides from the pre-proposal conference held on December 1, 2006. AR181 (Tab 8). Amendment 0002 also provided answers to questions submitted by prospective offerors and informed offerors that a subsequent amendment would be issued to address additional questions. AR2; AR181 (Tab 8).

31. Additional questions after the pre-proposal conference were due December 5, 2006, 10:00 a.m. EST. Shirlington did not submit any questions within the deadline. AR3.

32. On December 7, 2006, after the deadline for submitting questions relating to the pre-proposal conference, Shirlington submitted the following e-mail request to the Contracting

Specialist: "Per our conversation, please fax a copy of the attendees at the pre-proposal conference last Friday, Dec. 1, 2006, to 202-248-0722." AR3.

33. On December 8, 2006, DHS issued Amendment 003 to the solicitation. Among other things, the amendment included the Agency's answers to questions raised by prospective offerors. One question noted the two different delivery addresses listed in the RFP and sought clarification. The Agency responded as follows:

> Change the delivery address at page 38 to read: Department of Homeland Security Office of Procurement Operations, 245 Murray Lane, Building 410, Washington DC 20528. ATTN Frank Rumph.

AR225 (Tab 9). Amendment 0003 also extended the deadline for submitting proposals to December 19, 2006, at 10:00 a.m. EST. AR224.

34. The 245 Murray Lane, Building 410, Washington DC 20528 address is located on the Anacostia Naval Station. AR559 (Tab 31).

35. DHS normally uses the 245 Murray Lane location as the delivery address for its procurements. AR560-61 (Tab 32); AR628-29 (Rumph deposition). DHS uses the Anacostia Naval Station location in order to x-ray and screen incoming packages for security purposes. AR630 (Rumph deposition). Once the incoming proposals are screened, they are delivered by courier to the Office of Procurement Operations at 7th and D Streets, SW. AR630-31 (Rumph deposition).

36. Only three of the more than 15,000 procurement actions conducted by DHS in the past three years involved delivery to the GSA bid room at 7th and D Streets, SW. AR560 (Tab 32).

37. On December 11, 2006, DHS received correspondence from Shirlington's counsel informing DHS that Shirlington had filed a pre-award protest before the General Accountability Office ("GAO") regarding the Agency-wide transportation services solicitation.

38. Counsel for Shirlington also contacted the Director of the Office of Procurement Operations, Soraya Correa, by letter, dated December 8, 2006, informing her that he had filed a protest the previous day and urging her to take immediate corrective action.

39. On December 14, 2006, the Agency received the bid protest filed before the GAO alleging restrictive specifications and a failure to set aside the procurement for HUBZone small businesses.

40. On December 19, 2006, the deadline for proposals set forth in the solicitation, Ms. Lucretia Pearce, Shirlington's Chief Operating Officer, hand-delivered Shirlington's proposal to the General Services Administration ("GSA") bid room, located at 7th and D Streets, SW. Compl. at ¶ 41 (admitting that Shirlington delivered proposal to bid room at 7th and D Streets, SW)

41. The GSA bid room, located at 7th and D Streets, SW, is clearly marked as secure room for depositing bids for GSA procurements. It is located immediately inside the door of the building bearing the sign "General Services Administration National Capital Region." AR565 (color picture). A sign outside the room identifies the room as the "HPSD-12 Contractor Processing Center" and the door to the room contains a GSA notice to all bidders/offerors. AR566 (color picture); AR568 (color picture).

42. Shirlington did not deliver a proposal to the location at 245 Murray Lane, Building 410, the delivery address set forth in the solicitation. Compl. at ¶ 41.

43. The Agency has received multiple proposals in response to the solicitation, all of which were timely delivered to the correct delivery address set forth in the solicitation.

44. On January 8, 2007, the Agency filed its GAO report responding to Shirlington's protest. The Agency's report included a legal memorandum that challenged Shirlington's standing upon the grounds that Shirlington had not submitted a proposal in response to the solicitation. AR255 (Tab 12).

45. On January 10, 2007, Shirlington's counsel sent a letter stating that Shirlington had delivered its proposal to the "bid room" located at 7th and D Streets, SW. Counsel demanded that DHS retrieve his client's proposal. AR532 (Tab 23).

46. On January 10, 2007, the contracting officer stopped by the General Services Administration ("GSA") Bid Room located at 7th and D Streets, SW. Based upon a conversation with Mr. Campbell, a GSA employee, the contracting officer learned that Shirlington's proposal had been submitted there, instead of the location set forth in the solicitation. The contracting officer departed the Bid Room leaving the proposal at that location. To date, the Agency has not retrieved the proposal and at this point is unaware of its location. AR506 (Tab 21).

47. On January 11, 2007, Agency counsel renewed her motion to dismiss the GAO proceeding for lack of jurisdiction and submitted documentary evidence demonstrating that Shirlington had submitted its proposal to a location other than that specified in the solicitation. AR506 (Tab 21).

48. On February 8, 2007, the GAO denied the Agency's motion to dismiss. AR534 (Tab 24).

49. On January 19, 2007, after an ex parte conversation with the GAO, Shirlington's

counsel filed a second protest challenging the Agency's rejection of its proposal as late. AR536 (Tab 25).

50. On March 13, 2007, the GAO denied Shirlington's first protest. It held that the terms of the solicitation were not unduly restrictive and that the Agency's decision to not set aside the solicitation for HUBZone business was reasonable and fully supported in the administrative record. The GAO specifically held that the determination to set aside a procurement requires a business judgment regarding whether the agency will receive offers from at least two qualified, responsible HUBZone companies. It further held that the use of any particular method to assess the availability of HUBZone small business is not required and that measures such as prior procurement history, market surveys, and advice from the agency's small business specialist may all constitute adequate grounds for a contracting officer's decision not to set aside a procurement. AR434, 439 (Tab 16).

51. On March 30, 2007, the GAO denied the second protest. AR598 (Tab 39). It held that it is an offeror's responsibility to deliver its proposal to the proper place by the proper time and that late delivery generally requires the Agency to reject the proposal. AR600. The GAO further held that Shirlington delivered its proposal to the wrong address and that there was no basis to conclude that improper Government action caused the late submission of Shirlington's proposal. Id. The GAO held that there was no support for Shirlington's assertion that the Agency failed to provide sufficiently clear delivery instructions, when the Agency had amended the solicitation to explicitly clarify the delivery instructions. Finally, the GAO held that Shirlington could not rely upon the exception for late proposals that are under the Government's control, because the exception applies only to proposals that are delivered to the address set forth

in the solicitation. AR602.

52. On April 4, 2007, Plaintiff's counsel filed its Complaint for Preliminary Injunction, Permanent Injunction and Declaratory Judgment in this case.

## ISSUES PRESENTED

1. Whether this Court lacks subject matter jurisdiction to entertain Shirlington's claims because Shirlington is not an interested party to the procurement.

2. Whether Shirlington's claims are barred because Shirlington cannot show it has been prejudiced by agency action.

3. Whether the Agency's decision to set-aside the solicitation for small businesses was arbitrary, an abuse of discretion, or otherwise contrary to law.

## SUMMARY OF ARGUMENT

As shown below, Shirlington has failed to meet its burden of establishing subject matter jurisdiction in this case. Because Shirlington failed to deliver its proposal to the location specified in the solicitation, its proposal is late and the Agency is obligated to reject it. 48 C.F.R. § 15.208; Compl. at ¶ 41 (admitting that Shirlington delivered proposal to bid room at 7th and D Streets, N.W.). Because the Agency cannot consider Shirlington's proposal, Shirlington is not an actual or prospective offeror and has no direct economic interest in the award of the contract. Therefore, Shirlington is not an "interested party" and has no standing to challenge the terms of the solicitation. Accordingly, the Court should dismiss Shirlington's complaint.

In the alternative, if the Court finds that Shirlington possesses standing, the Court should conclude that Shirlington has failed to demonstrate that the Agency acted unlawfully or unreasonably in deciding to set aside the Agency-wide transportation procurement for small

businesses, rather than to restrict competition to HUBZone companies.

## ARGUMENT

### I. Standard Of Review

#### A. Standard Of Review For Motion To Dismiss

Pursuant to RCFC 12(b)(1) and 12(b)(6), the Court is required to grant Defendant's motion to dismiss if it finds that it does not have jurisdiction over Plaintiff's claim or that Plaintiff has failed to state a claim upon which relief can be granted. Awad v. United States, 61 Fed. Cl. 281, 283 (2004). When a defendant challenges this Court's jurisdiction, "the plaintiff bears the burden of proving that subject-matter jurisdiction is proper." Id. (citing Schickler, TMD U.S.A., Inc. v. United States, 54 Fed. Cl. 264, 268 (2002)).

If the factual basis for jurisdiction is challenged, the allegations in the complaint are not controlling and only uncontroverted factual allegations are accepted as true for purposes of the motion. Awad, 61 Fed. Cl. at 283. In deciding a motion to dismiss for lack of subject matter jurisdiction pursuant to rule 12(b)(1), the Court may consider evidentiary matters outside the pleadings. Indium Corp. of Am. v. Semi-Alloys, Inc., 781 F.2d 879, 884 (Fed. Cir. 1985); Adams v. United States, 20 Cl. Ct. 132, 133 n.1 (1990).

Here, Shirlington's complaint fails to offer a proper basis upon which this Court can assert jurisdiction to entertain Shirlington's claims. Accordingly, this Court should dismiss the complaint for lack of subject matter jurisdiction.

#### B. Standard Of Review For Motion For Judgment Upon The Administrative Record

This Court reviews allegations of error in the contract procurement process under the

deferential standard set forth in 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4); Tech Systems, Inc. v. United States, 50 Fed. Cl. 216, 221 (2001). An agency's contracting decision may be set aside only if the agency's actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706. To prevail, a protestor must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protestor would have been awarded the contract. Wackenhut Int'l, Inc. v. United States, 40 Fed. Cl. 93, 94-95 (1998). Only agency action that is so egregious that it prevented the fair and honest consideration of the protestor's offer or similarly tainted the procurement process may be enjoined. Cent. Ark. Maint., Inc. v. United States, 68 F.3d 1338, 1341-42 (Fed. Cir. 1995); accord CACI, Inc. v. United States, 719 F.2d 1567, 1573 (Fed. Cir. 1983).

In determining whether the agency's action was arbitrary or capricious, the Court considers whether: (1) there was subjective bad faith upon the part of procuring officials thus depriving the protestor of fair and honest consideration of its proposal; (2) there was a reasonable basis for the procuring officials' decision; (3) the procuring officials abused their discretion; or (4) the procuring officials violated pertinent statutes or regulations. Beta Analytics Int'l., Inc. v. United States, 44 Fed. Cl. 131, 136 (1999); Cincom Sys., Inc. v. United States, 37 Fed. Cl. 663, 671 (1997). In applying these factors, the proper focus is the agency's articulated rationale for the decision and the administrative record underlying it. Camp v. Pitts, 411 U.S. 138, 142-43 (1973); see also Tech Systems, 50 Fed. Cl. at 222 (the Court "cannot substitute its own judgment for that of the agency"); Winstar Communications, Inc. v. United States, 41 Fed. Cl. 748, 757 (1998) (the court's role is limited to ensuring that the agency has examined the relevant data and articulated a satisfactory explanation for its action including a rational

connection between the facts found and the choice made). Although the agency is required to proffer an explanation for its action, the explanation need not be extensive. Camp, 411 U.S. at 142-43.

A protestor must prove the arbitrary and capricious nature of the Government's actions or the violation of an applicable procurement regulation by a preponderance of the evidence. Tech Systems, 50 Fed. Cl. at 222-24. However, because injunctive relief is extraordinary in nature, a plaintiff must demonstrate the right to such relief by clear and convincing evidence. Cubic Def. Sys. v. United States, 45 Fed. Cl. 450, 474 (2003); Overstreet Elec. Co., Inc. v. United States, 47 Fed. Cl. 728, 732 (2000) (citing Bean Dredging Corp. v. United States, 22 Cl. Ct. 519, 522 (1991)); Cincom, 37 Fed. Cl. at 671 (citing 126 Northpoint Plaza LP v. United States, 34 Fed. Cl. 105, 107, appeal dismissed, 73 F.3d 379 (Fed. Cir. 1995)) (plaintiff must prove its case by clear and convincing evidence). A bid protestor cannot meet its burden merely by demonstrating that the record might have supported a different decision. Keco Indus., Inc. v. United States, 203 Ct. Cl. 566, 579, 492 F.2d 1200, 1206-07 (1974). Because contracting officials may exercise wide discretion in their evaluation of procurement regulations, a bid protestor may prevail only when it is clear that the agency's determinations were irrational and unreasonable. Cincom Systems, 37 Fed. Cl. at 672.

### C. The Standard For Granting Injunctive Relief

Shirlington here requests permanent injunctive relief. Injunctive relief is appropriate "only in extremely limited circumstances." CCL Serv. Corp. v. United States, 48 Fed. Cl. 113, 120 (2000) (quoting CACI, Inc. , 719 F.2d at 1581). In order to obtain a permanent injunction, a plaintiff must carry the burden of establishing entitlement to this extraordinary relief based upon

the following factors: (1) actual success on the merits; (2) that plaintiff will suffer irreparable injury if injunctive relief is not granted; (3) that, if the injunction is not granted, the harm to plaintiff will outweigh the harm to the Government and third parties; and (4) that granting the injunction serves the public interest. Bean Stuyvesant, L.L.C. v. United States, 48 Fed. Cl. 303, 320-21 (2000). The decision whether to grant an injunction is within the sound discretion of the trial court. FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993).

## II. Shirlington Does Not Possess Standing To Challenge The Terms Of The Solicitation

The threshold issue before the Court is whether Shirlington possesses standing to bring this protest, when it failed to timely deliver its proposal to the correct location as set forth in the solicitation. See Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 176 (2005) (holding that protestor that failed to timely submit a proposal lacks standing to challenge terms of the solicitation).

For this Court to possess jurisdiction over Shirlington's pre-award protest, Shirlington must have standing. Myers Investigative and Security Svcs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-04 (1998)). As the party invoking jurisdiction, Shirlington bears the burden of establishing the elements of standing. Id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

The Tucker Act, 28 U.S.C. § 1491, grants this Court jurisdiction to entertain pre-award bid protest actions. Graphicdata, LLC v. United States, 37 Fed. Cl. 771, 778 (1997). As amended by the Administrative Dispute Resolution Act of 1996, the Tucker Act provides that this Court:

> shall have jurisdiction to render judgment on an action by an

> interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation or regulation without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491 (b)(1) (emphasis added).

The Federal Circuit has held that the term "interested party," which is not defined in the Tucker Act, is to be construed in accordance with the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3551(2) (Supp. IV 1998), and that "standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." American Federation of Government Employees, AFL-CIO v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001). Waivers of sovereign immunity, such as those established by the Tucker Act, are to be narrowly construed in favor of the sovereign. McMahon v. United States, 342 U.S. 25, 27 (1951).

Shirlington has failed to meet its burden of establishing standing. In its Memorandum on Jurisdiction, filed on April 6, 2007, Shirlington does no more than represent that the Court possesses jurisdiction of pre-award protests based on the Tucker Act, while conveniently ignoring the question of standing. Shirlington's memorandum in support of its motion for judgment upon the administrative record is even less forthcoming – the discussion of jurisdiction is restricted to a single paragraph. Pl. Br. at 12. Because Shirlington is not an actual or prospective offeror under the solicitation, it lacks the requisite direct economic interest necessary to establish standing as an "interested party." Shirlington has failed to meet its burden of establishing jurisdiction in this case.

### A. Shirlington Is Not An Actual Offeror Under The Solicitation

Shirlington is not an actual offeror under the solicitation. The uncontested facts in the administrative record and in Shirlington's complaint establish that Shirlington did not timely deliver its proposal to the location set forth in the solicitation, as required by FAR 15.208.[2] Moreover, Shirlington cannot, as a matter of law, demonstrate that it falls within any of the timeliness exceptions set forth in that section. See generally FAR 15.208 (setting forth limited exceptions only for proposals "received at the Government installation designated for receipt of offers"); also Conscoop-Consorzia Fra Cooperative Di Prod. E Lavoro v. United States, 62 Fed. Cl. 219 (2004), aff'd, 159 Fed. Appx. 184 (Fed. Cir. 2005)) (holding that agency was required to reject untimely offers and could not consider an untimely offer unless one or more limited exceptions applied).[3] Shirlington has not attempted, even now, to deliver its proposal to the address set forth in the solicitation.

#### 1. The Burden Rests Upon The Contractor To Timely Deliver Its Proposal To The Proper Location

The Federal Acquisition Regulation clearly places the burden upon the offeror to transmit its proposal so as to reach the Government office designated in the solicitation by the time specified in the solicitation. FAR 15.208(a) provides that "[o]fferors are responsible for submitting proposals, and any modifications or revisions, so as to reach the Government office

[2] FAR 15.208(a) establishes that "[o]fferors are responsible for submitting proposals, and any modifications or revisions, so as to reach the Government office designated in the solicitation by the time specified in the solicitation." 48 C.F.R. § 15.208(a).

[3] Indeed, if the Agency agreed to consider Shirlington's proposal, it would be subject to protest by any of the other bidders who timely delivered their proposals to the correct address. See Hospital Klean of Texas, Inc. v. United States, 65 Fed. Cl. 618 (2005) (holding that agency improperly accepted untimely proposal).

designated in the solicitation by the time specified in the solicitation." 48 C.F.R. § 15.208(a). Here, Shirlington did not seek to clarify the delivery location and never questioned the delivery instructions set forth in the solicitation prior to the deadline. If Shirlington believed that the proposal was ambiguous, it would have a duty to inquire. Conscoop-Consorzia, 62 Fed. Cl. at 233 (2004), aff'd, 159 Fed. Appx. 184 (Fed. Cir. 2005)) (holding that "if an ambiguity is obvious and a bidder fails to inquire with regard to the provision, his interpretation will fail."). On the day its proposal was due (December 19, 2006), Shirlington did not seek assistance from the agency regarding delivery. See J&H Reinforcing and Structural Erectors, Inc. v. United States, 50 Fed. Cl. 570 (2001) (dismissing contractor's protest for lack of jurisdiction when contractor failed to timely inquire regarding alleged patent ambiguity in solicitation).

In fact, Shirlington did not become aware that its proposal was not timely filed until early January, when agency counsel informed Shirlington's counsel that the Agency had not received a proposal from his client. AR255 (Tab 12). Despite Shirlington's counsel's imperious demands to agency counsel that the Agency retrieve Shirlington's proposal from the GSA bid room, AR530 (Tab 23), there is no legal obligation for the Agency to hunt down and retrieve a proposal submitted to the wrong location.

**2. Shirlington's Cannot Justify Its Failure To Timely Deliver Its Proposal**

Shirlington's arguments, attempting to justify its failure to timely deliver its proposal, have evolved throughout its protest before the General Accountability Office and before this Court. Despite this evolution, Shirlington's arguments are wholly unavailing. Initially, Shirlington argued that it delivered its proposal to the wrong location because the solicitation was

inartfully drafted. AR539-544 (Tab 26). Next, Shirlington's president, Chris Baker, argued that the delivery address set forth in the solicitation was subject to multiple "interpretations" – as either a mailing address or a physical address. AR613 (Tab 40). Then, Shirlington's Chief Operating Officer, Lucretia Pearce, argued that Shirlington's past practice of delivering contract administration documents to the 7th and D Street location justified its decision to deliver the proposal to that location (despite having written the correct delivery location on the front if its proposal). AR609 (Tab 40). Subsequently, in her April 2007 statement, Ms. Pearce claimed that she was "misled" by statements of Shirley Turner, the contracting officer for DHS's existing contract with Shirlington.[4] See Memorandum Of Points And Authorities In Support Of Plaintiff's Motion For Leave To Supplement The Administrative Record With Additional Discovery, Att. A (statement of Lucretia Pearce at ¶ 5). In that submission, Shirlington argued, for the first time, that Frank Rumph had provided more explicit delivery directions to other offerors prior to the date that proposals were due. Id. at 3.

Despite these myriad arguments, and despite being permitted to take the deposition of Frank Rumph, Shirlington has failed to identify any affirmative Government misconduct that caused Shirlington to deliver its proposal to the wrong location. Instead, Mr. Rumph's deposition simply affirmed his earlier statement in the administrative record and further clarified the fact that, to his knowledge, DHS has always used the Anacostia Naval Station as the delivery address for contract proposals. AR559 (Tab 31).

---

[4] Ms. Turner has nothing to do with the procurement at issue in this case.

**a. The Delivery Location Was Clearly Set Forth In The Solicitation**

Shirlington relies upon the statement of Lucretia Pearce, attached to its April 18, 2007 motion for additional discovery, to imply that the delivery instructions in the solicitation were ambiguous. See Mot., Att. A (statement of Lucretia Pearce at ¶ 3). Shirlington's allegations are without merit.

The requirements for delivery of the proposal are unambiguously set forth in the solicitation itself. AR443 (Tab 17). Box 15 of the solicitation sets forth the delivery address as:

> Department of Homeland Security
> Office of Procurement Ops. (DO)
> 245 Murray Lane
> Building 410
> Washington, DC 20528

Shirlington was unquestionably aware of the correct delivery address, because the cover sheet of its proposal contained the correct address. AR512 (Tab 21). Because the solicitation is unambiguous and is not capable or more than one interpretation, the Court cannot rely upon extrinsic evidence to clarify the solicitation's terms. See Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1353 (Fed. Cir.2004). Therefore, Shirlington is not entitled to rely upon testimonial evidence regarding the interpretation of the solicitation. See City of Tacoma Dept. of Pub. Utils. v. United States, 31 F.3d 1130, 1134 (Fed. Cir.1994) ("Outside evidence may not be brought in to create an ambiguity where the language is clear.").

**b. Shirlington Cannot Meet Any Of The Timeliness Exceptions Set Forth In FAR 15.208**

Shirlington cannot, as a matter of law, demonstrate that it meets any of the timeliness exceptions set forth in FAR 52.215-1(c)(3). FAR 15.208 provides for the following limited

timeliness exceptions:

> (b)(1) Any proposal, modification, or revision, received at the Government office designated in the solicitation after the exact time specified for receipt of offers is "late" and will not be considered unless it is received before award is made, the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition; and--
>
> (I) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or
>
> (ii) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers; or
>
> (iii) It is the only proposal received.

48 C.F.R. § 15.208(b)(1)(I) - (iii) (emphasis added).

Each of these three limited exceptions apply only to proposals "received at the Government office designated in the solicitation." Id. Shirlington admits that it did not deliver its proposal to the office designated in the solicitation. Compl. at ¶ 41 (alleging that Shirlington delivered proposal to bid room at 7th and D Streets, N.W.); see also Compl. at Ex. 4 (statement of Lucretia Pearce acknowledging that she delivered proposal to GSA bid room at 7th and D Streets, N.W.). Nothing prevented Shirlington from calling the Agency, at any time before the deadline for receipt of proposals, to obtain more explicit instructions to reach the delivery address. Moreover, since the December 19, 2006 deadline for receipt of bids, Shirlington has made no attempt to deliver its proposal the correct location at 245 Murray Lane. Therefore, Shirlington does not, and cannot, demonstrate that it meets any of the regulatory exceptions for untimely

proposals.

Moreover, the discovery obtained by Shirlington has no bearing upon whether any of the timeliness exceptions apply to it. FAR 15.208(c) provides that the only "acceptable evidence to establish the time of receipt at the Government installation includes . . . oral testimony or statements of Government personnel." 48 C.F.R. § 15.208(c). Here, Shirlington sought discovery to "explain whether the Agency had contact with other potential or actual offers [sic] at any time prior to the date that proposals were due." Motion to Supplement Administrative Record, at 3. This information has nothing to do with when the Government may have received Shirlington's proposal (indeed, the administrative record establishes that the Agency has never received Shirlington's proposal at the designated location). Consequently, it has no bearing upon whether Shirlington could qualify for one of the regulatory exceptions.[5] Moreover, Mr. Rumph testified that proposals (indeed, all deliveries) are received by security personnel at Anacostia Naval Station and are forwarded to DHS at its 7th and D location by courier.

Shirlington relies upon California Marine Cleaning, Inc. v. United States, 42 Fed. Cl. 281 (1998), to support its argument that its mis-delivered proposal should be accepted as "received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers." FAR 15.208. Shirlington's reliance upon California Marine is misplaced. Contrary to Shirlington's representations, California Marine

[5] At most, information regarding the submission of other proposals demonstrates only that the delivery instructions in the solicitation were sufficiently clear to the other prospective bidders who successfully delivered their proposals to the correct location in a timely manner. See Community Heating & Plumbing Co., Inc. v. Kelso, 987 F.2d 1575, 1579 (Fed. Cir. 1993) (evidence of other offerors' interpretations considered in determining reasonableness of contractor's interpretation).

held that a proposal that was timely delivered to the proper location, but not discovered by the agency until later, must be considered for award. 42 Fed. Cl. at 297. The facts in California Marine bear no meaningful similarity to the facts of this case. In California Marine, it was undisputed that the protestor delivered its bid to the location designated in the solicitation; the only issue was whether the protestor had timely delivered the bid. Id. Here, Shirlington cannot legitimately claim that it delivered its proposal to the "Government installation designated for receipt of offers." Shirlington admits that it delivered its proposal to the GSA bid room at 7th and D Streets, N.W., not to 245 Murray Lane location specified in the solicitation. Compl. at ¶ 41 (alleging that Shirlington delivered proposal to bid room at 7th and D Streets, N.W.); see also Compl. at Ex. 4 (statement of Lucretia Pearce acknowledging that she delivered proposal to GSA bid room at 7th and D Streets, N.W.).

Shirlington distorts dicta in California Marine to support its argument that FAR 15.208 does not require that the contractor submit its bid to the designated Government installation prior to the bid deadline. Pl. Br. at 31. Shirlington misleadingly attempts to distinguish between the "designated office" for the receipt of bids and the "government installation" as those terms are applied by the GAO, implying that the "designated office" here is the 7th and D location and the "government installation" is the 245 Murray Lane location at the Anacostia Naval Station. Id. at 32. This distinction is irrelevant to this case. As the Court in California Marine explained, "government installation" refers to the entire Government facility in which the "designated office" is located and the distinction applies only to situations in which a proposal is timely delivered to the Government facility but not received at the designated office until later. 42 Fed. Cl. at 298, n. 33. Here, the 7th and D St., SW location cannot be construed as being within (or

even near) the "government facility" at the Anacostia Naval Station.[6] Following Shirlington's argument to its logical conclusion, any Government office would be obligated to accept proposals, regardless of whether the office was designated as the delivery location in the solicitation.

**B. Shirlington Is Not A Prospective Offeror Under The Solicitation**

The test for determining whether a protestor possesses standing as a prospective offeror is set forth in MCI Telecomm. Corp. v. United States, 878 F.2d 362 (Fed. Cir. 1989). In MCI, the plaintiff alleged that the Government had waived mandatory contract requirements and should be required to resolicit the contract. The court held that "in order to be eligible to protest, one who has not actually submitted an offer must be expecting to submit an offer prior to the closing date of the solicitation . . . the opportunity to qualify either as an actual or prospective bidder ends when the proposal period ends." 878 F.2d at 365 (emphasis added); see also Fed. Data Corp. v. United States, 911 F.2d 699, 704 (Fed. Cir. 1990). Shirlington cannot meet this standard. Because Shirlington failed to submit its proposal before the deadline for receipt of bids, it cannot qualify as a prospective offeror. Therefore, Shirlington is not a "prospective bidder" and does not have standing to challenge the terms of the solicitation.

Moreover, Shirlington cannot rely upon its economic interest in the subject matter of the procurement to establish standing. The facts of this protest are similar to those in McRae Industries, Inc. v. United States, 53 Fed. Cl. 177 (2002). McRae Industries, like Shirlington here, was not an actual offeror. Accordingly, the Court in McRae held that, because the protestor was

---

[6] Such a distinction might presumably apply to the designated office at Building 410, 245 Murray Lane, which is located on the Government facility of the Anacostia Naval Station.

not an actual offeror and did not have the requisite "direct economic interest" in the solicitation, it could not establish its standing under 28 U.S.C. § 1491(b)(1). The Court held that possessing an economic interest in the subject matter of the procurement is not enough; instead, a protester must be "an 'actual or prospective bidder' and have the requisite 'direct economic interest.'" Id. at 180 (citing Fed. Data Corp. v. United States, 911 F.2d 699, 703 (Fed. Cir. 1990)).

Because Shirlington is neither an actual offeror, nor a prospective offeror, it lacks the requisite standing to challenge the terms of the solicitation, and thus Count I of the Complaint should be dismissed.

## III. The Agency's Decision To Set Aside The Solicitation For Small Business Was Lawful and Reasonable

In 1997, Congress passed the Historically Underutilized Business Zone ("HUBZone") Act. 15 U.S.C. § 657a (1994 & Supp. V 1999). The Act established the HUBZone program, the purpose of which "is to a provide Federal contracting assistance for qualified small business concerns located in historically underutilized business zones, in an effort to increase employment opportunities, investment, and economic development in those areas." 48 C.F.R. ("FAR") § 19.1301(b) (2000). The Small Business Administration (the "SBA") is responsible for certifying qualified firms as HUBZone small business concerns ("HUBZone businesses"). FAR § 19.1303(a). Once a firm is HUBZone certified and its name appears on the SBA's List of Qualified HUBZone Small Business Concerns, the firm is eligible for HUBZone program preferences. FAR § 19.1303(b).

The HUBZone program provides three mechanisms to assist HUBZone businesses obtain Federal contracts: (1) HUBZone set-asides; (2) HUBZone sole source awards; and (3) HUBZone

price evaluation preferences. FAR §§ 19.1305-07. The HUBZone set-aside is at issue here.

**A. The Agency Met The Statutory Requirements For Determining Whether The Solicitation Qualified As A HUBZone Set-Aside**

The statutory and regulatory requirements for setting aside a solicitation for HUBZone business are straightforward. By statute, a contract opportunity shall be set aside for HUBZone businesses when the contracting officer makes two specific discretionary determinations: first, the contracting officer must have a "reasonable expectation that not less than 2 qualified HUBZone small business concerns will submit offers;" and second, the contracting officer must conclude "that the award can be made at a fair market price." 15 U.S.C. § 657a(b)(2). These same requirements are promulgated in the Federal Acquisition Regulations:

> (c) If the contracting officer decides to set aside the requirement for competition restricted to qualified HUBZone SBCs [small business concerns], the contracting officer must:
> (1) Have a reasonable expectation after reviewing SBA's list of qualified HUBZone SBCs that at least two responsible qualified HUBZone SBCs will submit offers; and
> (2) Determine that award can be made at fair market price.

13 C.F.R. § 126.607.

We do not dispute that the statute and regulations provide for a mandatory set aside. See Plaintiff's Br. at 14-16. However, the mandatory set aside is not triggered until the contracting officer makes the initial determination that at least two responsible, qualified HUBZone companies will submit offers and that the award can be made at a fair market price. Both of these determinations require the contracting officer to exercise reasonable discretion and judgment. Contract Management, Inc. v. Rumsfeld, 291 F.Supp.2d 1166, 1173 (D. Hawaii 2003), aff'd, 434 F.3d 1145 (9th. Cir. 2006) (holding that mandatory HUBZone set-aside is not

triggered until contracting officer determines that statutory criteria are met).

Here, the administrative record reveals that the Agency acted rationally and reasonably in deciding to not set aside the agency-wide transportation solicitation for HUBZone business. The Agency's decision is documented extensively in the administrative record. Moreover, the record directly refutes Shirlington's contentions regarding the nature of the Agency's analysis. See Pl. Br. at 17-19 (claiming that DHS failed to consult small business contractor databases).

### 1. The Scope And Complexity Of The Agency-Wide Transportation Procurement Precludes Adequate Competition From HUBZone Companies

The proposed procurement is larger in both scope and complexity than any of the Agency's existing transportation contracts. It cannot, therefore, be meaningfully compared to any of the existing contracts. The scope and complexity of the proposed requirements, among other factors, limits the pool of potentially qualified HUBZone businesses. AR251.

Currently, each of DHS's separate components acquire commercial executive sedan and shuttle services from different providers at varying degrees of quality and cost. AR249 (Tab 11). Shirlington, for example, currently provides a portion of the Agency's sedan services to DHS's headquarters component, but the Agency owns the sedans and houses the dispatching service on Agency property. The existing contract does not require contractor employees to have security clearances because the sedans are stored at Agency facilities. AR251.

In contrast, the Agency-wide transportation solicitation covers nearly all of DHS's individual components, not just its headquarters component. In particular, the solicitation provides that: (1) the DHS executive sedan service would be consolidated with a single dispatcher to provide on-call transportation and courier services for authorized DHS executives;

(2) the contractor would provide and house the dispatching service; (3) the contractors would provide all of the vehicles, including shuttle buses and executive sedans; and (4) contractors would be responsible for providing secure storage of the vehicles in a Defense Industrial Security Clearance Office ("DISCO") cleared facility. AR250. It further provides that the shuttle buses must be "handicapped/wheelchair accessible." Id.; AR21 (Tab 3). The agency-wide solicitation has a total potential value of significantly more than Shirlington's existing contract, which has a total value of only $21 million over a five-year period and covers only DHS's Headquarters component. AR250. The significant increase in cost is due, in part, to the requirement that the contractor supply all vehicles, as well as to the increased number of shuttle bus routes and the increased use of sedan services to support each of the other organizational components of DHS. AR251.

One of the Agency's principal rationales for consolidating the transportation services is to ensure the safety and security of DHS employees traveling between facilities in the Washington metropolitan area. Based upon the security requirements established by the Office of the Chief Security Officer, the Agency determined that contractors must – at a minimum – provide a secure facility for storing vehicles and dispatching calls and ensure that contractor employees obtain appropriate security clearances. AR250. These security requirements would affect the number of qualified potential offerors due to the expense and difficulty of providing secure storage facilities and qualified security-cleared personnel. AR251.

**2. The Agency Thoroughly Researched Prospective HUBZone Offerors And Concluded That It Would Not Receive Proposals From At Least Two Responsible Qualified HUBZone Companies**

Of the 11 companies that responded to the Request For Information ("RFI"), only four

claimed to be HUBZone companies. AR251. Based upon the information provided by each of the companies, and upon research conducted through the Consolidated Contractor Registration ("CCR") and Small Business Administration ("SBA") databases, the Agency concluded that only one of the HUBZone firms, Shirlington, had performed a contract that was similar to the proposed solicitation. AR251. The Agency further determined that another of the HUBZone respondents had previously submitted a marginal proposal that could not be considered for award for a previous DHS transportation contract. Id. The third HUBZone firm indicated that its experience was limited to providing shuttle bus service as a subcontractor to commercial organizations, while the fourth respondent was not a HUBZone-certified firm based upon the CCR and SBA databases. Moreover, only one of the RFI respondents, a small business firm, could currently meet the DISCO-cleared facility requirement. AR247 (Tab 10).

The Agency also considered the responses it had received to past transportation solicitations. AR251. Under previous solicitations, all of which were involved less onerous requirements (e.g., no security requirements or requirement that contractors supply the vehicles), the Agency received very few competitive proposals from HUBZone companies. Id. In fact, under the first Headquarters contract, only one offeror was a HUBZone firm and that firm, Shirlington, intially had difficulty performing the contract. Id.

In addition to reviewing responses to the RFI and past contracting history, the Agency researched the CCR and SBA databases. Id. Specifically, Kevin Boshears, the Agency's Director of Small and Disadvantaged Business Utilization, directed his staff to research these databases for information relating to the HUBZone firms that responded to the RFI. AR247 (Tab 10). Ms. Soraya Correa also directed her staff to conduct similar research using the CCR

and SBA databases. AR251.

Shirlington faults the Agency for failing to search these databases for "any and all potential HUBZone offerors" listed under the applicable North American Industrial Classification Codes ("NAICS") for the procurement. Pl. Br. at 18. Shirlington speculates that such a search would have revealed more than two qualified HUBZone companies. Id. at 19. Shirlington's argument, however, ignores the plain language of the FAR, which requires the contracting officer to have a "reasonable expectation" that "at least two responsible qualified HUBZone SBCs will submit offers." 13 C.F.R. § 126.607. The FAR does not require the Agency to set-aside a contract solely upon the basis of a database search and Shirlington cannot point to a single case requiring the Agency to automatically set aside a contract if a database search uncovers more than two HUBZone companies in the relevant NAICS code. Instead, the statute and regulations require the contracting officer to exercise her discretion to determine whether the Agency reasonably will receive at least two offers from responsible qualified offerors. A mere search of the databases cannot reveal whether any of the listed firms are responsible, or qualified, or would be in a position to submit an offer.

### 3. DHS's Decision To Require Contractors To Maintain Secure Vehicle Storage Facilities Was Clearly Set Forth In The Solicitation

Contrary to Shirlington's assertions, the solicitation clearly requires the contractor to provide a vehicle storage facility that is security-cleared. Pl. Br. at 21. Prior to issuing the solicitation, DHS amended the RFI to require that "all interested parties have a Defense Industrial Facility ("DISCO") cleared Contractor Owned facility at time of award" and to clarify that the "Contractor is responsible for maintaining a DISCO cleared facility for parking the

sedans and shuttle busses on a 24x7 basis." AR27 (Tab 5). The full panoply of security requirements are set forth at Attachment 6 to the solicitation. AR143, 147 (requiring contractors to abide by the requirements of Department of Defense Form DD254). Moreover, the security requirements were discussed at length during the security briefing at the pre-award conference. See AR220 (briefing slide at p. 21). The Agency also responded to specific questions from prospective offerors submitted by email and provided its responses as a part of the second amendment to the solicitation. See AR226 (response to question no. 8 clarifying nature of security requirements). Finally, Amendment 0003 to the solicitation attached a copy of Department of Defense Form DD254, which sets forth the specific facility security requirements. See AR235 (Block 1A at the top of the DD 254 requiring "Facility Clearance Required - SECRET"). Because all of the prospective offerors were on notice of the solicitation's security requirements, it was reasonable for the Agency to screen potential HUBZone offerors based upon their ability to provide secure facilities in accordance with the DISCO requirements.

**B. DHS Properly Exercised Its Discretion In Determining That It Would Not Receive Awards From At Least Two Responsible HUBZone Contractors**

The determination of whether a HUBZone small business concern is "responsible" and "qualified" to submit an offer for a given solicitation is purely within the discretion of the contracting officer. As the United States District Court of the District of Columbia stated, "[t]he decision whether or not to create a set-aside under this regulation is within the discretion of the agency and will not be second-guessed by the courts 'unless an abuse of discretion is clearly shown." Petchem, Inc. v. United States, 99 F. Supp. 2d 50, 58 (D.D.C. 2000).

This initial responsibility determination is distinct from the responsibility determination

requirement set forth at FAR § 9.104-1. There is no set standard for making the initial responsibility determination required pursuant to HUBZone set-aside. Instead, the determination is left to the contracting officer's discretion. JT Constr. Co., Inc., No. B-254257, 1993 WL 505803, at *4 (Comp. Gen. Dec.6, 1993). Here, the contracting officer reasonably determined that the potential HUBZone offerors would not be able to meet the requirements of the proposed solicitation. Specifically, she concluded that the acquisition would be too difficult and too expensive for HUBZone firms, particularly in light of the additional requirements for the contractor to provide all vehicles (including sedans), secured facilities, and increased security clearances for personnel. AR252.

The Agency's decision to not set-aside the solicitation for HUBZone businesses was reasonable and thoroughly explained in the administrative record. The Agency concluded, after extensive market research, an analysis of responses to a detailed request for information, and a review of past procurements and contract performance, that it would not receive at least two proposals from qualified, responsible HUBZone firms. Therefore, the Agency's decision was not arbitrary, capricious, or otherwise not in accordance with law. See Cincom Sys., Inc. v. United States, 37 Fed. Cl. 663, 671 (1997) (holding that court should not substitute its judgment for that of a procuring agency and should intervene only when it is clear that the agency's determinations were irrational or unreasonable).

## IV. Shirlington Cannot Demonstrate That The Agency Acted In Bad Faith

In Count 3 of its complaint, Shirlington 3 alleges that DHS breached an "implied duty of good faith and fair dealing" by excluding Shirlington from the new procurement, allegedly in response to political pressure from Members of Congress. Compl. at ¶¶57-75. However,

Shirlington has not identified a single act of bad faith upon the part of the Government, nor has it cited record evidence of bad faith sufficient to overcome the presumption of regularity associated with the procurement decisions being challenged.

Government officials are presumed to act conscientiously and in good faith in the discharge of their duties. L.P. Consulting Group, Inc. v. United States, 66 Fed. Cl. 238, 243 (2005) (citing Spezzaferro v. Fed. Aviation Admin., 807 F.2d 169, 173 (Fed. Cir. 1986)). Proving that the Government acted in bad faith is intended to be very difficult. See Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002). In order to overcome the presumption that Government officials acted in good faith, a plaintiff must allege and prove, by clear and strong evidence, specific acts of bad faith upon the part of the Government. L.P. Consulting, 66 Fed. Cl. at 243 (citing Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004)). The level of proof to overcome this presumption is high, and has been equated with evidence of some specific intent to injure the plaintiff. Id. (citing Galen).

Shirlington must prove that the Government took specific action and possessed the specific intent to harm it or to prevent it from bidding on the transportation contract. Information Technology & Applications Corp. v. United States, 316 F.3d 1312, 1323 (Fed. Cir. 2003); A-Transport Northwest Co. v. United States, 27 Fed. Cl. 206, 220 (1992). Shirlington, therefore, cannot show bad faith unless it demonstrates that the Government was motivated alone by malice. A-Transport at 220 (quoting Gadsden v. United States, 111 Ct. Cl. 487, 489-90 (1948)). The Court cannot infer bad faith merely from a series of events allegedly adverse to Shirlington's interests. Asco-Falcon II Shipping Co., v. United States, 32 Fed. Cl. 595, 604 (1994).

Here, Shirlington cannot point to a single affirmative act that allegedly constitutes Government misconduct. The Agency's decision to meet its transportation needs by means of an Agency-wide transportation contract is fully explained in the administrative record. Likewise, the Agency cannot be faulted for refusing to accept Shirlington's mis-delivered proposal, when Shirlington did not, and has not yet, delivered its proposal to the location specified in the solicitation. Mere allegations of bias cannot suffice for evidence of bad faith. Information Technology & Applications Corp. v. United States, 316 F.3d 1312, 1323 (Fed. Cir. 2003) (upholding trial court's refusal to allow discovery regarding alleged bias in absence of record evidence of bias).

## V. Shirlington Is Not Entitled To Injunctive Relief

### A. Shirlington Has Not Demonstrated That It Has Succeeded Upon The Merits Of Its Claims

For the above reasons, even if the Court finds that Shirlington possesses standing, Shirlington has failed to demonstrate that the Agency acted unlawfully or unreasonably in deciding to set aside the Agency-wide transportation procurement for small businesses, rather than to restrict competition to HUBZone companies. Therefore, Shirlington has not demonstrated success upon the merits of its claims.

### B. Shirlington Has Not Demonstrated That It Was Irreparably Injured By The Government's Actions

Because Shirlington is not an actual or prospective offeror for the agency-wide transportation solicitation, it cannot demonstrate that it would be irreparably injured by the Government's award of the contract to one of the actual offerors. Shirlington failed to timely deliver its proposal as required by the solicitation and the FAR. Therefore, it does not have a

direct economic interest in the award and cannot demonstrate that it will be injured by the Agency's award of the contract.

Even if the Court were to conclude that Shirlington possesses standing to challenge the terms of the solicitation, Shirlington cannot demonstrate that it would irreparably harmed by the Agency's decision to not set aside the procurement for HUBZone businesses. Shirlington does not dispute that it was eligible to bid on the solicitation as a small business. The Agency's decision to set aside the procurement for small business firms, and not exclusively for HUBZone firms, increased the pool of potential competitors but did not exclude Shirlington from the competition or deny it the opportunity to compete. Shirlington's own negligence is the only reason that it cannot compete for this contract.

### C. Permanently Enjoining The Procurement Would Not Serve The Public Interest

Requiring the Government to resolicit the transportation contract would unjustifiably interfere with the procurement process. As other courts have recognized, there is:

> a strong public interest in avoiding disruptions in procurements, and for withholding judicial interjection, unless it clearly appears that the case calls for an overriding public interest in having the agencies follow the regulations which control government contracting.

Kinnett Dairies, Inc. v Farrow, 580 F.2d 1260, 1270-71 (5th Cir. 1978) (citing Hayes International Corp. v McLucas, 509 F2d 247, 258 (5th Cir. 1975)). Given the strong public interest in avoiding unnecessary judicial intervention in the contracting process, and given the Government's evidence that this procurement was conducted fairly and reasonably, ordering the Government to re-solicit the transportation contract would not serve the public interest.

Additionally, ordering the Government to resolicit the contract would unfairly prejudice each of the other offerors that timely delivered their proposals to the correct address. See Hospital Klean of Texas, Inc. v. United States, 65 Fed. Cl. 618 (2005) (holding that agency improperly accepted untimely proposal).

**D. The Balance Of Harms Favors The Government**

The balance of harms in this case favors the Government, because ordering reprocurement would result in a significant expenditure of Government funds and resources and would unnecessarily intrude upon the contracting officer's discretion, and inappropriately reward Shirlington by extending its existing contract in the face of its negligent failure to deliver its proposal to the proper location in accordance with the solicitation.

In attempting to justify injunctive relief, Shirlington argues that DHS is currently receiving services under its existing contract with Shirlington that are substantively similar to those sought in the solicitation. Pl. Br. at 38. This contention is patently wrong. As set forth above, the Agency-wide transportation solicitation is significantly broader in scope and complexity than Shirlington's existing Headquarters transportation contract. AR251. Therefore, exercising an option under Shirlington's existing contract would not meet the needs the Agency has identified for consolidating its procurement of transportation services, including the needs for efficiency, cost savings, and heightened security. Id.

## CONCLUSION

For the foregoing reasons, the defendant respectfully requests that the Court deny Shirlington's request for injunctive relief and grant the Government's motion to dismiss, or, in the alternative, that the Court grant the Government's motion for judgment upon the administrative record.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

OF COUNSEL:

ROSE J. ANDERSON
Attorney Advisor
General Law Division
United States Department of
Homeland Security
Washington, DC 20528

s/ Kenneth D. Woodrow
KENNETH D. WOODROW
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, NW
Washington, DC 20530
Phone: (202) 353-0513
Fax: (202) 514-7976

May 15, 2007

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 15th day of May, 2007, a copy of the foregoing "DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Kenneth D. Woodrow