**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
***Bid Protest***

| | |
|---|---|
| SHIRLINGTON LIMOUSINE & TRANSPORTATION, INC., Plaintiff, | |
| v. | No. 07-220C<br>Judge Braden |
| THE UNITED STATES, Defendant. | |

**PLAINTIFF'S REPLY AND OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

David J. Taylor
SPRIGGS & HOLLINGSWORTH
1350 I Street, NW, Ninth Floor
Washington, D.C. 20005
Ph: (202) 898-5800
Fax: (202) 682-1639

*Counsel of Record for Plaintiff*
*Shirlington Limousine & Transportation, Inc.*

May 18, 2007

OF COUNSEL:

William J. Spriggs
Katherine A. Schultz
SPRIGGS & HOLLINGSWORTH

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. ARGUMENT ..... 2

A. Shirlington has Standing to Challenge the Terms of the Solicitation ..... 2

1. Shirlington is a Prospective Offeror ..... 3

2. Shirlington has a Direct Economic Interest ..... 5

3. DHS' Errors Prejudiced Shirlington ..... 6

B. The Agency's Decision Not to Set Aside the Solicitation for HUBZone Small Businesses was Unlawful ..... 7

C. DHS Erred in Failing to Accept Shirlington's Proposal as Timely Filed ..... 10

D. DHS Acted in Bad Faith ..... 14

III. CONCLUSION ..... 16

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

AABLE Tank Servs., Inc., No. B-273010,
1996 WL 655549 (Comp. Gen. Nov. 12, 1996) .... 10

*Baltimore Gas & Elec. Co. v. United States*,
133 F.Supp. 2d 721 (D. Md. 2001) .... 5

*Banknote Corp. of Am., Inc. v. United States*,
365 F.3d 1345 (Fed. Cir. 2004) .... 2, 3

*Bannum, Inc. v. United States*,
404 F.3d 1346 (Fed. Cir. 2005) .... 6

*Blue Dot Energy Co., Inc. v. United States*,
179 Fed. App'x 40 (Fed. Cir. 2006) .... 7

*Cal. Marine Cleaning, Inc. v. United States*,
42 Fed. Cl. 281 (1998) .... 11

*Cubic Def. Sys., Inc. v. United States*,
45 Fed. Cl. 239 (1999) .... 5

*Fed. Data Corp. v. United States*,
911 F.2d 699 (Fed. Cir. 1993) .... 5

*Galen Med. Assocs., Inc. v. United States*,
369 F.3d 1324 (Fed. Cir. 2004) .... 6

*Hosp. Klean of Texas, Inc. v. United States*,
65 Fed. Cl. 618 (2005) .... 10

*Impresa Construziono Geom. Domenico Garufi v. United States*,
238 F.3d 1324 (Fed. Cir. 2001) .... 5, 6

JT Constr. Co., Inc., No. B-254257,
1993 WL 505803 (Comp. Gen. Dec. 6, 1993) .... 7

*MCI Telecomm. Corp. v. United States*,
878 F.2d 362 (Fed. Cir. 1989) .... 3, 5

*McRae Indus., Inc. v. United States*,
53 Fed. Cl. 177 (2002) .... 4

*Mgmt. Solutions & Sys., Inc., v. United States*,
75 Fed. Cl. 820 (2007) ........ 2, 6

*MVM, Inc. v. United States*,
46 Fed. Cl. 126 (2000) ........ 5

*OTI Am., Inc. v. United States*,
73 Fed. Cl. 758 (2006) ........ 6

*Petchum, Inc. v. United States*,
99 F.Supp. 2d 50 (D.D.C. 2000) ........ 7

*Rex Serv. Corp. v. United States*,
448 F.3d 1305 (Fed. Cir. 2006) ........ 5

*Statistica, Inc. v. Christopher*,
102 F.3d 1577 (Fed. Cir. 1996) ........ 6

SWR, Inc., No. B-294266,
2004 WL 2609194 (Comp. Gen. Oct. 6, 2004) ........ 7

*United States v. International Bus. Machines Corp.*,
892 F.2d 1006 (1989) ........ 5

**STATUTES and REGULATIONS**

28 U.S.C. § 1491(b)(1) ........ 2

28 U.S.C. § 1491(b)(4) ........ 2, 16

31 U.S.C. § 3551 ........ 2

5 U.S.C. § 706(2)(A) ........ 2, 16

FAR § 15.208(b)(1)(ii) ........ 11, 12

FAR § 9.104-1 ........ 7

FAR 15.208 ........ 11

**OTHER AUTHORITIES**

Briefing Papers, No. 00-10 (Sept. 2000) ........ 5

National Industrial Security Program Operating Manual,
DoD 5220.22-M, Feb. 28, 2006 ........ 9

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
*Bid Protest*

| | | |
|---|---|---|
| SHIRLINGTON LIMOUSINE & TRANSPORTATION, INC., Plaintiff, | ) | No. 07-220C |
| v. | ) | Judge Braden |
| THE UNITED STATES, Defendant. | ) | |

**PLAINTIFF'S REPLY AND OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Shirlington Limousine & Transportation, Inc. ("Shirlington" or "Plaintiff"), respectfully files this Reply in support of its April 30, 2007 Motion for Judgment on the Administrative Record and for Declaratory and Injunctive Relief, and Opposition to the May 15, 2007 Motion to Dismiss or, in the Alternative, for Judgment Upon the Administrative Record filed by the United States.

## I. INTRODUCTION

It bears repeating that this is a case of first impression at the Court of Federal Claims. However, the facts in the Administrative Record ("AR") and the Parties' briefs unerringly show that the Department of Homeland Security ("DHS") acted illegally when it attempted to push Shirlington out of its existing contract.

First, DHS acted unlawfully when it chose not to set-aside Solicitation Number HSHQDC-07-R-00009 (the "Solicitation") for competition among Historically Underutilized Business Zone Small Business Concerns ("HUBZone SBCs" or "HUBZone" businesses). In

addition to this blatant violation of the bedrock principles of federal procurement law, the Government also erred when it refused to accept the proposal Shirlington did submit (to be in the running for the broader small business award, if its HUBZone protest were denied) as properly filed. Finally, the Government simply cannot explain or justify DHS' behavior as anything other than a breach of the implied duty of good faith and fair dealing that it owed to Shirlington.

Standing alone, any one of these violations would render DHS' behavior "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4). An agency's action is not in accordance with the law when it is unreasonable. "Unreasonableness" includes failing to explain a proper rationale in the AR and failing to conduct adequate market research for the HUBZone set-aside. DHS' failures render the entire procurement to date unreasonable, which is itself a violation of relevant principles of procurement law.

## II. ARGUMENT

### A. Shirlington has Standing to Challenge the Terms of the Solicitation

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), this Court has jurisdiction in bid protest actions brought by an "interested party" objecting to a solicitation or to a proposed award or actual award of a contract. 28 U.S.C. § 1491(b)(1). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" to be synonymous with "interested party" as defined by the Competition in Contracting Act, 31 U.S.C. § 3551. *See Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004); *Mgmt. Solutions & Sys., Inc., v. United States*, 75 Fed. Cl. 820, 825 (2007).

The Court applies a two-part test to determine whether a protester is an "interested party." First, the protester must be an "actual or **prospective** bidder." *Id.* (emphasis added).

Second, the protester must establish that it possesses the requisite "direct economic interest." *Id.* As a prospective offeror who filed a timely pre-award bid protest, Shirlington qualifies as an interested party.[1]

### 1. Shirlington is a Prospective Offeror

In a pre-award bid protest, in which the plaintiff challenges the terms of a solicitation itself, there is no requirement that a protester submit a bid or offer to be considered an "interested party." Shirlington, one of the incumbent HUBZone contractors for these services, instead secured its status as a "prospective offeror" by filing a timely protest of the terms of the Solicitation.[2] The Government suggests that the holding in *MCI Telecomm. Corp. v. United States*, 878 F.2d 362 (Fed. Cir. 1989) is to the contrary. Govt. Br. at 26. This suggestion, however, is incorrect.

*MCI* actually supports Shirlington's position as an interested party. In *MCI*, the protester sought to establish that it had the requisite interested party status as a prospective bidder or offeror. The court presented the question of the case as: "whether a would-be protester wishing to bring about a resolicitation on which it says it intends to bid has the necessary status, even though it failed to either bid in response to the original solicitation or to protest before the close of the proposal period for the original solicitation." *MCI* at 364. This implies that interested party status as a prospective bidder or offeror can be secured by either (1) filing a bid, or (2)

[1] DHS raised this issue several times during the protests underlying this action. However, GAO twice summarily denied the agency's Motion to Dismiss on these same grounds. (AR Tab 24 at 535; AR Tab 28 at 553.)

[2] The fact that Shirlington also, after filing its protest well before the bid closing date, also then submitted a proposal under the Solicitation was an act of prudence to protect it against being totally out of the running in the event its HUBZone set-aside protest was not sustained. This was in no way related to its status as an interested party in its pre-award protest of the Solicitation, a fact continuously lost on counsel for the defendant.

filing a protest before the close of the solicitation, as Shirlington did in this matter. The U.S. Court of Federal Claims has also accepted this legal interpretation of the term "prospective bidder." *McRae Indus., Inc. v. United States*, 53 Fed. Cl. 177, 180 (2002) (stating "[t]herefore, because McRae decided not to submit a bid for this contract or protest the RFP requirements prior to the close of bidding, McRae is not a 'prospective bidder' and does not have standing to challenge the award.").

Accepting the Government's interpretation of "prospective bidder" would essentially nullify the term's meaning because it would require all contractors to be actual offerors to preserve their interested party status in any pre-award protest. This would be a very hollow rule indeed because it would require a contractor to waste both time and material resources preparing a proposal that it knows has a high likelihood of being rejected under a solicitation which it is pointing out in its protest is flawed. The very essence of a pre-award protest is to put the government on notice that something about its solicitation is wrong; protesters are not allowed to "sit on their rights," but must point out to the government the error of its ways, either before the closing date, or, at the very latest, prior to award of a contract.

By way of illustration, under the government's theory of the rule, if a HUBZone contractor were to file a pre-award protest regarding a solicitation set-aside for Service-disabled veteran-owned small businesses, the contractor would still be required to file a proposal, despite the fact that it is automatically ineligible to compete under its terms. Obviously, this would be an irrational result and contrary to the "interested party" doctrine.

It is undisputed that Shirlington filed its initial protest of the Solicitation on December 7, 2006. (AR Tab 2 at 11.) Proposals were due on December 19, 2006. (AR Tab 9 at 224.) Thus,

having filed a timely pre-award protest, Shirlington is considered a prospective bidder.[3]

### 2. Shirlington has a Direct Economic Interest

It is also unnecessary that Shirlington submit a proposal to have an economic interest in the outcome of the procurement. *Impresa Construziono Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001). The facts of our case are distinguishable from *Fed. Data Corp. v. United States*, relied upon by the Government. 911 F.2d 699, 703 (Fed. Cir. 1993). There it was decided that a bidder who withdrew from a procurement lacked an economic interest. *Id.* In this case, should the competition be properly set-aside for HUBZone SBCs, the incumbent HUBZone contractor will submit an offer and potentially receive one or more contract awards, thereby preserving its very economic existence. Absent the error being corrected, it will lose its livelihood. There cannot be a more direct economic interest than that. Our case is also distinguishable from cases where a successful protest results in an award to another party. *See e.g., MCI*, 878 F.2d 362; *United States v. International Bus. Machines Corp.*, 892 F.2d 1006 (1989).

---

[3] To be sure, the Federal Circuit has also held that a protester who failed to submit a bid or file a timely bid protest at the Court of Federal Claims lacks standing. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006). However, *Rex* involved a protest of the solicitation terms filed at the Court of Federal Claims post-award, which is considered untimely as objections to solicitation terms or patent improprieties or ambiguities generally must be brought, at the latest, before contract award. Briefing Papers, No. 00-10 at 7 (Sept. 2000), citing *MVM, Inc. v. United States*, 46 Fed. Cl. 126, 130 (2000); *Cubic Def. Sys., Inc. v. United States*, 45 Fed. Cl. 239, 252 (1999). In contrast, Shirlington's protest at the Court of Federal Claims was timely, even though it was filed after the Solicitation's closing date, because it was filed before a contract was awarded. Further, by filing a timely protest at GAO, before the closing date, Shirlington had put the government on notice of defects in the Solicitation, and its filing should be considered to "relate back" to the pre-closing filing it made. *Baltimore Gas & Elec. Co. v. United States*, 133 F.Supp. 2d 721, 730 (D. Md. 2001). In that case the court noted that, if a court filing is made and a GAO filing exists at the same time, GAO will automatically dismiss, and the court correctly stated that the rules do not require the filing in two fora at the same time.

Shirlington's economic interest stems from the fact that if the protest is successful, the government will be obligated to rebid the contract, and thus Shirlington could compete for the contract again. *Impresa*, 238 F.3d at 1334. "Under these circumstances, [Shirlington] has a 'substantial chance' of receiving the award and an economic interest and has standing to challenge the award." *Id.* (citation omitted).

### 3. DHS' Errors Prejudiced Shirlington

The final qualification for standing requires that Shirlington show that DHS' alleged errors caused it "prejudice." *Mgmt. Solutions & Sys., Inc.*, 75 Fed. Cl. at 825. Prejudice is a question of fact and Shirlington "must show that there was a 'substantial chance' [sic] it would have received the contract award but for [that] error . . ." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005) (citations omitted); *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1331 (Fed. Cir. 2004) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)); *see also OTI Am., Inc. v. United States*, 73 Fed. Cl. 758, 767 (2006).

The question of prejudice may turn on the type of relief sought by the parties. *Mgmt. Solutions & Sys., Inc.*, 75 Fed. Cl. at 825. DHS' failure to comply with the legal requirements governing the conduct of this Solicitation has denied Shirlington the opportunity to compete for this procurement. Accordingly, Shirlington has asked this Court to order cancellation of the Solicitation and an Order compelling DHS to issue a new solicitation set aside for HUBZone businesses. Thus, considering the fact that Shirlington may compete under any reissued solicitation, and that Shirlington is one of the incumbents on the existing DHS transportation contracts, Shirlington had a more than "substantial chance" of winning this procurement but for DHS' improper decision not to set-aside the Solicitation and its failure to accept Shirlington's proposal. Accordingly, Shirlington has been prejudiced by DHS' actions, its economic interest is directly harmed, and it has standing to bring this suit.

**B. The Agency's Decision Not to Set Aside the Solicitation for HUBZone Small Businesses was Unlawful**

At the "rule of two" stage, *i.e.*, when a contracting officer is determining whether she can expect to receive offers from two or more HUBZone businesses, a contracting officer's decision not to set aside a procurement must be reasonable. SWR, Inc., No. B-294266, 2004 WL 2609194 (Comp. Gen. Oct. 6, 2004). The Government asserts that the contracting officer performed a "responsibility determination" as part of her analysis of whether DHS could expect to receive two such offers. Govt. Br. at 34. While the decision a contracting officer must make about a potential offeror's responsibility in deciding whether to set aside a procurement is not the same as a responsibility determination under FAR § 9.104-1, this determination must be reasonable and will be set-aside if an abuse of discretion is shown. *Blue Dot Energy Co., Inc. v. United States*, 179 Fed. App'x 40, 46 (Fed. Cir. 2006); *Petchum, Inc. v. United States*, 99 F.Supp. 2d 50, 58 (D.D.C. 2000); JT Constr. Co., Inc., No. B-254257, 1993 WL 505803, at *4 (Comp. Gen. Dec. 6, 1993). DHS' analysis of the potential offerors was such an abuse of discretion.

The Government's argument that it was proper to rely so heavily upon the results of the June 2006 Request for Information ("RFI") in its analysis of potential offerors is incorrect. (AR Tab 12 at 259.) Most importantly, responses to the RFI were not mandatory. In fact, Shirlington, as one of the incumbent contractors, was told by DHS contracting personnel that it need not respond to the RFI because DHS was already aware that Shirlington was a potential HUBZone offeror. (AR Tab 13 at 276.) Had they accepted DHS' invitation and not responded, DHS would now be arguing that it had received expressions of interest from one less HUBZone company. At a minimum, this shows that the results of the June 2006 RFI were incomplete and therefore would be an unreasonable basis for an evaluation of potential offerors. The

Government's statement that Shirlington need not apply could also be viewed as further evidence of its bad faith in the attempt to displace Shirlington as an incumbent contractor.

In addition, the Administrative Record offers very little information regarding the capability packages submitted by the eleven RFI responders. (AR Tab 4 at 26.) Potential contractors were asked to submit capability packages responding to six core criteria: (a) core services, including NAICS codes; (b) key personnel; (c) corporate experience; (d) type of business; (e) current facility security clearance level for overnight parking of vehicles and buses; and (f) drivers with suitability determinations. (AR Tab 3 at 25.) However, the only information in the Administrative Record reflecting DHS' analysis of these packages indicates a very cursory and superficial review of the offerors' capabilities. (AR Tab 4 at 26.) In fact, the summary chart provided by DHS indicates that DHS merely analyzed each corporation's location, business size, and facilities. *Id.* The Administrative Record provides little-to-no information about their abilities to provide key personnel, their corporate experience, and their driver's credentials. DHS states that it conducted additional research about the RFI responders, but the Administrative Record is devoid of any evidence of this research, except for the broad conclusions offered by Ms. Correa and Mr. Boshears, who stated that of the four HUBZone responders, one was found to be an incumbent DHS transportation contractor; the second had submitted a marginal proposal during prior DHS procurements; the third had limited experience with these types of services; and the fourth was determined not to be a HUBZone business. (AR Tab 10 at 247; AR Tab 11 at 251.) Importantly, there were over twenty other HUBZone companies listed in the Central Contractor Register ("CCR") in the relevant NAICS code at the time and DHS made no attempt to find out about them, much less their capabilities. This is insufficient evidence to conclude that DHS had conducted a reasonable examination of the potential HUBZone offerors.

Further, the Government also incorrectly relied upon these June 2006 responses to determine a contractor's ability to provide a DISCO certified facility, a requirement that was added long after offerors were required to supply their capability packages in response to the RFI. In fact, it was not publically announced that the contractor would be required to provide a DISCO cleared facility until DHS issued the October 10, 2006 Amendment to the RFI. (AR Tab 5 at 27.) Like the original RFI, the Amended RFI did not require a response, and in fact, specifically stated "A response to this RFI is NOT required or expected." *Id.* By the time the Amended RFI was published, however, the Commodity Counsel had already held multiple meetings to review the results of the RFI and decide upon a strategy for acquisition. Govt. Br. at 5 (citing AR Tab 11 at 250). Thus, DHS prematurely reviewed the potential offerors' capability to meet a contract requirement before that requirement was even publically included as part of the procurement.[4]

Overall, DHS' analysis of the June 2006 RFI responders' capabilities was premature. An offeror should be permitted the opportunity to muster its resources in response to a Solicitation. There are many ways in which HUBZone offerors could have geared up to meet the requirements of the Solicitation. For example, an offeror could have entered into a teaming agreement with another HUBZone company not included in the NAICs code specified for this procurement, but which had the requested security capabilities. Or, as Shirlington did, a

---

[4] Further, a contractor or prospective contractor cannot apply for a DISCO Facility Clearance (FCL) on its own. A DISCO Facility Clearance (FCL) "is an administrative determination that a company is eligible for access to classified information or award of a classified contract." National Industrial Security Program Operating Manual, DoD 5220.22-M, Feb. 28, 2006, § 2-1-1 at 2-100; 2-102. Rather, a government contracting activity (GCA) may sponsor an uncleared company for an FCL. *Id.* A "[c]ontract award may be made prior to the issuance of an FCL. In those cases, the contractor will be processed for an FCL at the appropriate level and must meet eligibility requirements for access to classified information." *Id.* at 2-100. Thus, it was also

HUBZone offeror could make arrangement to meet all of the requirements of the contract at the time of award, rather than the due date for responses to the RFI.

Public policy and the public interest mandate that a contracting officer be required to conduct a thorough, thoughtful and reasonable assessment when considering the "rule of two." If qualified HUBZone SBCs exist, they must be given the opportunity to compete for contracts. DHS' determination that it could not expect to receive offers from two or more HUBZone businesses was based upon insufficient and incorrect information and therefore was done in violation of federal procurement law and regulation.

**C. DHS Erred in Failing to Accept Shirlington's Proposal as Timely Filed**

Contrary to DHS' arguments, Shirlington's proposal should be accepted under both the case law and statutory exceptions to the filing requirements of the FAR. First, DHS fails to address Shirlington's arguments under the case law exception. As laid out in the opening brief, however, DHS was in fact the paramount cause of the late submission and, more importantly, consideration of the late proposal will not compromise the integrity of the competitive procurement process. *Hosp. Klean of Texas, Inc. v. United States*, 65 Fed. Cl. 618, 622 (2005). Shirlington's bid was delivered to the 7th and D Street bid room before the bid submission deadline – *i.e.* the bid room located in the same building occupied by the DHS Office of Procurement Operations Headquarters and staff and where all the submitted bids were eventually delivered. (*See* AR 620, 630.) Thus, DHS' continued refusal to accept Shirlington's bid, which still remains in the 7th and D Street bid room, contravenes "the intent and spirit of the competitive system." AABLE Tank Servs., Inc., No. B-273010, 1996 WL 655549, at *3 (Comp. Gen. Nov. 12, 1996).

---

premature for DHS to determine the contractors' security capabilities before the time of the award.

Second, DHS clearly misunderstands Shirlington's argument regarding the statutory exception and fails to address its principle point. FAR § 15.208(b)(1)(ii) allows a "late" bid to be considered if (i) it is received before award is made; (ii) acceptance of the bid would not unduly delay the acquisition; and (iii) there is acceptable evidence to establish that the bid was received at the *government installation* designated for receipt and was under the government's control prior to the time for receipt. Considering an award has yet to be made for this acquisition and will not be made until the resolution of this litigation, parts (i) and (ii) of the exception are thus satisfied. It is with regard to Shirlington's arguments addressing part (iii) that DHS is confused.

DHS alleges that "Shirlington distorts *dicta* in *California Marine* to support its argument that FAR 15.208 does not require that the contractor submit its bid to the designated Government installation prior to the bid deadline." Govt. Br. at 25. Shirlington has never made such an argument, especially considering that the exception provided by FAR 15.208 requires the contractor to establish that the bid was received at the government installation prior to the bid deadline.

Shirlington's argument is that the exception applies on these facts because the bid was received at the 7th and D Street bid office, which is part of the designated *government installation*, prior to the bid deadline. Pl. Br. at 31-32. In *Cal. Marine Cleaning, Inc. v. United States*, 42 Fed. Cl. 281, 298 (1998), the court explained that this exception addresses bids that have not been received at the designated office prior to the deadline because, if they had, then they would not be "late" and would not need an exception. Therefore, the focus is on whether the bid was "received at the *government installation* prior to bid opening, *i.e.*, anywhere on the government installation other than the designated office." *Id.* (emphasis in original).

DHS simply mis-quotes Shirlington's argument when it states that Shirlington "impl[ies] that the "designated office" here is the 7th and D location and the "government installation" is the 245 Murray Lane location at the Anacostia Naval Station." Govt. Br. at 25. Shirlington has repeatedly recognized that the "designated office" is the 245 Murray Lane location, while arguing that the 7th and D Street location is part of the "government installation."[5] Although Shirlington laid out significant evidence on this point in its opening brief, the testimony of Frank Rumph in his May 1, 2007 deposition confirms the validity of this argument. Rumph concedes that one hundred percent of his work and that most of the DHS procurement work is done at the 7th and D Street location. (AR 620-22.) Further, when asked if he "routinely receive[s] mail [to the 7th and D Street location] that's addressed to 245 Murray Lane," he said "yes." (AR 626.) In fact, DHS Procurement Operations does not even have an office at 245 Murray Lane. (AR 630.) Rather, everything "DHS related" that is sent to 245 Murray Lane is delivered back to the 7th and D Street location. *See id.* Thus the evidence demonstrates that, at a minimum, these two locations – 245 Murray Lane and the 7th and D Street location – were part of the same *government installation* and this provision of the statutory exception was clearly satisfied.

To the extent DHS argues Shirlington fails to meet the requirements of the statutory exception because the bid has never been "received at the Government office designated in the solicitation," Shirlington notes that it has done everything possible to meet that requirement and DHS has made technical compliance impossible. The latter provisions of the exception require the bid to be "under the Government's control prior to the time set for receipt of offers." FAR § 15.208(b)(1)(ii). Shirlington complied with this portion of the exception when it relinquished control over the proposal to the 7th and D Street Bid Office before the deadline and received a

---

[5] Pl. Br. at 32 ("Here, the *designated office* would be the 245 Murray Lane location, where as the

written receipt from a government employee who stated that it was the right place to submit the proposal. (AR Tab 34 at 563; AR 609; Memorandum of Points and Authorities in Support of Plaintiff's Motion for Leave to Supplement the Administrative Record with Additional Discovery, Att. A (April 18, 2007 declaration of L. Pearce at ¶6).) Upon learning that its bid was not received to the designated office, Shirlington contacted the bid room and Mr. Campbell assured Shirlington that its proposal would be delivered to DHS. Since that point, Shirlington has repeatedly requested that DHS retrieve the proposal from the bid room located in the same building as the entire DHS Procurement Operations, but DHS refuses to do so. (AR Tab 23 at 530; AR Tab 26 at 547-48.)

By refusing to retrieve the proposal, DHS is attempting to have it both ways. It cannot refuse to retrieve the proposal that is *in the government's control*, while maintaining its argument that Shirlington has never delivered the proposal to the designated office. Even more egregious is DHS' argument before this Court that Shirlington has not met the statutory exception because it has never delivered its bid the designated office, while neglecting to acknowledge that any attempt by Shirlington to retrieve and remove its bid from the government's control will void its entire argument. DHS is simply tying Shirlington's hands on this point by making it impossible for Shirlington to comply with the technical requirement *and* still maintain the integrity of its bid and the procurement process.

Thus the evidence demonstrates Shirlington has met both the statutory and the case law exception to the FAR filing requirements. DHS' arguments to the contrary are both unsupported by the record and disingenuous for the afore-mentioned reasons DHS should be ordered to accept

---

*government installation* includes the 7th and D Street Bid Office.").

the timely filed proposal and evaluate it along with the others for possible award of a contract under the small business competition.

### D. DHS Acted in Bad Faith

DHS has violated the implied covenant of good faith and fair dealing under the existing contract, and in the attempt to enter into a new contract to the exclusion of Shirlington, in at least the following ways:

1. It commenced a new procurement strategy as a result of Congressional urging following the Hearings on the Shirlington Limousine contract in May and June of 2006. (Compl. at ¶¶ 65, 67-8.)

2. In July, 2006, it issued a "sources sought" RFI, going out of its way to emphasize that responses were not required, only later to argue that there were few HUBZone responses to this RFI. (AR Tab 3 at 21; AR Tab 10 at 247; AR Tab 11 at 251.)

3. It even told Shirlington that it "need not respond" as DHS "already knew about Shirlington," which would have reduced the number of HUBZone responders if Shirlington had not in fact responded anyway. (AR Tab 13 at 276.)

4. It enlarged the parameters of the solicitation and made the conscious decision not to set aside for HUBZone SBCs, without engaging in the relevant market research that would have shown that there were over twenty HUBZone companies in the relevant NAICS code, many of them "capable" of performing its transportation requirements. (AR Tab 2 at 19-20; AR Tab 14 at 283, 286-290.)

5. It tried to coerce Shirlington into continuing its operations without a contract, only reluctantly finally agreeing to enter into the exercise of an Option, in October, 2006, and that only for nine months instead of the normal one year. (Compl. at ¶ 69.)

6. Upon received a letter from Congresswoman Louise Slaughter as a result of the exercise of that option, demanding that the Shirlington contract be "revoked," DHS capitulated to the Congresswoman's demands and took all steps it could to see that Shirlington did not get a follow-on contract. (Compl. at ¶¶ 70-72.)

7. It did this by issuing this Solicitation in November, calculatingly not set aside for HUBzone competition as required by law and as it had done for these very services in the past. (AR Tab 6 at 29.)

8. It prevailed upon the Office of Small and Disadvantaged Business Utilization ("OSDBU") to "sign off" on the failure to set aside for HUBZone SBCs, which the OSDBU knew, or should have known, as not proper due to the paucity of

market research which was in fact done. (AR Tab 10 at 247.) Valid market research, as pointed out in plaintiff's brief and by the SBA's comments of Lara Hudson at the GAO would have left the OSDBU no choice but to stand its ground and insist upon a HUBZone set-aside. (AR Tab 14 at 283-84.)

9. It tried to confuse the potential offerors by providing conflicting delivery addresses in the Solicitation and then later changing the delivery address of the proposals. (AR Tab 6 at 29, 42, 66; AR Tab 9 at 225.)

10. It added provisions which it knew, or at least hoped, would not allow HUBZone companies like Shirlington to continue to participate, such as the secure DISCO facility requirement, and the requirement that the sedans now be owned by the contractor, whereas in the past they were owned by the government. (AR Tab 5 at 27; AR Tab 3 at 22.)

11. It misled the relevant Congressional committees into thinking that it would be cost effective to make these changes, when in fact they will cost the government much more than the existing contracting regime.

12. After Shirlington timely submitted its proposal under the small business contract solicitation, having also timely protested the terms of the solicitation at GAO, the government refused to accept that proposal, delivered to its contacting headquarters Bid Room at 7th and D streets, NW, two floors below where the entire DHS contracting operation is housed, and, despite repeated entreaties, adamantly to this day refuses to accept that proposal. (AR Tab 23 at 530; AR Tab 26 at 547-48.)

13. It avoided phone calls from Shirlington seeking guidance on how to proceed with the delivery of the proposal, up to and including the morning proposals were due. (Mot. Att. A (April 18, 2007 declaration of L. Pearce at ¶ 5.))

14. In deposition testimony designed to elicit information on instructions given to Shirlington and/or other potential or actual offerors, its agent had testimonial amnesia, remembering little (and certainly no details) of events which transpired only a few months ago. (AR at 615-658.)

15. In short, it has systematically attempted to "get rid of" Shirlington, under both its exiting and any new contracts, as a direct result of improper political pressure. (Compl. at ¶¶ 57-75.)

While the burden is very high in allegations of bad faith, and counsel is aware of the "well-nigh irrefragable proof" theorem, Plaintiff submits that it is well-nigh impossible to get "smoking gun" proof in cases such as this, and that the Court can and should infer from the

confluence of timing and known facts the obvious but missing facts sufficient to demonstrate bad faith in this particular case.

## III. CONCLUSION

As demonstrated above, Shirlington has standing to pursue these claims before the U.S. Court of Federal Claims. Further, DHS' error in deciding not to set aside the Solicitation for competition among HUBZone small business concerns should be rectified. If the Court agrees with Plaintiff that the Solicitation should have been set aside, then that will obviate the need to consider Count II (failure to accept the proposal on the alternative solicitation) and Count III (breach of the implied duty of good faith and fair dealing). If, however, the Court should conclude that the government acted within the law and reasonably in failing to set-aside this procurement for HUBZone SBCs, then its failure to accept Shirlington's proposal as timely filed and its capitulation to political pressure, which have significantly harmed Shirlington, will have to be addressed. Each of the violations of procurement law detailed in Shirlington's filings render DHS' actions "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4).

Accordingly, Shirlington respectfully requests that the Court grant Shirlington's Motion for Judgment on the Administrative Record and for Declaratory and Injunctive Relief and deny the Government's Motion to Dismiss, or in the Alternative, for Judgment Upon the Administrative Record.

Respectfully submitted,

David J. Taylor
SPRIGGS & HOLLINGSWORTH
1350 I Street, NW, Ninth Floor
Washington, D.C. 20005
Ph: (202) 898-5800
Fax: (202) 682-1639

Mr. Taylor's Direct Dial
(202) 898-5838

davidtaylor@spriggs.com

*Counsel of Record for Plaintiff*
*Shirlington Limousine & Transportation, Inc.*

May 18, 2007

OF COUNSEL:

William J. Spriggs
Katherine A. Schultz
SPRIGGS & HOLLINGSWORTH

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of May, 2007, a copy of the foregoing "Plaintiff's Reply and Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Judgment on the Administrative Record" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

David J. Taylor