# In the United States Court of Federal Claims

No. 07-220C
Filed: June 27, 2007
**TO BE PUBLISHED**[*]

| | |
|---|---|
| SHIRLINGTON LIMOUSINE & TRANSPORTATION, INC., Plaintiff, | Bid Protest; |
| v. | HUBZone Act, 15 U.S.C. § 657a, 48 C.F.R. § 19.1305; |
| THE UNITED STATES, Defendant. | Late Bid, 48 C.F.R. §§ 15.208(a), (b); Motion to Dismiss, RCFC 12(b)(1); Standing. |

**David J. Taylor,** Spriggs & Hollingsworth, Washington, D.C., counsel for Plaintiff.

**Kenneth D. Woodrow**, United States Department of Justice, Civil Division, Washington, D.C., counsel for Defendant.

**Rose J. Anderson**, United States Department of Homeland Security, General Law Division, Washington, D.C., of Counsel.

**MEMORANDUM OPINION AND FINAL ORDER**

**BRADEN,** ***Judge***.

## I. FACTUAL BACKGROUND AND PROTESTS AT THE GOVERNMENT ACCOUNTABILITY OFFICE.[1]

On October 25, 2005, the United States Department of Homeland Security ("DHS") awarded Plaintiff Contract No. HSHQDC-05-00036 ("Contract") as a set-aside, pursuant to the Historically

---

[*] On June 27, 2007, a pre-publication draft of the Memorandum Opinion and Final Order was provided to the parties under seal, with instructions to propose any redactions, but no redactions were proposed.

[1] The facts herein recited were derived from the April 17, 2007 Administrative Record and Supplements thereto ("AR 1-662") and the May 23, 2007 oral argument ("TR 1-87").

Underutilized Business Zone ("HUBZone") Act, 15 U.S.C. § 657a.[2] *See* AR at 423-31. Under the Contract, Plaintiff provides and operates shuttle buses that transport DHS employees between the agency's offices and operates sedans, leased by DHS, to transport managers and senior executives. *Id.* The term of the Contract was for one year with four one-year options, but Plaintiff and DHS later modified the option periods. *Id.* Currently, Plaintiff is performing, pursuant to a nine-month option period, ending on July 26, 2007. *Id.*

In May 2006, DHS initiated a comprehensive analysis of the agency's transportation requirements. *See* AR at 249 (Jan. 8, 2007 Aff. of Soraya Correa, Director of DHS Office of Procurement Operations). Thereafter, DHS's Chief Administrative Officer concluded that DHS could cut costs and improve services, if it used a "strategic sourcing process"[3] to acquire transportation services. *Id.* at 249-50. In response, DHS formed a Commodity Council, comprised of program and acquisition representatives from each of the agency's organizational units. *Id.* The Commodity Council's mission was to consolidate and refine DHS's requirements and develop an acquisition strategy, considering: historical data, *i.e.*, existing contracts and results of previous competitive actions; market surveys; and the expertise of Council members. *Id.* at 249.

On June 23, 2006, the Contracting Officer responsible for the consolidated transportation procurement issued a Request for Information ("RFI") to ascertain interest in providing a DHS-wide transportation services contract. *See* AR at 21, 250. The RFI solicited "interested parties willing and capable of providing for DHS and component transportation needs of daily scheduled shuttle bus/van services over fixed routes, unscheduled group bus/van transportation, and VIP transport via executive sedan, to include provision of all labor and equipment." *Id.* at 21. All interested firms were invited to submit a capability package, including: 1) core services, utilizing North American Industrial Classification Codes ("NAICS") codes; 2) key personnel; 3) corporate experience and a listing of existing or previous contracts for similar types of services; 4) type of business; 5) current

---

[2] In 1997, Congress enacted the HUBZone Act, 15 U.S.C. § 657a (1994 & Supp. V 1999), to "provide Federal contracting assistance for qualified small business concerns located in historically underutilized business zones, in an effort to increase employment opportunities, investment, and economic development in those areas." 48 C.F.R. § 19.1301(b) (2000). The United States Small Business Association ("SBA") is responsible for certifying qualified HUBZone small business concerns. *Id.* § 19.1303(a). Once HUBZone certified and listed on the SBA's List of Qualified HUBZone Small Business Concerns, a firm is eligible for HUBZone preferences, either through set-asides, sole source awards, or price evaluation preferences. *Id.* §§ 19.1303(b), 19.1305-07.

[3] The Office of Management and Budget requires that all civilian agencies implement strategic sourcing initiatives to improve federal procurement practices. *See* AR at 1. The Director of DHS's Office of Procurement Operations represented that "[t]he strategic sourcing process has been successfully used at DHS for several commercial commodities and services it currently uses (e.g., handguns, express mail services, copiers, acquisition and program management support services, etc)." *Id.* at 249.

facility security clearance level for overnight parking of vehicles and buses; 6) principals and drivers with suitability determinations; and 7) handicapped/wheelchair accessible shuttle buses. *Id.* at 21-25. The RFI informed potential offerors that: "The determination as to whether or not it is practicable or feasible to use contractor proposed storage space or a particular type of storage space at a particular location shall be made by the Department of Homeland Security after considering the nature of program demands and special requirements at that location." *Id.* at 23. DHS, however, discouraged Plaintiff from responding to the RFI, representing to Plaintiff that DHS already was aware of Plaintiff's interest in the proposed procurement. *See* AR at 276 (Jan. 18, 2007 Decl. of Lucretia Pearce, Plaintiff's Chief Operating Officer); *see also id.* at 283 (SBA Jan. 22, 2007 Comments).

In September 2006, the Commodity Council and the Contracting Officer announced the following acquisition strategy: 1) DHS executive sedan service would be consolidated into a single contract to provide on-call transportation and courier services for authorized DHS executives; 2) DHS would award two separate contracts for shuttle bus services; 3) contractors would provide all of the vehicles, including shuttle buses and executive sedans; and 4) contractors would be responsible for providing secure storage of the vehicles. *See* AR at 250.

Because of the increased scope of the proposed procurement, the Director of DHS's Office of Small and Disadvantaged Business Utilization ("OSDBU") consulted with the Director of DHS's Office of Procurement Operations ("OPO") to ascertain whether the procurements could be restricted to fewer contracts.[4] *See* AR at 251 (Jan. 8, 2007 Aff. of Soraya Correa, Director of OPO); *see also id.* at 246 (Jan. 8, 2007 Aff. of Kevin Boshears, Director of OSDBU). Four of the eleven firms that responded to the June 23, 2006 RFI claimed that they were HUBZone firms. *Id.* at 247, 251. The Director of OSDBU and the Director of OPO, however, determined that: one firm previously submitted a marginal proposal that could not be considered for award for a previous DHS transportation contract; a second firm's experience was limited to providing shuttle bus services as a subcontractor to commercial organizations; and a third firm was not HUBZone certified. *Id.* at 251. Based on the information provided by each of the RFI responders and research conducted through the Consolidated Contractor Registration ("CCR")[5] and SBA databases, they determined that only Plaintiff had performed a contract that was similar to the proposed solicitation. *Id.* at 247, 251.

---

[4] Under the proposed solicitation, DHS's transportation services would be provided by three contractors, rather than seven utilized under the existing Contract. *See* TR at 61.

[5] The CCR is a database for searching all small businesses. *See* Central Contractor Registration, *available* at http://www.ccr.gov; *see also* 48 C.F.R. 13.102 ("Contracting officers should use the Central Contractor Registration database (see Subpart 4.11) at http://www.ccr.gov as their primary sources of vendor information."). According to the SBA, the CCR and the Dynamic Small Business Search are "important sources for conducting market research on SBCs [small business concerns]. Although the CCR website was created primarily for the U.S. Department of Defense, COs from other agencies use CCR and now the Dynamic Small Business Search as part of their market research when determining whether to set-aside an acquisition for SBCs." AR at 283.

Moreover, only one of the eleven responding firms, a Section 8(a) small business[6] (as opposed to a HUBZone business), owned a facility with a security clearance from the Defense Industrial Security Clearance Office ("DISCO") and could provide the services needed. *Id.* at 247, 257.

Accordingly, the Director of OSDBU and the Director of OPO concluded that "conducting this procurement under a HUBZone sole source or competitive set-aside presented a high degree of risk of the government not receiving adequate proposals." AR at 251; *see also id.* at 247. Moreover, the procurement "would be too difficult and too expensive for a HUBZone company to fulfill," due to the increase in the scope and number of security requirements. *Id.* at 252; *see also id.* at 247. Nevertheless, the Director of OSDBU and the Director of OPO decided that small businesses were interested in the procurement and could fulfill the requirements. *Id.* at 252. On October 6, 2006, the Director of OPO convened a meeting of senior executives involved with the procurement and each concurred with the decision to set aside the procurement for small businesses. *Id.* at 252.

On October 10, 2006, DHS amended the RFI to inform potential offerors that the contract "will require that all interested parties have a Defense Industrial Security Clearance Office ("DISCO") cleared Contractor Owned facility at time of award" and "[a]ll Contractor principals and operations personnel are required to obtain a Security Clearance." AR at 27.

On November 20, 2006, DHS posted Solicitation HSHQDC-07-R-00009 for DHS-wide transportation services contract ("Solicitation") on the FedBizOps website. *See* AR at 29.

The Solicitation included a Standard Form 1449, designating in Box 15 the delivery address:

> Department of Homeland Security
> Office of Procurement Ops. (DO)
> 245 Murray Lane
> Building 410
> Washington[,] DC 20528

AR at 29.

In the Section entitled "Instructions To Offerors," the Solicitation instructed:

> **Offers shall be received by December 12, 2006, 2:00 pm Eastern Standard Time (EST)**. Offers shall be submitted in a sealed envelope only to the Contract Specialist, at the address below.

---

[6] Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a), authorizes the SBA to enter into procurement contracts with other federal agencies and to subcontract performance of these contracts to socially and economically disadvantaged small businesses. *See* Pub. L. No. 85-536, § 8(a), 72 Stat. 384, 389 (1958) (codified as amended at 15 U.S.C. § 637(a) (1988)). This is different than the HUBZone program.

> Submissions must show the name and address of the Offeror. Mr. Frank Rumph's phone number is 202-447-5588.
>
> Frank Rumph, Contract Specialist
> OPO Headquarters Procurement Division
> 7th & D Street, SW
> Washington, DC 20024

AR at 66 (emphasis in original).

The section of the Solicitation entitled, "Contract Administration Data," provided the names of the Contracting Officer and Contract Specialists, with the following address underneath each name:

> Office of Procurement Operations
> 7th and D
> 245 Murray Lane, SW
> Bldg. 410
> Washington, DC 20528.

AR at 42.

The Solicitation also provided offerors with the opportunity to submit questions:

> Questions concerning this [Solicitation] must be sent in writing via email to the address listed below:
>
> DHS.WideTransportation@dhs.gov
>
> **Any requests for additional information or explanations concerning this document must be received no later than (10:00 a.m. eastern standard time) on November 28, 2006.**

AR at 66 (emphasis in original).

In addition, the Solicitation provided that "[a]ll Managers and Operational personnel performing under the resulting contract(s) will be required to meet the security requirements identified in Attachment 6 at the time of full performance." AR at 38.

On November 28, 2006, DHS issued Solicitation Amendment 0001, regarding the pre-proposal conference and incorporating applicable Department of Labor wage determination for the Solicitation. *See* AR at 169.

On December 1, 2006, DHS held a pre-proposal conference "to provide potential offerors with the background of the requirement and the strategic source initiative, address information that potential offerors would need to know regarding the preparation of their proposals and provide an overview of the necessary security requirements." AR at 3. Plaintiff's representatives attended the pre-proposal conference. *Id*; *see also id.* at 527 (Jan. 9, 2007 letter from Plaintiff's counsel to GAO and DHS counsel). Any questions that arose after the pre-proposal conference were to be submitted by December 5, 2006 at 10 a.m. EST. *Id.* at 3.

On December 4, 2006, DHS issued Solicitation Amendment 0002, providing slides from the pre-proposal conference and answers to questions submitted by prospective offerors, and informing offerors that a subsequent amendment would be issued to address additional questions. *See* AR at 2, 193.

On December 7, 2006, Plaintiff filed a protest with the United States Government Accountability Office ("GAO"), alleging that the Solicitation violated the terms of the HUBZone Act, 15 U.S.C. § 657a (2004), and FAR § 19.1305 (2006), by failing to restrict competition to HUBZone small business concerns and because the facility requirements were unduly restrictive. *See* AR at 11.

On December 8, 2006, DHS issued Solicitation Amendment 0003:

> **1. Question:** Regarding solicitation. The SF 1449, 15. states "Deliver to Department of Homeland Security Office of Procurement ops (DO), 245 Murray Lane, Building 410, Washington DC 20528. @ page 38 the delivery address is 7th and D Street, SW. Please clarify.
>
> **Government Response: Change the delivery address @ page 38 to read:**
>
> Department of Homeland Security Office of Procurement Operations, 245 Murray Lane, Building 410, Washington DC 20528. ATTN Frank Rumph.

AR 225 (emphasis in original).[7]

---

[7] DHS uses the 245 Murray Lane location as the delivery address for procurements. *See* AR at 628-29 (May 1, 2007 Dep. of Frank Rumph, DHS Contract Specialist). DHS uses the 245 Murray Lane location, on the Anacostia Naval Station, to x-ray and screen incoming packages for security purposes, before they are delivered by courier to the Office of Procurement Operations Headquarters at 7th and D Streets. *Id.* at 630-31. Only three of the more than 15,000 procurement actions conducted by DHS in the past three years were delivered to the GSA bid room at 7th and D Streets. *Id.* at 560-61 (OPO Data Call). Plaintiff's Chief Operating Officer, however, insisted that:

> For the past three years, as the incumbent contractor, [Plaintiff] has understood that the Murray Lane address and the 7th and D Streets, SW address, are, for all intents

In addition, Solicitation Amendment 0003 extended the deadline to December 19, 2006, 10:00 a.m. EST. *See* AR at 224. On December 19, 2006, at "approximately 8:30 a[.]m[.], [the Contract Specialist stated he] received two phone calls from prospective offerors requesting directions to the proposal delivery address . . . [he] responded by stating that the location was located on the Anacostia Naval Station." *Id.* at 559 (Feb. 15, 2007 Aff. of Frank Rumph, DHS Contract Specialist).

Around 9:46 a.m. on December 19, 2006, Plaintiff's Chief Operating Officer hand-delivered Plaintiff's proposal to Bid Room 1065, located within the General Services Administration ("GSA") Building, at 7th and D Streets, identified by a sign at the entrance labeled "HSPD-12 Contractor Processing Center."[8] *See* AR at 566, 568; *see also id.* at 609 (Jan. 18, 2007 Decl. of Lucretia Pearce, Plaintiff's Chief Operating Officer).[9] The GSA bid room is located in the same building as DHS's Office of Procurement Operations Headquarters, but in a different office, on a different floor. *Id.* at 566. Plaintiff's Chief Operating Officer represented that she advised a government employee that she was "delivering bids for the Homeland Security Transportation Contract," at which time the government employee registered the proposal and handed her a "bid receipt" that included: the DHS Solicitation number; a December 19, 2006, 9:46 a.m. date/time stamp; and the government employee's signature. *Id.* at 563, 609.

---

> and purposes, synonymous. . . . [Plaintiff] has delivered and received documents labeled 245 Murray Lane, Bld. 410 at the 7th and D Streets, SW address for the past three years . . . Since that time, all documents that read 245 Murray Lane, including monthly invoices and procurement modifications, as well as contract renewal documents, have been hand delivered to the 7th and D Streets, SW.

*Id.* at 609-10.

[8] Plaintiff's Chief Operating Officer represented that this is the location where Plaintiff delivered the proposal for the existing Contract, even though that proposal had a different address, *i.e.*, 745 Murray Drive [now Lane]. *See* AR at 609-10.

[9] Plaintiff's Chief Operating Officer represented that in 2004 she was informed by the "Contracting Officer's Technical Representative ("COTR") . . . that Murray Drive (later changed to Murray Lane) is 7th and D Streets, SW." *See* AR at 609. Plaintiff's Chief Executive Officer represented that the security guards at 7th and D Streets "confirmed that responses to Solicitations and proposals that list 245 Murray Lane are routinely signed in and delivered to the HSPD-12 Bid Room at the 7th and D Streets, SW address." *Id.* at 613. The GSA Contracting Officer that date/time stamped Plaintiff's proposal represented: "I do know that the GSA Bid Room routinely receives proposals for DHS and that had a customer approached me while I was present in the Bid Room, I would have accepted the customer and assisted them in any way possible." *Id.* at 557 (Jan. 1, 2007 Decl. of Aliza Brown).

By 10:30 a.m. on December 19, 2006, DHS had received nine proposals responding to the Solicitation that timely were delivered to the correct address. *See* TR at 41.

On January 8, 2007, DHS responded to Plaintiff's GAO protest challenging Plaintiff's standing on the grounds that Plaintiff did not submit a proposal in response to the Solicitation. *See* AR at 255-56.

On January 9, 2007, Plaintiff's Chief Executive Officer and Chief Operating Officer returned to the GSA bid room and discovered that the proposal was still there. *See* AR at 610 (Jan. 18, 2007 Decl. of Lucretia Pearce, Plaintiff's Chief Operating Officer). They spoke with the Chief of GSA's Operations Branch Procurement Division who assured them that the proposal would be delivered to DHS and that the GSA bid room had made the mistake. *Id.* at 610-11. After learning that DHS's January 8, 2007 GAO report represented that Plaintiff never submitted a proposal, on January 10, 2007, Plaintiff's counsel sent a letter to DHS confirming that Plaintiff "hand delivered its proposal to DHS on December 19, 2006, at 9:46 a.m." *Id.* at 529-30. On January 10, 2007, the Contracting Officer went to the GSA bid room, located at 7th and D Streets, and learned from the Chief of GSA's Operations Branch Procurement Division that Plaintiff's proposal was submitted there, but the Contracting Officer left Plaintiff's proposal in the GSA bid room. *Id.* at 506 (DHS's Jan. 11, 2007 Motion to Dismiss).

On January 10, 2007, Plaintiff's Chief Operating Officer contacted the Chief of GSA's Operations Branch Procurement Division and was advised that Plaintiff's proposal was delivered to the wrong location and must be picked up. *Id.* at 611 (Jan. 18, 2007 Decl. of Lucretia Pearce, Plaintiff's Chief Operating Officer).

On January 11, 2007, DHS's counsel renewed a Motion to Dismiss Plaintiff's GAO protest for lack of jurisdiction and presented evidence that Plaintiff submitted the proposal to a location other than the one specified in the Solicitation. *See* AR at 506. On January 19, 2007, Plaintiff filed a second protest, challenging DHS's rejection of the proposal as late. *See* AR at 539-49.

On February 8, 2007, GAO denied DHS's Motion to Dismiss. *See* AR at 534 (e-mail from GAO counsel to DHS counsel stating: "GAO will dismiss a protest when no element of that protest need be considered on the merits. I see some merit to this protest, and so I will not grant the agency's motion to dismiss.").

On January 22, 2007, SBA filed a Comment in response to DHS's Report:

> Based upon our analysis of the facts, we believe that the [Solicitation], issued as a small business set aside, should have been set aside for HUBZone businesses and the protest should be sustained. . . . The evidence that is contained in the Agency report clearly shows that two or more HUBZone business concerns were interested in performing the requirement. . . . DHS . . . argues that the HUBZone SBCs that responded were not capable of performing on the contract due to lack of a DISCO

> clearance; however DHS fails to provide the quantitative data to support its findings. . . . The information upon which DHS basis[sic] its conclusion not to set aside for HUBZone is inadequate and appears to be limited to the eleven SBCs that responded to the RFI despite the existence of thirty-three SBCs in the CCR database. Furthermore, a decision as to responsibility (capability) is decided by SBA and is based on the information the concerns submit in their offers, not in response to an RFI or based on information contained in an unidentified database. Additionally, DHS does not provide evidence of how it ascertained that the firms could not meet the requirement by time of award.

AR at 278, 283-84.

Nevertheless, on March 13, 2007, GAO denied Plaintiff's December 7, 2006 protest on the grounds that: DHS's decision not to set aside the procurement for HUBZone businesses was reasonable, because there was not a reasonable expectation that offers would be received from two or more HUBZone businesses; and the Solicitation was not unduly restrictive, because the record established that the security requirements were reasonably designed to meet DHS's needs. *See* AR at 433-42. On March 30, 2007, GAO denied Plaintiff's January 19, 2007 protest on the grounds that the Government did not cause Plaintiff's proposal to be late and the proposal was not received at the Government installation designated for receipt prior to the submission deadline. *Id.* at 598-602.

## II. PROCEDURAL HISTORY IN THE UNITED STATES COURT OF FEDERAL CLAIMS.

On April 4, 2007, Plaintiff filed a Complaint in the United States Court of Federal Claims, together with a Motion for a Temporary Restraining Order, a Motion for a Preliminary Injunction, and a Memorandum of Points and Authorities in Support. Count I of the Complaint alleges that "DHS's decision not to set aside the Solicitation for HUBZone small business concerns was arbitrary, capricious, and not in accordance with the law and regulation." Compl. ¶ 13. Count II alleges that DHS erred in failing to accept Plaintiff's proposal, pursuant to the case law and FAR § 15.208(b)(1)(ii) exceptions for late proposals. *Id.* ¶¶ 36-56. Count III alleges that "DHS breached the implied duty of good faith and fair dealing in deciding to abrogate the Existing Contract and in conducting its research and analysis of potential HUBZone offerors when drafting the current Solicitation." *Id.* ¶ 58. In addition, the Complaint requests that the court "[d]eclare that the Solicitation should be canceled and reissued as a HUBZone small business set-aside" or else "declare that DHS should be required to accept [Plaintiff's] proposal for the small business contract as timely and properly filed." Compl. at 21 (Prayer for Relief). The Complaint also requests that the court "[p]reliminarily and permanently enjoin DHS from proceeding with an award of the Contract." *Id.*

On April 5, 2007, the court convened a telephone status conference with the parties. On April 6, 2007, Plaintiff filed a Memorandum on Jurisdiction. On April 9, 2007, the Government filed an Unopposed Motion for a Protective Order, that the court granted. On April 12, 2007, the court convened a telephone status conference and issued a Scheduling Order.

On April 17, 2007, the Administrative Record was filed. On April 18, 2007, Plaintiff filed a Motion for Leave to Supplement the Administrative Record, with Expanded Discovery, *e.g.*, the Deposition of Frank Rumph, Contract Specialist. Plaintiff also moved for leave to file a Supplemental Brief to Plaintiff's Motion for Judgment on the Administrative Record, including testimony adduced during the Rumph Deposition. On April 27, 2007, the Government filed: a Response to Plaintiff's April 18, 2007 Motion; a Motion to Strike the April 18, 2007 Declaration of Lucretia Pearce; and a Corrected Motion. On April 30, 2007, the court issued an Order granting Plaintiff's April 18, 2007 Motion for Leave to Supplement the Administrative Record. On the same date, the court issued an Order, denying the Government's Corrected Motion to Strike the Pearce Declaration.

On April 30, 2007, Plaintiff filed a Motion for Judgment on the Administrative Record and Memorandum in Support ("Pl. AR Mot.") and a Motion for Leave to Supplement the Administrative Record with the following documents: January 31, 2007 Additional Comments of Protester in File No. B-299241; January 18, 2007 Declaration of Lucretia Pearce, Plaintiff's Chief Operating Officer; and January 18, 2007 Declaration of Christopher Baker, Plaintiff's Chief Executive Officer. On May 2, 2007, Plaintiff filed a Motion for Leave to Request Documents and an Extension of Time to File Supplemental Brief.

On May 4, 2007, the court convened a telephone status conference and issued an Order, granting Plaintiff's April 30, 2007 Motion for Leave to Supplement the Administrative Record and granting Plaintiff's May 2, 2007 Motion for Leave to Request Documents and Extension of Time to File Supplemental Brief. On May 7, 2007, the Government filed a Supplement to the Administrative Record with two e-mail messages, dated November 28, 2006 and December 5, 2006. On May 9, 2007, Plaintiff also supplemented the Administrative Record with: January 31, 2007 Additional Comments of Protester in File No. B-299241; January 18, 2007 Declaration of Lucretia Pearce, Plaintiff's Chief Operating Officer; and January 18, 2007 Declaration of Christopher Baker, Plaintiff's Chief Executive Officer.

On May 9, 2007, Plaintiff filed a Supplemental Brief to the Motion for Judgment on the Administrative Record ("Pl. AR. Mot. Supp."). Plaintiff also filed a Consent Motion to Supplement the Administrative Record with the May 1, 2007 Deposition of Frank Rumph, which the court granted. On May 14, 2007, Plaintiff filed the Rumph Deposition as a Supplement to the Administrative Record, pages 614-58. On May 15, 2007, the Government filed a Motion to Dismiss or, in the Alternative, for Judgment Upon the Administrative Record and Opposition to Plaintiff's Motion for Judgment Upon the Administrative Record ("Gov't AR Mot."). On May 18, 2007, Plaintiff filed a Reply and Opposition to the Government's Motion to Dismiss or, in the Alternative, for Judgment on the Administrative Record ("Pl. AR Reply"). On May 18, 2007, Plaintiff filed a Motion to Supplement the Administrative Record with the April 18, 2007 Declaration of Lucretia Pearce, Plaintiff's Chief Operating Officer.

On May 23, 2007, the court held oral argument on all pending motions. *See* TR at 1-87. On that occasion, the court granted Plaintiff's May 18, 2007 Motion to Supplement the Administrative

Record and Plaintiff's May 23, 2007 oral Motion for Leave to Supplement the Administrative Record, with the document marked "Sprint cellular services call detail." *Id.*

To date, the Government has not awarded a Contract, pursuant to the November 20, 2006 Solicitation.

## III. DISCUSSION.

### A. Jurisdiction.

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, §§ 12(a), (b), 110 Stat. 3870 (1996), authorizes the United States Court of Federal Claims to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see also Banknote Corp. of Am., Inc.* v. *United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("The [United States] Court of Federal Claims has jurisdiction to review both pre-award and post-award bid protests pursuant to 28 U.S.C. § 1491(b), enacted as part of the Administrative Dispute Resolution Act of 1996[.]").

The Complaint alleges that: DHS violated the HUBZone Act, 15 U.S.C. § 657a, and FAR § 19.1305 by failing to set aside the Solicitation for a HUBZone small business concern; DHS violated FAR § 15.208(b)(1)(ii) by failing to accept Plaintiff's late proposal; and DHS breached the implied duty of good faith and fair dealing by failing to conduct sufficient research and analysis of potential HUBZone offerors when drafting the Solicitation. *See* Compl. ¶¶ 13, 51, 58. These allegations recite a sufficient basis for the court to exercise jurisdiction, pursuant to 28 U.S.C. § 1491(b)(1).

### B. Standing.

As a threshold matter, a protester must establish that it is an "interested party." 28 U.S.C. § 1491(b)(1). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" to be synonymous with "interested party," as defined by the Competition in Contracting Act, 31 U.S.C. § 3551.[10] *See Rex Serv. Corp.* v. *United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citations omitted); *see also Banknote Corp.*, 365 F.3d at 1352 (holding that the United States Court of Federal Claims' jurisdiction under the Tucker Act, as amended, is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract"). Accordingly, the trial court must apply

[10] The term "'interested party,' with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2)(A).

a two-part test to determine whether a protester is an "interested party" *i.e.*, the protestor must show that it was an *actual or prospective bidder* and the protester must have a *direct economic interest* in the procurement. *See Rex Serv. Corp.*, 448 F.3d at 1307 ("[T]o come within the [United States] Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction, [the protester] is required to establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." (citations omitted)) (emphasis added).

As part of the "direct economic interest" requirement, a protestor must show that any alleged errors caused the protestor "prejudice." *See Galen Med. Assocs.* v. *United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("'[T]o prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it.'" (quoting *Data Gen. Corp.* v. *Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (alterations in original)); *see also Myers Investigative & Sec. Servs., Inc.* v. *United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("prejudice (or injury) is a necessary element of standing."). The United States Court of Appeals for the Federal Circuit has advised that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached *before* addressing the merits." *Info. Tech. & Applications Corp.* v. *United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (emphasis added); *see also* Myers, 275 F.3d at 1369 ("standing is a threshold jurisdictional issue[.]" (citations omitted)).

The United States Court of Appeals for the Federal Circuit has held that a protestor can establish prejudice by showing a "substantial chance" that it would have received the award if the error was corrected. *See Bannum, Inc.* v. *United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005) ("To establish prejudice [plaintiff] was required to show that there was a 'substantial chance' it would have received the contract award but for . . . errors in the bid process." (citations omitted)); *see also Statistica, Inc.* v. *Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) ("To establish competitive prejudice, a protestor must demonstrate that but for the alleged error, there was a '*substantial chance*' that [it] would receive an award-that is was within the zone of active consideration." (citations omitted; emphasis and alterations in the original)).

The United States Court of Appeals for the Federal Circuit has held that prejudice depends on the relief sought by the plaintiff:

> In *Impresa* [*Construzioni Geom. Domenico Garufi* v. *United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001),] we considered the standard to be applied where the plaintiff claims that the government was obligated to rebid the contract (as contrasted with a situation in which the plaintiff claims that it should have received the award in the original bid process). [] To have standing, the plaintiff need only establish that it 'could compete for the contract' if the bid process were made competitive. . . . [Plaintiff] *need not* show that it would have received the award in competition with other hypothetical bidders, [but rather] must show that it would have been a qualified bidder.

*Myers*, 275 F.3d at 1370 (emphasis added; citations omitted).

**C. Standard For Decision On A RCFC 12(b)(1) Motion To Dismiss.**

A challenge to the "court's general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion." *Palmer* v. *United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999); *see also* RCFC 12(b)(1) ("Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter [.]").

When considering whether to dismiss an action for lack of subject matter jurisdiction, the court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke* v. *United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). Nonetheless, Plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Reynolds* v. *Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question, it [is] incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction.").

**D. Plaintiff Does Not Have Standing To Seek An Adjudication Of This Bid Protest In The United States Court of Federal Claims.**

**1. As A Matter Of Law, Plaintiff Was Not A "Prospective Offeror."**

The court first examines the contention that the prior GAO filing established Plaintiffs status as a "prospective offeror."

**a. The Parties' Arguments.**

Plaintiff argues that it established prospective offeror status by filing a protest at GAO on December 7, 2006, well before the December 19, 2006 deadline for submission of proposals in response to the November 20, 2006 Solicitation. *See* Pl. AR Reply at 3-4 (citing AR at 11, 224). Plaintiff contends that *MCI Telecomm. Corp.* v. *United States*, 878 F.2d 3652 (Fed. Cir. 1989), stands for the proposition that "interested party status as a prospective bidder or offeror can be secured by either (1) filing a bid, or (2) *filing a protest before the close of the solicitation, as [Plaintiff] did in this matter.*" *Id.* at 3 (citing *MCI Telecomm. Corp.*, 878 F.2d at 362 ("[the question is] whether a would-be protestor wishing to bring about a resolicitation on which it says it intends to bid has the necessary status, even though it failed to *either* bid in response to the original solicitation or to protest before the close of the proposal period for the original solicitation." *Id.* at 364.)) (emphasis added).

At oral argument, the Government emphasized that the United States Court of Appeals for the Federal Circuit's ruling in *Rex Serv. Corp.* is dispositive of the standing issue in this case, because "the opportunity to become a prospective offeror passed with the deadline for receipt of proposals; and . . . *the fact that the plaintiff had timely challenged the solicitation before the GAO*

*was irrelevant*." TR at 47-48 (quoting *Rex Serv. Corp.*, 448 F.3d at 1308) (emphasis added). Since Plaintiff had a choice of forums, Plaintiff must bear the consequences of that choice—in this case, an unsuccessful protest at GAO. *See* TR at 48.

> GOVERNMENT COUNSEL: [Plaintiff] lost before GAO. It now brings this protest, but it does so untimely[,] [b]ecause it cannot qualify as a prospective offeror in this case, because in the interim between bringing that first protest, which was prior to the deadline and now, [it] . . . failed to deliver the proposal to the correct address. . . . It cannot have a proposal under consideration, because that deadline is now past and, therefore, it cannot be a prospective offeror and does not have standing as an interested party.

TR at 48-49.

Plaintiff responds that *Rex Serv. Corp.* is not applicable, because the protest in that case was filed after the award was made. *See* Pl. AR Reply at 5 n.3. In contrast, the protest in this case was timely, because it was filed pre-award. *Id.* Moreover, "by filing a timely protest at GAO, before the closing date, [Plaintiff] had put the government on notice of defects in the Solicitation, and its filing [in the United States Court of Federal Claims] should be considered to 'relate back' to the pre-closing filing it made." *Id.* (quoting *Baltimore Gas & Elec. Co.* v. *United States*, 133 F.Supp. 2d 721, 730 (D. Md. 2001) ("[The Government] argues that ADRA should be read to require that a federal court complaint must be filed prior to the closing of bids, even if the plaintiff is simultaneously pursuing agency-level and GAO protests. However, federal regulations specify that GAO 'will dismiss any protest where the matter involved is the subject of litigation before a court of competent jurisdiction.' . . . Clearly, ADRA did not intend simultaneous protests to proceed in two fora. Thus, [the court] find[s] that [plaintiff's] suit is timely." (citation omitted))).[11]

### b. The Court's Resolution.

In this case, Plaintiff filed a protest at GAO prior to the December 19, 2006 deadline for submission of proposals that was unsuccessful. *See* AR at 433-42. Since Plaintiff chose GAO as the forum of resolution, Plaintiff effectively relinquished the ability to file a timely protest in the United States Court of Federal Claims. *See* 4 C.F.R. § 21.11(b) ("GAO will dismiss any case where the matter involved is the subject of litigation before, or has been decided on the merits by, a court

---

[11] At oral argument, Plaintiff's counsel argued the *Baltimore Gas & Elec. Co.* case is relevant because, it was decided when the United States District Courts had concurrent jurisdiction with the United States Court of Federal Claims over pre-award bid protests. *See* TR at 14.

of competent jurisdiction. GAO may, at the request of a court, issue an advisory opinion on a bid protest issue that is before the court."). Although *Rex Serv. Corp* involved a subcontractor's attempt to bring a *post-award* bid protest in the United States Court of Federal Claims after making no effort to submit a proposal, those facts do not affect the relevant principle that a timely *pre-award* protest submitted to GAO does not confer plaintiff standing to later bring a protest in the United States Court of Federal Claims. As the Federal Circuit has held: "It is not relevant to [plaintiff's] status that it filed a pre-award agency protest[.]" *See Rex Serv. Corp.,* 448 F.3d at 1308. Therefore, as a matter of law, Plaintiff's December 7, 2006 GAO protest does not confer "prospective offeror" status for purposes of standing in the United States Court of Federal Claims.

Accordingly, Plaintiff can only achieve "interested party" status as an "actual offeror." *See Banknote Corp.*, 365 F.3d at 1352 (holding that the United States Court of Federal Claims' jurisdiction under the Tucker Act, as amended, is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract" (citation omitted)).

### 2. As A Matter Of Law, Plaintiff Was Not An "Actual Offeror."

FAR 15.208(a) clearly advises prospective government contractors of their responsibility "for submitting proposals . . . so as to reach the Government office designated in the solicitation by the time specified in the solicitation." 48 C.F.R. § 15.208(a). In this case, the parties do not dispute that Plaintiff's proposal was filed at the wrong location. Plaintiff, however, argues that governing case law and FAR §15.208(b)(1) excuse Plaintiff's failure to comply with the delivery requirements of the Solicitation.

#### a. Governing Case Law.

##### i. The Parties' Arguments.

Plaintiff argues that DHS "was the paramount cause of the late submission and consideration of the late proposal will not compromise the integrity of the competitive procurement process." *See* Pl. AR Mot. at 26 (citing *Hosp. Klean of Texas, Inc.* v. *United States*, 65 Fed. Cl. 618, 623 (2005) ("As GAO explained in *Wyatt and Assocs.*, [Comp. Gen. B-243349, July 1, 1991, 91-2 CPD ¶ 5 at 2] . . .: As a general rule, an offeror has the responsibility of assuring the timely arrival of its proposal at the place designated in the solicitation. However, a hand-carried offer that is received late *may be accepted where improper government action was the paramount cause* for the late delivery, and the integrity of the procurement process would not be compromised by acceptance of the offer." (citations omitted; emphasis added)). In this case, DHS's actions are asserted as the "paramount cause" of the late submission, because: the Solicitation was confusing, with two different addresses listed separately and as one address (AR at 29, 42, 66); the Contract Specialist gave directions to other prospective offerors, without amending the Solicitation in violation of FAR § 52.214-6 (AR at 559); and Plaintiff was assured by government personnel that the proposal properly was submitted (AR at 609-611). *See* Pl. AR Mot. at 26-28; *see also* TR at 29-31. Plaintiff

also asserts that it attempted in good faith to ensure that the proposal properly was filed (including asking government personnel if the 7th and D Street bid room was the proper location prior to, at the time of, and after submission and receiving assurance that the proposal had been timely and properly submitted (AR at 609-611)). *See* Pl. AR Mot. at 28-29 (citing *Hosp. Klean*., 65 Fed. Cl. at 622 ("One of the fundamental principles underlying the rules for the consideration of late bids is that a bidder who has done all it could and should to fulfill its responsibility should not suffer if the bid did not arrive as required because the government failed in its own responsibility, and if that is otherwise consistent with the integrity of the competitive system. We therefore have held that a late hand-carried bid may be considered for award if to do so would not compromise the competitive system and *either* the government's 'affirmative misdirection' made timely delivery impossible, *Select, Inc.*, supra, *or* government mishandling after timely receipt by the agency was the sole or paramount cause for the bid's late receipt at the designated location." (quoting *Palomar Grading & Paving, Inc.*, Comp. Gen. B-274885, Jan. 10, 1997, 97-1 CPD ¶ 16 at 2) (emphasis added)).

The Government responds that it was not the "paramount cause" of Plaintiff's late proposal, because the delivery address was unambiguously set forth in Box 15 of the Solicitation (AR at 443) and the correct address was written on the cover sheet of Plaintiff's proposal (AR at 512). *See* Gov't AR Mot. at 22; *see also* TR 38-40, 79. Moreover, no Government action prevented Plaintiff from calling DHS before the submission deadline to receive more explicit directions for delivering its proposal. *Id.* at 23.

**ii. The Court's Resolution.**

The court has determined that governing "case law" does not apply to this case, because the Government was not the "paramount cause" of Plaintiff's late proposal. In determining whether the "paramount cause" standard is met, the court considers whether "the bidder's reasonable reliance on improper delivery instructions in the solicitation made it *impossible* for the bid to be timely delivered to the bid opening location." *Hosp. Klean*., 65 Fed. Cl. at 624 (citing *Palomar Grading & Paving, Inc.*, Comp, 97-1 CPD ¶ 16 at 3) (emphasis added). This standard is not met where "the offeror or its agent contributed significantly to the late receipt *by not acting reasonably in fulfilling its responsibility* to deliver a hand-carried proposal to the proper place by the proper time, even though late receipt may have been caused in part by erroneous government action." *Hosp. Klean*., 65 Fed. Cl. at 622 (citing *Monthei Mechanical, Inc.,* Comp. Gen. B-216624, Dec. 17, 1984, 84-2 CPD ¶ 675 at 2) (emphasis added); *see also O.S. Systems, Inc.*, Comp. Gen. B-292827, Nov. 17, 2003, 2003 CPD ¶ 211 at 2 (same language).

Although the two different addresses on the Solicitation created ambiguity, the Government remedied this by Solicitation Amendment 0003 that specifically stated: "Change the delivery address @ page 38 to read: Department of Homeland Security Office of Procurement Operations, 245 Murray Lane, Building 410, Washington DC 20528. ATTN Frank Rumph." *See* AR at 225. Amendment 0003 also extended the deadline for submission of proposals to December 19, 2006, at 10:00 a.m. Therefore, Plaintiff was not only on constructive notice of Amendment 0003, but must have actually read it, because Plaintiff knew that the submission deadline had been extended. *Id.*

Moreover, Plaintiff was aware of the proper delivery address, because it was on the cover sheet of Plaintiff's proposal. *Id.* at 512. In addition, the GSA contracting officer in the GSA bid room and any other non-DHS government personnel that Plaintiff's agents may have questioned were under no duty to know or inform Plaintiff that the correct location for submission of proposals for the Solicitation was 245 Murray Lane.[12] Furthermore, any prior use of the GSA bid room for delivery of DHS procurement proposals has no bearing on Plaintiff's responsibility to deliver the proposal at issue in this case to the address designated in the Solicitation. *See Schmid & Kalhert GmBH & Co. KG*, Comp. Gen. B-233467, Feb. 13 1989, 89-1 CPD ¶ 148 at 2 ("We view the protester's reliance on this alleged practice [of forwarding offers from the Center to the designated office] as a risk the protester chose to take; it remained the protester's burden to assure timely delivery of its offer at the specified location.").

Moreover, Plaintiff has failed to explain why it sought no clarification of the delivery instructions by: submitting written questions in response to the Solicitation (AR at 66), asking oral questions at the pre-proposal conference that Plaintiff's agents attended and submitting written questions afterwards (AR at 3); or at least calling the Contracting Officer or the Contract Specialist the morning of the deadline, like several of the prospective offerors (AR at 559).[13]

Accordingly, the court has determined that the record does not evidence "affirmative misdirection" by the Government in this case, or that it was "impossible" for Plaintiff timely to submit the proposal to the correct location. *See Hosp. Klean*., 65 Fed. Cl. at 622-24. Therefore, Plaintiff did not "act reasonably in fulfilling its responsibility." S*ee O.S. Systems, Inc.*, 2003 CPD

---

[12] Plaintiff's Chief Operating Officer represented that she announced to a government employee that she was "delivering bids for the Homeland Security Transportation Contract," at which time the "bid" was registered and a "bid receipt" issued with the DHS Solicitation number, a December 19, 2006, 9:46 a.m. date/time stamp, and the government employee's signature. *See* AR at 563, 609. Plaintiff's Chief Executive Officer represented that the security guards at 7th and D Streets "also confirmed that responses to Solicitations and proposals that list 245 Murray Lane routinely are signed in and delivered to the HSPD-12 Bid Room at the 7th and D Streets, SW address." *Id.* at 613.

[13] Contrary to Plaintiff's contention, FAR § 52.214-6 merely provides that "[o]ral explanations or instructions given before the award of a contract will not be binding. Any information given a prospective bidder concerning a solicitation will be furnished promptly to all other prospective bidders as an amendment to the solicitation, *if* that information is necessary in submitting bids or if the lack of it would be prejudicial to other prospective bidders." 48 C.F.R. § 52.214-6 (emphasis added). Responding to a telephone call from a prospective bidder with the direction that the bid office was located on "Anacostia Naval Station" was not "necessary in submitting bids" or "prejudicial to other prospective bidders," especially because it had nothing to do with the content of the Solicitation and was merely a direction to a location already represented on the Solicitation and clarified by Amendment 0003. *See* AR at 29, 225, 559.

¶ 211 at 2 ("Even conceding that USSOCOM may have complicated delivery of hand-carried proposals by not including more explicit instructions in the RFP and by designating a location with restricted access for receipt of proposals, . . . the record indicates that the main reason that the proposal was received late was because the delivery driver was unfamiliar with the exact address . . . and decided to make another delivery first and then to attempt to find the filing location unaided, rather than seeking advice concerning the address and location of the contracting officer immediately upon entering the facility"); *see also Integrated Support Sys., Inc.*, Comp. Gen. B-283137.2, Sept. 10,1999, 99-2 CPD ¶ 51 at 1 ("[E]ven assuming that the RFP was not as clear as it could have been, given the two 15th Street entrances, the record demonstrates that the protester significantly contributed to the late receipt of its proposal by failing to allow sufficient time to hand-deliver its proposal"). Because the Government was not the "paramount cause" of the late submission, the court does not need to consider the affect that acceptance of the late proposal would have on the competitive procurement process.

**b. Federal Acquisition Regulation § 15.208(b)(1).**

**i. The Parties' Arguments.**

In the alternative, Plaintiff argues that DHS should accept the proposal under FAR § 15.208(b)(1)(ii):

> (b)(1) Any proposal, modification, or revision, that is received at the designated Government office after the exact time specified for receipt of proposals is "late" and will not be considered unless it is received before award is made, *the contracting officer determines that accepting the late proposal would not unduly delay the acquisition*; and–
>
> (i) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or
>
> (ii) *There is acceptable evidence to establish that it was received at the Government installation designated for receipt of proposals and was under the Government's control prior to the time set for receipt of proposals;* or
>
> (iii) It was the only proposal received.

48 C.F.R. § 15.208(b)(1) (emphasis added).

Plaintiff asserts that the requirements of this exception were satisfied, because: Plaintiff's proposal was received by the Government at the 7th and D Street bid room before any award was made, therefore, accepting Plaintiff's proposal would not unduly delay the procurement process; and

the proposal has been under the Government's control since the time of submission. *See* Pl. AR Mot. at 31. Plaintiff further contends that the proposal "was received at the Government installation designated for receipt of proposals," because the 7th and D Street bid room and the 245 Murray Lane location are part of the same government installation. *Id.* at 31-32 (quoting 48 C.F.R. § 15.208(b)(1); *see also Cal. Marine Cleaning, Inc.* v. *United States*, 42 Fed. Cl. 281, 298 n.33 (1998) ("The distinction between 'designated office' and 'government installation' is thus critical, though regrettably the terms are not defined in the FAR. A careful review of past GAO decisions and the Federal Register preamble to the March 1997 amendment to the late bid rule reveals the following distinction: 'designated office' refers to the particular location designated for the receipt of bids in the IFB; 'government installation' refers to the entire government facility in which the 'designated office' is located.")). Plaintiff argues that "[a]lthough the 7th and D Street Bid Office is not physically located in the immediate vicinity of the 245 Murray Lane location, the evidence demonstrates that for all intents and purposes these locations were considered one in the same." *Id.* at 32. Specifically, Plaintiff asserts that the locations are often referred to as one location, because proposals for DHS procurement solicitations are mailed to the 245 Murray Lane location, but are then sent to the Office of Procurement Operations at 7th and D Streets, where DHS's procurement work is actually conducted. *Id.* at 32 (citing AR at 609-10); *see also* Pl. AR Reply at 12 (citing AR at 620-22, 626, 630). Plaintiff also asserts that proposals and other responses to DHS solicitations that list the 245 Murray Lane location routinely are received at the GSA bid room at 7th and D Streets, including Plaintiff's proposal for the existing Contract. *See* Pl. AR Mot. at 32-33 (citing AR at 557, 608-610, 613).

The Government responds that Plaintiff's proposal was not "'received at the Government office designated in the solicitation,'" because Plaintiff did not submit the proposal to the office designated in the Solicitation at 245 Murray Lane before the deadline and subsequently has made no effort to do so. *See* Gov't AR Mot. at 23 (quoting 48 C.F.R. § 15.208(a) and citing Compl. ¶ 41). The Government also contends that Plaintiff's proposal was not "'received at the Government installation designated for receipt of proposals,'" because the GSA bid room at 7th and D Streets was not within or even near the government facility at the Anacostia Naval Station at 245 Murray Lane. *Id.* at 25-26 (quoting 48 C.F.R. § 15.208(b)(1)(ii) and citing *Cal. Marine Cleaning, Inc.,* 42 Fed. Cl. 281 at 298 n.33); *see also* TR at 70-75. Therefore, the Government concludes that "[f]ollowing [Plaintiff's] argument to its logical conclusion, any Government office would be obligated to accept proposals, regardless of whether the office was designated as the delivery location in the [S]olicitation." *See* Gov't AR Mot. at 26.

**ii. The Court's Resolution.**

The court has also determined that FAR § 15.208(b)(1) is inapplicable in this case.

FAR § 15.208(b)(1)(ii)'s requirements that a proposal must be received at the "Government installation designated for receipt" prior to the deadline and remain under the "Government's control," until it is forwarded to the "designated Government office," suggest that the regulation was designed as a "mail room" exception. *See* 48 C.F.R. § 15.208(b)(1)(ii). For this reason, the

exception only makes sense if a proposal was sent from one part of a Government installation to the designated office by a Government agent in the ordinary course of business. *Id.* Because this is not what happened in this case, the exception does not apply. It would be a closer case if GSA had sent the proposal to the "designated Government office" at 245 Murray Lane, however, GSA was under no duty to do so, because the transmission of proposals from the GSA bid office, at 7th and D Streets, to DHS was not part of the ordinary course of business under the Solicitation. Indeed, Plaintiff not only delivered the proposal to the wrong office, but also to the wrong agency. *See* AR at 565-66.

Plaintiff explains that it cannot meet the requirement that the proposal was received at the "designated Government office," because if Plaintiff removed the proposal from the GSA bid room to deliver it to the designated office, it would no longer remain "under the Government's control." *See* Pl. AR Reply at 13; *see also* 48 C.F.R. § 15.208(b)(1)(ii). Plaintiff's dilemma, however, illustrates that FAR § 15.208(b)(1)(ii) is inapplicable to the facts in this case.

Moreover, as matter of law, Plaintiff did not deliver the proposal to the "designated Government installation." *See* 48 C.F.R. § 15.208(b)(1)(ii). In *Cal. Marine Cleaning*, *Inc.*, the United States Court of Federal Claims stated that "'designated office' refers to the particular location designated for the receipt of bids" and "'government installation' refers to the entire government facility in which the 'designated office' is located." 42 Fed. Cl. at 298 n.33. First, contrary to Plaintiff's assertion, the Administrative Record evidences that only three out of more than 15,000 DHS procurement actions in the past three years have involved delivery to the GSA bid room at 7th and D Streets, which undercuts the argument that there was a relationship between the 245 Murray Lane location and GSA bid room. *See* AR at 560-61. Second, Plaintiff argues that the 7th and D Streets and 245 Murray Lane locations are part of the same "government installation," because DHS procurement work is conducted at both and the addresses are often listed together. *See* Pl. AR Mot. at 32-33 (citing AR at 557, 608-610, 613). The problem is that Plaintiff's proposal was not delivered to the DHS Office of Procurement Operations Headquarters, located at 7th and D Streets, but to the GSA bid room at 7th and D Streets—a different agency, office, and floor. *See* AR at 565-66. Third, an installation is defined as "a military camp or base." *See* WEBSTER'S II NEW COLLEGE DICTIONARY 574 (3d ed. 2005).[14] This definition, in the context of the FAR language, can only mean that a "government installation" is a single geographical location. For example, 245 Murray Lane, Building 410 is the same government installation as the Anacostia Naval Station. *Cf. Cal. Marine Cleaning, Inc.,* 42 Fed. Cl. 281 at 298 n.33 ("Thus, in the present case, Building 291 was the designated office for delivery of hand-carried bids, whereas the 'government installation' was the

---

[14] When the text of a statute does not provide a definition of a particular term or phrase, the court may consult dictionaries for interpretive guidance. *See Rumsfeld* v. *United Tech. Corp.*, 315 F.3d 1361, 1369-70 (Fed. Cir. 2003) ("We initially turn, therefore, to standard dictionary definitions and other pertinent regulations.") (citing *Estate of Cowart* v. *Nickols Drilling Co.*, 505 U.S. 469, 477 (1992) (relying on dictionary definition and related statutory provisions to interpret the text of a statute)); *see also Wis. Dep't of Revenue* v. *William Wrigley, Jr., Co.*, 505 U.S. 214, 223 (1992) (referring to BLACK'S LAW DICTIONARY and WEBSTER'S THIRD INT'L DICTIONARY to interpret the text of a statute).

San Diego Naval Station."). For these reasons, Plaintiff's proposed definition of "government installation" exceeds reasonable bounds.

Because Plaintiff did not timely submit a proposal, Plaintiff is not an "actual offeror" and cannot establish "interested party" status. Accordingly, Plaintiff does not have standing to bring the claims alleged in the April 4, 2007 Complaint in the United States Court of Federal Claims.

Although Plaintiff may perceive the court's ruling as harsh, the prohibition against late bids "alleviates confusion, ensures equal treatment of all offerors, and prevents one offeror from obtaining a competitive advantage that may accrue where an offeror is permitted to submit a proposal later than the deadline set for all competitors." *PMTech, Inc.*, Comp. Gen. B-291082, Oct. 11, 2002, CPD ¶ 172 at 2; *see also* TR 42-45.

## IV. CONCLUSION.

For the aforementioned reasons, the court hereby grants the Government's May 15, 2007 Motion to Dismiss. The Clerk of the United States Court of Federal Claims is directed to dismiss Plaintiff's April 4, 2007 Complaint.

**IT IS SO ORDERED.**

**s/Susan G. Braden**
**SUSAN G. BRADEN**
**Judge**